BRETT L. TOLMAN, United States Attorney (#8812)
D. LOREN WASHBURN, Assistant United States Attorney (#10993)
MARTY WOELFLE, Trial Attorney (AZ #009363)
Attorneys for the United States of America
185 South State Street, Suite 400
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682

_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 2:07CR00286 TS |
| Plaintiff, | ) | |
| v. | ) | **GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS FOR ALLEGED VIOLATION OF U.S. TREATY OBLIGATIONS** |
| BARON LOMBARDO, et al., | ) | |
| Defendants. | ) | |

_____

The United States of America, by and through counsel undersigned, hereby submits its

memorandum in opposition to defendants' motion to dismiss Counts 1 and 16 through 19 of the

Indictment in this case (Doc. #79).[1]  The defendants claim that the prosecution against them is

precluded by treaties binding on the United States.  However, the treaties cited by the defendants

_____

[1] Defendants Baron Lombardo (Doc. #81), Francisco Lombardo (Doc. #84), Tina Hill (Doc. #85), Count Lombardo (Doc. #88) and Henry Bankey (Doc. #90) moved to join in this motion.  Defendant Kimberlie Lombardo has also filed a motion to join (Doc. #110).  However, her motion was untimely without good cause, and she has therefore waived her objections pursuant to Federal Rule of Criminal Procedure 12(e).  United States v. Coppola, 526 F.2d 764, 772-73 (10th Cir. 1975).

do not affect U.S. domestic law, nor confer private rights on individual litigants.  Therefore, the

defendants' motion is without merit, and should be denied.

I.      **APPLICABLE UNITED STATES STATUTES**

      A.      **The General Agreement on Trade in Services**

The General Agreement on Trade in Services ("GATS") was negotiated during the

Uruguay Round of mandated negotiations under the General Agreement on Trade and Tariffs

("GATT")[2] in the early 1990's.  The GATS has three elements: a main text containing general

obligations and disciplines, annexes dealing with rules for specific trade sectors, and individual

countries' specific commitments to provide access to their markets.  The individual countries'

commitments appear in schedules that list the sectors being opened, the extent of market access

being given in those sectors, and any limitations on national treatment.  The United States'

Schedule[3]  included commitments regarding "Recreational, Cultural, & Sporting Services,"

"Entertainment Services Including Theater, Live Bands and Circus Services" and "Other

Recreational Services (excepting sporting)."  Gambling and betting services are not mentioned in

the United States Schedule.  The GATS, along with other agreements negotiated during the

Uruguay Round, was ratified by Congress, effective December 8, 1994.

---

[2] As a result of the Uruguay Round negotiations, the World Trade Organization (WTO) replaced the GATT as the international organization, but the General Agreement still exists as the WTO's umbrella treaty for trade in goods.

[3] The United States Schedule of Specific Commitments and Supplements thereto, along with other GATS documents discussed in this Response will be provided to the Court in a separate submission ("WTO Document Submission").  These documents, available on line at the WTO web site (www.wto.org), are too voluminous to be attached to this pleading.

B.    **Authorization of the Uruguay Round Agreements**

The Uruguay Round agreements were approved by Congress pursuant to Title 19, United States Code, §§ 3501 - 3624.  Specifically, Title 19, United States Code, § 3511 states "the Congress approves – (1) the trade agreements described in subsection (d) of this section resulting from the Uruguay Round of multilateral trade negotiations . . . and (2) the statement of administrative action proposed to implement the agreements."   The GATS treaty is specifically listed within this statute in subsection (d) at (14).

Congress further defined the relationship between the terms of the GATS and existing federal law at Title 19, United States Code, § 3512(a)(1), which declares "[n]o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect." Subsection 2 states that the Act shall not be construed to "amend or modify any law of the United States . . . or . . . to limit any authority conferred under any law of the United States, including section 2411 of this title."  Finally, the statute states:

No person other than the United States:

(A) shall have any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement, or

(B) may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any State, or any political subdivision of a State on the ground that such action or inaction is inconsistent with such agreement.

Title 19, U.S.C. § 3512(c).

C.    **The Statement of Administrative Action**

The Statement of Administrative Action was submitted to Congress along with the

implementing bill for the Uruguay Round agreements:  The first portion of the Statement

contains a Summary of Provisions and states in pertinent part:

> This Statement describes significant administrative actions proposed to implement the
> Uruguay Round agreements.  In addition, incorporated into this Statement are two other
> statements required under [the Omnibus Trade and Competitiveness Act of 1988]: (1) an
> explanation of how the implementing bill and proposed administrative action will change
> or affect existing law; and (2) a statement setting forth the reasons why the implementing
> bill and proposed administrative action are necessary or appropriate to carry out the
> Uruguay Round agreements.

H.R. Rep. 103-316, H.R. Rep. No. 316, 103rd Cong. 2nd Sess. 1994, 1994 WL 16137731, 1994

U.S.C.C.A.N. 4040 (hereafter Statement).

> The statement of administrative action approved by the Congress under section
> 3511(a) of this title shall be regarded as an authoritative expression by the United
> States concerning the interpretation and application of the Uruguay Round
> Agreements and this Act in any judicial proceeding in which a question arises
> concerning such interpretation or application.

Title 19, U.S.C. § 3512(d).

1.    **United States Sovereignty**

The Statement section devoted to U.S. sovereignty states:

> The WTO will have no power to change U.S. Law.  If there is a conflict between
> U.S. law and any of the Uruguay Round agreements, section 102(a)[4] of the
> implementing bill makes is clear that U.S. law will take precedence . . . Moreover,
> as explained in greater detail in this Statement in connection with the Dispute
> Settlement Understanding, WTO dispute settlement panels will not have any
> power to change U.S. law or order such a change.  Only Congress and the
> Administration can decide whether to implement a WTO panel recommendation
> and, if so, how to implement it.

---

[4] 19 U.S.C. § 3512(a).

Statement, 1994 U.S.C.C.A.N. at  4042.

### 2.    United States Federal Law

Regarding the WTO "Relationship to Federal Law" the Statement says that "[s]ection 102(a)(1) [19 U.S.C. § 3512(a)(1)] clarifies that no provision of a Uruguay Round agreement will be given effect under domestic law if it is inconsistent with federal law, including provisions of federal law enacted or amended by the bill."  Statement, 1994 U.S.C.C.A.N. at 4050.

### 3.    Private Law Suits

The section titled "Private Law Suits" states:

The provision also precludes a private right of action attempting to require, preclude, or modify federal or state action on grounds such as an allegation that the government is required to exercise discretionary authority or general 'public interest' authority under other provisions of law in conformity with the Uruguay Round agreements. . . . Section 102(d) [19 U.S.C. § 3512(d)] makes clear that this Statement is to be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round agreements and the Uruguay Round implementing legislation in any judicial proceeding in which a question on that subject may arise, . . . as regards private rights of action or defenses under or in connection with those agreements.

Statement, 1994 U.S.C.C.A.N. at 4055.

### 4.    Dispute Settlement

In a section concerning dispute settlement, the Statement says the following:

[t]he new WTO dispute settlement system does not give panels any power to order the United States or other countries to change their laws.  If a panel finds that a country has not lived up to its commitments, all a panel may do is recommend that the country begin observing its obligations.  It is then up to the disputing countries to decide how they will settle their differences.  The defending country may choose to make a change in its law.  Or it may decide instead to offer trade 'compensation' – such as lower tariffs.

Statement, 1994 U.S.C.C.A.N. at 4300.

5

5.     **Implementation**

Concerning implementation, the Statement reads as follows:

Reports issued by panels or the Appellate Body under the DSU have no binding effect under the law of the United States and do not represent an expression of U.S. foreign or trade policy. . . . If a report recommends that the United States change federal law to bring it into conformity with a Uruguay Round agreement, it is for Congress to decide whether any such change will be made.

Furthermore, neither federal agencies nor state governments are bound by any finding or recommendation included in such reports.  In particular, panel reports do not provide legal authority for federal agencies to change their regulations or procedures or refuse to enforce particular laws or regulations.
In all cases following a panel report, the DSU leaves to the discretion of the United States any change in federal or state law and the manner in which any such change may be implemented.

Statement, 1994 U.S.C.C.A.N. at 4318.

The House Committee on Ways and Means recommended passage of the Uruguay Round

agreements on October 3, 1994.  In doing so, the Committee stated:

The Uruguay Round Agreements Act incorporates all amendments to existing Federal statutes or provision of new authorities, including authority for Federal agencies to issue regulations, known to be necessary or appropriate to enable full implementation of, and compliance with, U.S. obligations under the agreements.
* * *
Since the Uruguay Round agreements as approved by the Congress, or any subsequent amendments to those agreements, are not self-executing, any dispute settlement findings that a U.S. statute is inconsistent with an agreement also cannot be implemented except by legislation approved by the Congress unless consistent implementation is permissible under the terms of the statute. . . .
Also, there is no private right of action to challenge, under any other law, any action or inaction by the United States or a State or local government on the ground that it is inconsistent with the Uruguay Round agreements.[5]

---

[5] H.R. Rep. 103-826(I), H.R. Rep. No 826(I), 103rd Cong. 2nd Sess., 1994, 1994 WL 548728, pp. 25-26.

## II.    THE DEFENDANTS HAVE NO STANDING TO RAISE ALLEGED VIOLATIONS OF THE GATS OR RULINGS OF ANY WTO BODY IN THIS FORUM

### A.    The GATS is not Self-Executing and Creates no Private Rights

The defendants claim that the prosecution against them is foreclosed by the United States' obligations to comply with the GATS and the rulings of the WTO Appellate Body.  In fact, even if this were true, the defendants have no standing to raise alleged violations of the GATS, as that treaty is not self-executing.  United States v. Thompson, 928 F.2d 1060, 1066 (11th Cir. 1991) ("the treaty in question[6] does not create any privately enforceable rights and therefore is not self-executing.  Because the treaty is not self-executing [the defendant] does not have standing to protest an alleged violation of the treaty.").

Generally, international agreements do not confer private rights.  As the Fourth Circuit Court of Appeals stated, "[i]nternational treaties are not presumed to create rights that are privately enforceable.  Courts will only find a treaty to be self-executing[7] if the document, as a whole, evidences an intent to provide a private right of action.  Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir. 1992); see also Auguste v. Ridge, 395 F.3d 123, 132 (3rd Cir. 2005) ("Treaties that are not self-executing do not create judicially-enforceable rights unless they are first given effect by implementing legislation."); Kwan v. United States, 272 F.3d 1360, 1362 (Fed. Cir. 2001); United States v. Nai Fook Li, 206 F.3d 56, 60-61 (1st Cir. 2000).  The

---

[6] Geneva Convention on the Territorial Sea and Contiguous Zone, 1964 WL 15353.

[7] "(A 'self-executing' international agreement is one that directly accords enforceable rights to persons without the benefit of Congressional implementation.)"  Haitian Refugee Center, Inc. v. Baker, 949 F.2d 1109, 1110 (11th Cir. 1991); see also Cornejo v. County of San Diego, ___ F.3d. ___, No. 05-56202, slip. op. (9th Cir. Sept. 24, 2007).

GATS, as shown by the enabling legislation cited above, is clearly not self-executing. Therefore, the defendants have no standing to claim protection from criminal prosecution under the Treaty.

In addition to the <u>Thompson</u> case discussed above, and the authority cited below in Section IV.A, the United States notes these cases:  <u>Renkel v. United States</u>, 456 F.3d 640, 644 (6th Cir. 2006) ("[A]ny private law suit seeking to enforce the United States' obligations under the Convention must be based on domestic law."); <u>Raffington v. Cangemi</u>, 399 F.3d 900, 903 (8th Cir. 2005) ("[T]he [Convention Against Torture] is a non-self-executing treaty, which means there is no direct right of action for violations of the treaty, only for violation of any domestic law implementing the treaty"); <u>Guayalupo-Moya v. Gonzales</u>, 423 F.3d 121, 136 (2nd Cir. 2005) (Non-self-executing International Covenant on Civil and Political Rights (ICCPR) does not create private rights); <u>Igartua-De La Rosa v. United States</u>, 417 F.3d 145, 150 (1st Cir. 2005) (U.S. citizens in Puerto Rico had no treaty-based right to vote in presidential elections); <u>Al-Fara v. Gonzales</u>, 404 F.3d 733, 743 (3rd Cir. 2005) ("The 1967 Protocol[8] is not self-executing, nor does it confer any rights beyond those granted by implementing legislation"); <u>In re Rath</u>, 402 F.3d 1207, 1209 (Fed. Cir. 2005) ("It is well established that executory treaties [those that are not self-executing] have no direct effect until implemented by domestic law"); <u>United States ex rel. Perez v. Warden, FMC Rochester</u>, 286 F.3d 1059, 1063 (8th Cir. 2002) ("[T]he ICCPR does not bind federal courts because the treaty is not self-executing and Congress has yet to enact implementing legislation"); <u>Hain v. Gibson</u>, 287 F.3d 1224, 1243 (10th Cir. 2002) (ICCPR was

---

[8] 1951 United Nations Convention Relating to the Status of Refugees, 1967 Protocol, 19 U.S.T. 6223, 1968 WL 89568.

not self executing and did not provide a basis for habeas petition); <u>Buell v. Mitchell</u>, 274 F.3d 337, 372 (6th Cir. 2001) ("[A] 'non-self-executing' agreement will not be given effect as law in the absence of necessary authority").  As these numerous cases make clear, non-self-executing international agreements do not create private rights.

### B.    Assertion of Private Rights Under the GATS is Specifically Prohibited By Applicable U.S. Statute

Title 19, United States Code, § 3512(c)(1) states, in pertinent part, that no person other than the United States "may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any State, or any political subdivision of a State on the ground that such action or inaction is inconsistent with such agreement."  The statute further states:

> It is the intention of the Congress through paragraph (1) to occupy the field with respect to any cause of action or defense under or in connection with any of the Uruguay Round Agreements, including by precluding any person other than the United States from bringing any action against any State or political subdivision thereof . . .

19 U.S.C. § 3512(c)(2) (2007).  The defendants claim that the statute applies only to actions against states or their political subdivisions; however, this is not what the statute says.  Congress did not limit its legislative assertion to the litigation of WTO matters in State courts; Congress clearly meant to "occupy the field."  Therefore, the defendants have no standing to raise any matter associated with the WTO or the GATS as a defense to this criminal prosecution.  The Court should not consider any argument that relies on any provision of the GATS or any ruling from any body of the WTO.

III.    **THE WTO LITIGATION: "MEASURES AFFECTING THE CROSS-BORDER SUPPLY OF GAMBLING AND BETTING SERVICES"**

In March of 2003, the government of Antigua & Barbuda, a WTO signatory nation, requested consultation with the United States regarding prohibitions in U.S. law against Internet gambling.[9]  In its Request, Antigua & Barbuda stated:

> It is my Government's understanding that the cumulative impact of the Federal and State measures of the type listed in the Annex to this request is that the supply of gambling and betting services from another WTO Member (such as Antigua and Barbuda) to the United States on a cross-border basis is considered unlawful under United States law.
>
> These measures and their application may, therefore, constitute an infringement of the obligations of the United States of America under the GATS and the Schedule of Specific Commitments by the United States of America annexed to the GATS.  In particular these measures and their application appear to contravene, among other provisions, Articles II, VI, VIII, XI, XVI and XVII of the GATS.

WT/DS285/R, B-1 (Oct. 23, 2007) (a copy is provided in the WTO Document Submission).

The consultation did not resolve the matter, and on June 12, 2003, Antigua & Barbuda requested the Dispute Settlement Body to establish a Panel, which was constituted on July 21, 2003.  The resulting proceedings, which were suspended for a time in 2004 to allow negotiations between the parties, resulted in a final Report in November of 2004.[10]

---

[9]United States - Measures Affecting the Cross-Border Supply of Gambling and Betting Services, WT/DS285/1, S/L/110 March 27, 2003.  A copy is provided in the WTO Document Submission.  According to a story in The Washington Post, the Antigua & Barbuda WTO litigation was instigated by Jay Cohen, after Mr. Cohen was convicted of Wire Wager Act violations (United States v. Cohen, 260 F.3d 68 (2d. Cir. 2001)).  "Against All Odds – Antigua Besting U.S. in Internet Gambling Case at WTO," The Washington Post, August 4, 2006 at D1.  Mr. Cohen is quoted as saying "[i]t kind of helped keep my spirits up" while he was serving his prison sentence.

[10]Report of the Panel, WT/DS285/R, November 10, 2004.  A copy of the Panel Report is included in the WTO Document Submission.

In its Report, the Panel stated that it found that Antigua & Barbuda had met its burden of proving that the United States had committed to open its domestic gambling market to foreign competition, and that by enforcing certain specified state anti-gambling laws[11] and federal laws relating to gambling,[12] the United States failed to comply with its GATS obligations. The Panel also found that, although the United States had demonstrated that the federal laws were designed to protect public morals and public order, they were not "necessary" to do so, and thus were not provisionally justified under the general exceptions to the obligations imposed on WTO member states by the GATS. In addition, the Panel found evidence of discriminatory application of the federal laws in relation to Internet betting on horse racing.

In January of 2005, both sides appealed the findings of the Panel. The matter was referred to the Appellate Body, which issued its Report in April of 2005.[13] The Appellate Body upheld the Panel's finding, on a somewhat different basis.[14] On May 19, 2005, the United States informed the Dispute Settlement Body that it intended to implement the recommendations and rulings in this dispute, and that it would need a reasonable period of time to do so. The response time provided expired on April 3, 2006. At the Dispute Settlement Body meeting of April 21, 2006, the United States explained that it was in compliance with the recommendations and rulings the Body made in this dispute. Antigua did not agree, and sought an additional ruling

---

[11]Those of Colorado, Louisiana, Massachusetts, Minnesota, New Jersey, New York, South Dakota, and Utah.

[12] 18 U.S.C. §§ 1084, 1952, and 1955.

[13] Report of the Appellate Body, WT/DS285/AB/R, April 7, 2005. A copy of the Appellate Body Report is included in the WTO Document Submission.

[14] WTO Summary "US - Gambling (DS285)." A copy of the Summary is included in the WTO Document Submission.

from the Dispute Settlement Body.  On March 30, 2007, a panel of the Dispute Settlement Body

concluded that the United States had not complied with the recommendations and rulings of the

Dispute Settlement Body.  On May 4, 2007, United States Trade Representative John K.

Veroneau issued a press release summarizing how the United States would respond to this

determination:

> The United States is invoking procedure under Article XXI of the General
> Agreement on Trade in Services (GATS) in order to clarify its commitment
> involving 'recreational services,' which was interpreted in the course of WTO
> dispute settlement as including a U.S. commitment to allow Internet gambling
> services.
>
> 'U.S. laws banning interstate gambling have been in place for decades.  Most
> WTO Members have similar laws.  Unfortunately, in the early 1990s, when the
> United States was drafting its international commitments to open its market to
> recreational services, we did not make it clear that these commitments did not
> extend to gambling.  Moreover, back in 1993 no WTO Member could have
> reasonably thought that the United States was agreeing to commitments in direct
> conflict with its own laws,' said Deputy United States Trade Representative John
> K. Veroneau.
>
> 'Neither the United States nor other WTO Members noticed this oversight in the
> drafting of U.S. commitments until Antigua and Barbuda initiated a WTO case
> ten years later.  In its consideration of this matter, the WTO panel acknowledged
> that the United States did not intend to adopt commitments that were inconsistent
> with its own laws.  However, under WTO rules, dispute settlement findings must
> be based on the text of commitments and other international documents, rather
> than the intent of the party.  The United States strongly supports the rules-based
> trading system and accepts the dispute settlement finding.  In light of those
> findings, we will use WTO procedures for clarifying our commitments.'
>                     * * *
> In light of these developments in the WTO dispute, the United States has decided
> to make use of the established WTO procedures to correct its schedule in order to
> reflect the original U.S. intent – that is, to exclude gambling from the scope of the
> U.S. commitments under the GATS.  The GATS provides that when a Member
> modifies its services schedule, other Members who alleged they will be affected
> by this action may make a claim for compensatory adjustment to other areas of
> the GATS Schedule.  However, since no WTO Member either bargained for or
> reasonably could have expected the United States to undertake a commitment on

gambling, there would be very little, if any, basis for such claims.[15]

On July 16, 2007, the Office of the United States Trade Representative issued a request for public comment regarding the negotiations for compensatory adjustments to the U.S. Schedule of Services Commitments under the GATS.[16]  In the portion of the notice titled "Supplementary Information," it states:

> In the course of a WTO dispute resolution proceeding originally filed by Antigua and Barbuda in 2003, the United States' GATS schedule was found to have included a market access commitment covering Internet gambling based outside of the United States.  This finding was a result of imprecision in the drafting of the 1994 U.S. GATS schedule, combined with the application of formal treaty interpretation rules under which a country's intent is not determinative.

Request, 72 FR 38846 (Jul. 16, 2007).  At its meeting on July 24, 2007, the Dispute Settlement Body agreed that the matter had been referred to arbitration, in accordance with Article 22.6 of the Dispute Settlement Understanding.[17]

## IV.    GENERALLY APPLICABLE CASE LAW AND PUBLIC POLICY

As stated by the United States Supreme Court in Breard v. Greene, 523 U.S. 371, 375, 118 S.Ct. 1352, 1354-55, 140 L.Ed.2d 529 (1998):

> First, while we should give respectful consideration to the interpretation of an international treaty by an international court with jurisdiction to interpret such, it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern implementation of the treaty in that State.

---

[15]Veroneau, John K., Statement of Deputy United States Trade Representative John K. Veroneau Regarding U.S. Actions under GATS Article XXI, May 5, 2007, available at http://www.ustr.gov.

[16] 72 FR 38846 (July 16, 2007).

[17] The United States Written Submission regarding the initial arbitration claims of Antigua and Barbuda was provided to the WTO on September 19, 2007.

13

> Second, although treaties are recognized by our Constitution as the supreme law
> of the land, that status is no less true of the provisions of the Constitution itself, to
> which the rules of procedural default apply.  We have held 'that an Act of
> Congress . . . is on a full parity with a treaty, and when a statute that is subsequent
> in time is inconsistent with a treaty, the statute to the extent of the conflict renders
> the treaty null.'

(interior citations omitted); <u>See</u> <u>also</u> <u>Sanchez-Llamas v. Oregon</u>, 126 S.Ct. 2669, 2684, 165

L.Ed.2d 557 (2006).  As the above ruling demonstrates, the terms of the WTO treaties simply do

not bind U.S. domestic courts.

### A.     Rulings of the WTO Appellate Body Do Not Bind U.S. Courts

The United States and its courts are not bound by decisions of the WTO Appellate Body:

> WTO decisions are 'not binding on the United States, much less this court.'
> Further, '[n]o provision of any of the Uruguay Round Agreements . . . nor the
> application of any such provision to any person or circumstance, that is
> inconsistent with any law of the United States shall have effect. 19 U.S.C. §
> 3512(a).  Neither the GATT nor any enabling international agreement outlining
> compliance therewith . . . trumps domestic legislation; if U.S. statutory provisions
> are inconsistent with the GATT or an enabling agreement, it is strictly a matter
> for Congress.

<u>Corus Staal BV v. Dept. of Commerce</u>, 395 F.3d 1343, 1348 (internal citations omitted); <u>see</u> <u>also</u>

<u>Timken Co. v. United States</u>, 354 F.3d 1334, 1344 (Fed. Cir. 2004) ("the decision is not binding

on the United States, much less this Court."); <u>NSK Ltd. v. United States</u>, 358 F.Supp.2d. 1276,

1283-84 (CIT 2005).

### B.     The Charming Betsy Doctrine Cannot Be Applied to the GATS

The <u>Charming Betsy</u> doctrine arose out of the seizure of an American-owned ship sailing

under a Danish flag.  The Supreme Court interpreted an applicable statute in a manner so as to

make the seizure unlawful, avoiding a painful international confrontation with the Danish

Government.  In doing so, the Court said "an Act of Congress ought never be construed to

violate the law of nations if any other possible construction remains."  Murray v. Charming

Betsy, The, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208, 1804 WL 1103, *29 (1804).

This sensible assertion, that U.S. law and international law should be read in harmony

where possible, has spawned a large number of cases in which litigants sought to use a provision

in the "law of nations" to his or her advantage.  However, it has never, ever been applied to

absolutely override a clear statement of Congressional intent.  As stated by the Court of

International Trade:

> When confronted with a conflict between an international obligation and U.S.
> law, it is of course true that an unambiguous statute will prevail over the
> international concern.  Yet, absent express language to the contrary, a statute
> should not be interpreted to conflict with international obligations.

Hyundai Electronics Co. Ltd. v. United States, 53 F.Supp.2d 1334, 1343-44 (CIT 1999); see also

Luigi Bormioli Corp. Inc. v. United States, 304 F.3d 1362, 1368 (Fed. Cir. 2002) ("we think that

the statute must be interpreted to be consistent with GATT obligations, absent contrary

indications in the statutory language or its legislative history.").  As stated in Guaylupo-Moya v.

Gonzales, 423 F.3d 121, 135-36 (2nd Cir. 2005):

> [T]he Charming Betsy canon comes into play only where Congress's intent is
> ambiguous.  If a statute makes plain Congress's intent . . . then Article III courts,
> which can overrule Congressional enactments only when such enactments conflict
> with the Constitution, must enforce the intent of Congress irrespective of whether
> the statute conforms to customary international law.

See also United States v. Yousef, 327 F.3d 56, 92 (2nd Cir. 2003) ("The Charming Betsy canon

comes into play only where Congress's intent is ambiguous.").

Given this rule, the Charming Betsy canon can have no application to U.S. statutes

concerning the GATS and its dispute resolution process.  Congress made its intent crystal clear,

not only in the legislative history, but in the language of the implementing statutes.  This has

been recognized in several cases involving "anti-dumping" provisions adjudicated in the Federal

Circuit and the Court of International Trade.  For example, <u>Corus Staal BV v. Dept. of</u>

<u>Commerce</u>, 395 F.3d 1343 (Fed. Cir. 2005), involved an appeal by a Dutch manufacturer against

findings made by the Department of Commerce.  The Dutch claimed that the Department

unreasonably refused to interpret the statute at issue in a manner consistent with U.S.

international obligations (based on WTO rulings), as required under the <u>Charming Betsy</u>

doctrine.  The Court stated:

> WTO decisions are not binding on the United States, much less this court. . . .
> Neither the GATT nor any enabling international agreement outlining compliance
> therewith . . . trumps domestic legislation: if U.S. statutory provisions are
> inconsistent with the GATT or an enabling agreement, it is strictly a matter for
> Congress. . . . Congress has enacted legislation to deal with the conflict presented
> here. It has authorized the United States Trade Representative, an arm of the
> Executive Branch, in consultation with various congressional and executive
> bodies and agencies, to determine whether or not to implement WTO reports and
> determinations, and, if so implemented, the extent of implementation.

<u>Corus Staal</u>, 395 F.3d at 1348-49 (interior citations omitted): <u>See</u> <u>also</u> <u>Timken Co. v. United</u>

<u>States</u>, 354 F.3d 1334, 1344 (Fed. Cir. 2004); <u>Canadian Lumber Trade Alliance v. United States</u>,

425 F.Supp.2d 1321, 1350 (CIT 2006); <u>NSK Ltd. v. United States</u>, 358 F.Supp.2d 1276, 1283-84

(CIT 2005), <u>aff'd.</u> 162 Fed. Appx. 982 (Fed. Cir. 2006).

    C.    **<u>The Statutes at Issue Serve Dual Functions in Law</u>**
           **<u>Enforcement that Would be Defeated by the Private Rights</u>**
           **<u>Asserted by the Defendants</u>**

The statutes the defendants claim to have been invalidated by the Uruguay Round

agreements were passed as part of omnibus anti-crime legislation designed not only to strengthen

the federal Government's ability to address organized crime, but also to protect the rights of the

several States to determine what types of gambling activities would be allowed and how that

16

activity would be regulated within their jurisdictions.  See United States v. McDonough, 835 F.2d 1103, 1104-05 (5th Cir. 1988) ("The legislative history sets forth a dual purpose – to assist the various states in enforcing their gambling laws and to aid the suppression of organized gambling activities.") (emphasis in original); Martin v. United States, 389 F.2d 895, 897 (5th Cir. 1968); United States v. Corrar, 2007 WL 196862, *8 (N.D. Ga. 2007).

This public policy goal was clearly demonstrated in a letter[18] addressed to the United States Trade Representative and signed by 35 State Attorneys General after the issuance of the WTO Appellate Body ruling.  The letter states:

> After the lower panel's ruling, USTR assured state officials that if the Appellate body upheld the lower panel's ruling on this point, the United States could act to withdraw the gambling sector from the United States' specific GATS commitments.  We urge you to do so, as the cost of withdrawing the sector will only increase as foreign suppliers of gambling services invest in the U.S. market in the wake of this case.  Our states have a diversity of regulations vis-á-vis gambling.  We believe that under our constitutional system of federalism, states should continue to have the flexibility and sovereign authority to determine whether and under what conditions gambling occurs within their borders, without such decisions being subject to second-guessing by WTO tribunals.

Letter from Atty.'s Gen. to Hon. Rob Portman, Ambassador, U.S. Trade Rep., (Jun. 6, 2005). The effect of allowing the defendants to usurp the role of the United States Government in determining the meaning and application of the U.S. commitments under the GATS would severely undermine the federal system of government, to the great detriment of State regulatory authority.  The defendants should not be permitted to claim private rights under the WTO treaty.

---

[18]A complete copy of the Attorney Generals' letter is included with the WTO Documents.

V.    **THE SCOPE OF THE WIRE WAGER ACT IS NOT AFFECTED BY THE WTO AGREEMENT, OR RULINGS OF WTO BODIES**

    A.    **America's Entry Into the GATS Did Not Incorporate WTO Rulings Into U.S. Domestic Law**

Defendants claim that the Government may not apply provisions of the U.S. Criminal Code to Internet gambling, because to do so is a violation of the United States' obligations under the GATS and the Dispute Settlement Undertaking.  In actuality, even the WTO Panel has rejected this proposition.  The Panel Report stated:

> We also wish to emphasize what we have *not* decided in this case.  We have not decided that WTO Members do not have a right to regulate, including a right to prohibit, gambling and betting activities.  In this case, we came to the conclusion that the US measures at issue prohibit the cross-border supply of gambling and betting services in the United States in a manner inconsistent with the GATS.  We so decided, not because the GATS denies Members such a right, but because we found, inter alia, that, in the particular circumstances of this case, the measures at issue were inconsistent with the United States' scheduled commitments and the relevant provisions of the GATS.

Panel Report at 273, ¶7.4, WT/DS285/R, Nov. 10, 2004 (emphasis in original).

As noted in the Statement of Administrative Action:

> Reports issued by panels or the Appellate Body under the DSU have no binding effect under the law of the United States and do not represent an expression of U.S. foreign or trade policy. . . . If a report recommends that the United States change federal law to bring it into conformity with a Uruguay Round agreement, it is for Congress to decide whether any such change will be made.

Statement, 1994 U.S.C.C.A.N. at 4318.  The defendants' assertion that any WTO determination or constituent body ruling has changed or must change domestic U.S. law is flatly wrong.

    B.    **The Charming Betsy Doctrine Has No Application in this Case**

The ruling in Murray v. Charming Betsy, The, 6 U.S. (2 Cranch) 64, 2 L.Ed. 208, 1804 WL 1103 (1804) concerned an action for damages arising from the seizure of a vessel at sea.

18

The case was a particularly thorny one for the Supreme Court, as it involved the law of the sea,

international relations, and the standing of what was then a very young country in the community

of nations.  In its resolution of the myriad problems presented by the Charming Betsy litigation,

the Court stated:

> It has also been observed that an act of Congress ought never to be construed to
> violate the law of nations if any other possible construction remains, and
> consequently can never be construed to violate neutral rights, or to affect neutral
> commerce, further than is warranted by the law of nations as understood in this country.

Charming Betsy, 2 Cranch at 118, 1804 WL at *29.  Upon this statement, an entire mansion of

statutory construction has been built.  However, all of the cases applying the Charming Betsy

doctrine agree on one point: international law may be resorted to only when there is an

ambiguity or lacuna in the U.S. statute under consideration.  See ARC Ecology v. U.S. Dept. of

Air Force, 411 F.3d 1092, 1102-03 (9th Cir. 2005); Guaylupo-Moya v. Gonzales, 423 F.3d 121,

135-36 (2nd Cir. 2005); United States v. Yousef, 327 F.3d 56, 92 (2nd Cir. 2003); Sampson v.

Federal Republic of Germany, 250 F.3d 1145, 1154 (7th Cir. 2001); Federal-Mogul Corp. v.

United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995).

The defendants claim that the Charming Betsy doctrine requires that the Wire Wager Act

be construed to lack extraterritorial application, so as to harmonize with WTO rulings.  The

argument is legally and factually flawed.  First, the charges in the Indictment do not require

extraterritorial application of §1084.  The prohibitions of the Wire Wager Act apply to the

transmission as well as the reception of bets and betting information. United States v. Reeder,

614 F.2d 1179, 1184-85 (8th Cir. 1980); see also United States v. Pezzino, 535 F.2d 483, 484 (9th

Cir. 1976) (Per Curiam); United States v. Sklaroff, 506 F.2d 837, 839 (5th Cir. 1975); United

States v. Tomeo, 459 F.2d 445, 446-47 (10th Cir. 1972).  All of the communications alleged in

the Indictment were either initiated in or terminated in the United States; therefore, no extraterritorial application of the statute is required. Further, as all of the communications alleged in Counts 16, 17, 18 and 19 were either initiated in or terminated in the District of Utah, the jurisdiction of this Court is established.

The case of United States v. Sagansky, 358 F.2d 195, 200 (1st Cir. 1966), involved an argument which is the reverse of that made by the defendants in this case. The defendant in Sagansky claimed that the Wire Wager Act applied only to those who transmitted bets, and not to those who accepted them. The Court rejected this argument and stated:

> The gist of this contention is that the offense is committed by the one who initially sends in the bet and not by the one who receives it; in other words, the meaning of 'transmission' as used in this statute does not embrace the act of receiving. While this might be a proper construction of the term 'transmission' taken out of context, § 1084(a) does not punish the mere transmission of bets or wagers, but rather 'use' of interstate wire communications facilities for their transmission. When a person holds himself out as being willing to make bets or wagers over interstate telephone facilities, and does in fact accept offers of bets or wagers over the telephone as part of his business, we think it is consistent with both the language and the purpose of the statute to hold that he has 'used' the facility for the transmission of bets or wagers.

The defendants' focus on the physical location of the bettors and the Gambling Gateway Enterprise's client Internet gambling web sites is misplaced. As long as the transmissions at issue used a. wire communication facility in interstate and foreign commerce that touched the United States, the elements of a §1084 charge are established. Further, no extraterritorial application of §1084 is required.

Second, even if the defendants were correct, and upholding the Indictment required this Court to find that Congress intended §1084 to reach beyond the Court's usual jurisdiction, the words of the statute would support such a finding. The Wire Wager Act encompasses

20

transmissions "in interstate or foreign commerce." This language demonstrates beyond question that the legislature was looking outside the United States in formulating the statute's prohibitions. Pasquantino v. United States, 544 U.S. 349, 371-72, 125 S.Ct. 1766, 1780-81, 161 L.Ed.2d 619 (2005) ("the wire fraud statute punishes frauds executed in 'interstate or foreign commerce,' so this is surely not a statute in which Congress had only 'domestic concerns in mind.'").

The cases cited by the defendants are inapposite; they are uniformly civil cases dealing with immigration law (Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); Chew Heong v. United States, 112 U.S. 536, 5 S.Ct. 255, 28 L.Ed. 770 (1884)); the application of U.S. employment regulations outside the United States (E.E.O.C. v. Arabian American Oil Co., 449 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991);[19] Weinberger v. Rossi, 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982); Foley Bros. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949)); aspects of the law of the sea (McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Lauritzen v. Larsen, 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed.2d 1254 (1953)("'[T]he law of the sea,' we have had occasion to observe, 'is in a peculiar sense an international law, but application of its specific rules depends upon acceptance by the United States.'" (citation omitted)); anti-trust legislation; (F. Hoffman-LaRoche Ltd. v. Empagran SA, 542 U.S. 155, 124 S.Ct. 2359, 159

---

[19] Recognized as superseded by statute in Fray v. Omaha World Herald Co., 960 F.2d 1370 (8th Cir. 1992); In re Union Pacific Railroad Employment Practices Litigation, 479 F.3d 936 (8th Cir. 2007).

L.Ed.2d 226 (2004);[20] or tort claims; (<u>Smith v. United States</u>, 507 U.S. 197, 113 S.Ct. 117, 122

L.Ed.2d 548 (1993); <u>New York Cent. R. Co. v. Chisholm</u>, 268 U.S. 29, 45 S.Ct. 402, 69 L.Ed.

828 (1925).[21]

Defendants further argue that § 1084 does not apply to Internet communications, because

the Internet did not exist when the Wire Wager Act was passed. This argument ignores the clear

language of the statute. Congress prohibited the use of wire communications facilities to

transmit bets and betting information; it did not limit the prohibition to transmissions involving

telephones. The defendants also ignore the applicable statutory definition:

> The term 'wire communication facility' means any and all instrumentalities,
> personnel, and services (among other things, the receipt, forwarding, or delivery
> of communications) used or useful in the transmission of writings, signs, pictures,
> and sounds of all kinds by aid of wire, cable, or other like connection between the
> points of origin and reception of such transmission.

---

[20] The Court ruled that, while the Sherman Anti-Trust Act could have extraterritorial application, the plaintiff in this case was required to show a connection between the alleged domestic conduct and the foreign harm. On remand, the District of Columbia Circuit Court found no Sherman Act violation. <u>Empagran SA v. F. Hoffman-LaRoche Ltd.</u>, 417 F.3d 1267 (D.C. Cir. 2005).

[21] <u>American Civil Liberties Union v. Gonzales</u>, 478 F.Supp.2d 775, 798 (E.D. Pa. 2007) involved a challenge to COPA (the Child Online Protection Act, 47 U.S.C. §231), which prohibited the transmission "in interstate or foreign commerce by means of the World Wide Web" any "material that is harmful to minors." The statute was struck down as unconstitutional as being both under- and over-inclusively drawn to narrowly achieve a permissible government goal, the protection of minors using the Internet. The Court found that the legislative history indicated that Congress did not intend COPA to have extraterritorial application ("'[t]o the extent that an international problem exists, the Committee has requested that the Commission on Online Child Protection study the matter and report back to Congress.'"). There is no such statement in the legislative history of the Wire Wager Act. The language of the statute indicates an intent to encompass conduct occurring outside the United States. <u>See</u> <u>Pasquantino v. United States</u>, 544 U.S. 349, 371-72, cited above. The United States filed a Notice of Appeal in <u>American Civil Liberties v. Gonzales</u> on May 25, 2007, No. 07-2539.

Title 18, U.S.C. § 1081. This definition absolutely encompasses Internet computer communications.

The defendants cite to <u>United States v. Corrar</u>, 2007 WL 196862 (N.D. Ga. 2007)[22] and <u>United States v. Cohen</u>, 260 F.3d 68 (2nd Cir. 2001), both of which held that § 1084 <u>did</u> apply to Internet communications. The defendants intimate that those decisions would have been different had § 1084 been considered under the <u>Charming Betsy</u> doctrine and harmonized with the GATS, but advance no basis for such speculation.[23]

### C.    The Charming Betsy Doctrine Cannot be Applied to the Uruguay Round Authorizing Statutes

Defendants present a novel argument by claiming that the <u>Charming Betsy</u> doctrine of statutory construction must be applied to the statute <u>in which Congress specifically forbids resource to any law other than that of the United States.</u> This contention cannot be supported. According to the Statement of Administrative Action: "[s]ection 102(a)(1)[24] clarifies that no

---

[22] In <u>Corrar</u>, the defendant appealed his conviction of § 1084 violations for attempting to collect a gambling debt owed to an Internet gambling web site called "Play With Al." (The operators of the "Play With Al" web site were indicted by the Queens District Attorney in November of 2006, Indictment No. 2699/2006.) The district court determined that the government had failed to prove a Travel Act [18 U.S.C. § 1952] violation because it had shown neither underlying unlawful activity nor facilitation. The court upheld the defendant's conviction on Wire Wager Act charges. In rejecting the defendant's appeal under the rule of lenity, the court stated that "even if internet gambling were permissible under state law, using interstate wire communication facilities to promote it would not be." <u>Corrar</u>, 2007 WL 196862 at *8.

[23] The defendants argue that a separate canon of construction, requiring statutes to be read in harmony, would also effect the application of §1084. However, the defendants fail to cite what particular statute § 1084 is be harmonized with. Assuming that the defendants are referring to WTO treaties and rulings, the applicable U.S. statutes specifically prohibit any reference to foreign law.

[24] Title 19, United States Code, § 3512: "(a) Relationship of agreements to United States law. (1) United States law to prevail in conflict. No provision of any of the Uruguay Round

provision of a Uruguay Round agreement will be given effect under domestic law if it is inconsistent with federal law, <u>including provisions of federal law enacted or amended by the bill</u>" (emphasis added).  Statement, 1994 U.S.C.C.A.N. at 1368.  The defendants' extraordinary claim cannot stand in the face of the plain language of the statute.

The defendants claim that the United States Department of Justice, as an agency of the Executive Branch, must change its interpretation of the scope of § 1084 to comport with "binding WTO norms."  This is decidedly not the case.  As discussed above, "<u>neither federal agencies nor state governments are bound by any finding or recommendation included in [WTO] reports.  In particular, panel reports do not provide legal authority for federal agencies to change their regulations or procedures or refuse to enforce particular laws or regulations</u>."  Statement, 1994 U.S.C.C.A.N. at 4318 (emphasis added).

Defendants claim that Title 19, U.S.C. § 3512 bars only non-government challenges to State statutes.  This is also decidedly incorrect.  Title 19, U.S.C. § 3512(a)(1) contains the following prohibition: "No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect."  A subsequent section (3512(c)(1)) states that no person other than the United States "may challenge, in any action brought under any provision of law, any action or inaction by any department, agency, or other instrumentality of the United States, any State, or any political subdivision of a State on the ground that such action or inaction is inconsistent with such agreement."

---

Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect."

> It is the intention of the Congress through paragraph (1) to occupy the field with respect to any cause of action or defense under or in connection with any of the Uruguay Round Agreements, including by precluding any person other than the United States from bringing any action against any State or political subdivision thereof . . . .

Title 19, U.S.C. §3512(c)(2). The intent of Congress is also set out in the Statement of Administrative Action: "Section 102(c) (§3512(c)) of the implementing bill precludes any private right of action or remedy . . . against a federal, state, or local government, or against a private party, based on provisions of the Uruguay Round agreements." Statement, 1994 U.S.C.C.A.N. at 4055. Therefore, the defendants' contention on this point cannot be unsupported, and should be denied.

## D.  International Comity Does not Require or Support Dismissal of the Indictment

Defendants claim that the Indictment in this case must be dismissed because it is a violation of United States obligations of international comity. However, international comity may not override clear and unequivocal statutory language. Hilton v. Guyot, 159 U.S. 113, 166, 16 S.Ct. 139, 144, 4 L.Ed.2d 95 (1895) (no obligation to enforce foreign judgment exists where foreign law conflicted with domestic law). In this case, the clear and unequivocal language of the federal statutes at issue contain no ambiguity, and therefore create no basis for reference to foreign law.

The defendants cite Gross International Corp. v. Tokyo Kikai Seisakusho, Ltd., 2007 WL 2301266, as supportive of their argument, when it is not. That opinion simply issued the order required by the ruling in Gross International Corp. v. Man Roland Druckmaschinen Aktiengesellschaft, 491 F.3d 355 (8th Cir. 2007). In the substantive proceeding, the U.S. plaintiff sought an order to prevent a Japanese company from filing suit in Japanese courts to recover

damages paid to the plaintiff pursuant to an anti-trust judgment. The plaintiff anticipated that

such a suit would be forthcoming after Congress repealed the anti-trust statute that provided the

basis for the judgment, and the Japanese legislature authorized suits for the return of damages

paid by Japanese companies under the rescinded statute. The court found that "a foreign antisuit

injunction will issue only if the movant demonstrates (1) an action in a foreign jurisdiction

would prevent United States jurisdiction or threaten a vital United States policy, and (2) the

domestic interests outweigh concerns of international comity. Gross International, 491 F.3d at

359. The Court ruled that the plaintiff could not qualify for injunctive relief, and that the

plaintiff's appropriate remedy lay in the Japanese courts. The Eighth Circuit Court of Appeals

adopted what it termed the "conservative approach" to foreign adjudications, which places more

emphasis on respect for the laws and judgments of foreign jurisdictions than under "the liberal

approach" adopted by other circuits. The Court stated:

> The propriety of the [Japanese statute authorizing the suit], and [the defendant's]
> action thereunder, are matters for the Japanese courts in the first instance. Any
> response by the United States, such as a blocking statute for protection against a
> judgment awarded under the [Japanese statute] or trade sanctions against Japan,
> must come through authorized representatives of the United States Executive or
> Legislative Branches, not the Judiciary.

Gross International, 491 F.3d at 368. In the final analysis, this is a choice of laws case, rather

than one concerning the application of international comity considerations. It does not support

the argument made by the defendants.

## VI.    CONCLUSION

The treaty that the defendants appeal to is a trade agreement between sovereigns. It does

not create individual rights, nor does it have a direct impact on any domestic law. The

defendants have no standing to claim protection under the GATS, and the federal statutes

authorizing the Uruguay Round agreements preclude reference to the GATS, WTO Panel

Reports or Appellate Body rulings in determining the legality, application and scope of any

United States statute.  The defendants have failed to establish any basis for narrowing the scope

of the statutes under which they are charged, application of the rule of lenity, or the defense of

entrapment by estoppel.  The various motions to dismiss the Indictment on the basis of WTO

rulings are without merit, and therefore should be denied.

Respectfully submitted this 2nd day of November, 2007.

BRETT L. TOLMAN
United States Attorney

/s/ *D. Loren Washburn*
D. LOREN WASHBURN
Assistant United States Attorney

/s/ *Marty Woelfle*
MARTY WOELFLE
Trial Attorney
Organized Crime & Racketeering Section

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2007, the foregoing was filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

D. Gilbert Athay
43 East 400 South, Suite 325
Salt Lake City, UT 84111-2767

David V. Finlayson
David V. Finlayson, LLC
43 East 400 South
Salt Lake City, UT 84111

Scott C. Williams
Scott C. Williams LLC
43 East 400 South
Salt Lake City, UT 84111

Mark R. Gaylord
Ballard Spahr Andrews & Ingersoll, LLP
One Utah Center - Suite 600
201 South Main Street
Salt Lake City, UT 84111-2221

G. Fred Metos
McCaughey & Metos
10 West Broadway, Ste. 650
Salt Lake City, UT 84101

Vanessa M. Ramos
Utah Federal Defenders
46 W. Broadway, Ste. 110
Salt Lake City, UT 84101

Michael Pancer
4th Floor
105 West F Street
San Diego, CA 92101-6036

Fred D. "Pete" Gibson III
Lionel Sawyer & Collins
1700 Bank of America Plaza
300 South Fourth Street

/s/ _____