MICHAEL PANCER
Lawyer for Defendant
105 West "F" Street, 4thFloor
San Diego, California 92 101-6087
Telephone: (619) 236-1826

LONI F. DeLAND (0862)
Local Counsel for Defendant
43 East 400 South
Salt Lake City, Utah 84111
Telephone: (801) 364-1333

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | MEMORANDUM IN SUPPORT OF MOTIONS TO SUPPRESS |
| Plaintiff, | | (DOCKET ENTRIES 74 & 77) |
| | : | |
| vs. | : | |
| | : | Case No. 2:07CR286 |
| RICHARD CARSON-SELMAN, | | |
| Defendant. | : | Judge Ted Stewart |

## ARGUMENT

### I.

### SUMMARY OF AFFIDAVIT

Internal Revenue Service Criminal Investigation ("IRSCI") Special Agent Jamie Hipwell, after outlining his training and experience, stated facts in support of probable cause for the issuance of a search warrant at the businesses located at 1111 Desert Lane as follows:

In February 2006, three former employees of the Draper, Utah based Hill Financial Services and Gateway Technologies, told Salt Lake City IRSCI investigators that they believed that their

former employers were in operating the businesses in violation of federal tax requirements. (S/W Aff. p. 3.) Seven more former employees joined the first three (collectively the Cooperating Witnesses), and purported to describe to the agents how Hill Financial and Gateway Technologies operated. (*Id.*)

The Cooperating Witnesses were given use and derivative immunity by the United States Attorney's Offices in both Utah and Missouri in exchange for their information. (S/W Aff. p. 4.) They were also given use immunity by the Organized Crime and Racketeering Section of the Department of Justice. (S/W Aff. p. 4.)

The information provided by the Cooperating Witnesses was corroborated to the extent possible, and the investigators found no instance where the information provided by the Cooperating Witnesses was in error. (S/W Aff. p. 4.) The Cooperating Witnesses wanted to stay anonymous as long as possible, stating that they and their families had been threatened by the Targets.[1] (S/W Aff. p. 4.)

Most of the cooperating witnesses worked at Hill Financial, which had offices in the same building as Gateway Technology. The Cooperating Witnesses used the data collected and maintained by Gateway to determine how much money was owed to which client web site and how much was due to the Targets. (S/W Aff. p. 10.)

Defendants Baron Lombardo, Henry Bankey, and Richard Carson-Selman founded Gateway Technology (originally incorporated as CurrenC Worldwide, Ltd.) , a company that operated a web-site (the Gateway) that allegedly provided a way for internet gambling web sites to illegally take bets

---

[1] Baron Lombardo, Richard Carson-Selman, Henry Bankey, Tina Hill, Count Lombard, Kittie and Frank Lombardo, and others known and unknown.

funded by credit card and Western Union wire transfers in violation of federal law and in violation of policies and procedures put in place by credit card companies and Western Union to prevent such transactions.[2] (S/W Aff. p. 3.)

Hill Financial Services, owned and operated by Tina Hill, was formed to provide accounting services to Gateway Technologies so that the Targets could keep track of the Gateway transactions. Kittie and Frank Lombardo kept track of any wire transfers from gamblers in the United States through Western Union offices in the Philippines.[3] (S/W Aff. p. 3.)

The cooperating witnesses stated that the Targets used Hill Financial Services, Gateway Technologies, and a number of other business entities using the term "CurrenC" to illegally process wagers and wagering information in interstate and foreign commerce, and to open bank accounts in South Korea, Jamaica, and other locations to facilitate credit card and Western Union transactions funding wagering accounts. The Targets also opened several bank accounts in the United States to receive proceeds from the Gateway transactions and to handle money used to fund the operations of Gateway and Hill Financial. A number of the entities formed by the Targets also received proceeds from the operation of Gateway. (S/W Aff. pp. 3-4.)

The Targets enabled internet gambling sites to offer Visa and MasterCard credit cards to fund wagering accounts. Once the gambler inputted his/her credit card information, the information would be provided via hyperlink to Gateway, which would automatically transfer the information to the credit card issuing bank, but would mis-code the transaction as a purchase of goods and services not involving gambling. If the credit card was approved, the funds would be transferred by

---

[2] The source of this information is unknown.

[3] The source of this information is also unknown.

the issuing bank to the acquiring bank, from the acquiring bank to an account controlled by the Targets in the Korean Exchange Bank, and from there to a bank in Jamaica. The money would then be transferred to the client, less a fee charged by the Targets for their services. (S/W Aff. pp. 7-8.) The Targets used a Merchant Identification Number assigned to various businesses they controlled in order to facilitate the credit card transactions. (*Id.*)

If a gambler chose to fund a wagering account using a wire transfer, he would click on the Western Union icon and provide the necessary information. The clients were provided with a list of recipient names and various Western Union offices located in and around Manila, the Philippines, where the wires were sent by the gambler. An agent in the Philippines named Duke Ventura picked up the wire transfers, notified Kittie and/or Frank Lombardo that the money had been received, and the client would be notified. Between September 2002 and April 2006, the Targets transferred $3,646,001.42 from offshore accounts to an account held by Gateway Technologies in Nevada, where it was used to pay salaries and expenses and dispersed to the Targets. (S/W Aff. p. 9.) From August 2004 to March 2006, the Hill Financial Services account received a total of $1,007,007.88 from overseas. This money was used to pay salaries and overhead expenses, and dispersed to the individual Targets. (S/W Aff. p. 10.)

In March of 2005, the Targets lost the services of LG Card as an acquiring bank because LG Card had too many suspicious credit card transactions. (*Id.*) According to the Cooperating Witnesses, April of 2005 the Targets were forced to close in their bank account in Jamaica used as the dispersion point for money paid to Internet gambling web sites. (S/W Aff. p. 11.) Because of the crippled banking relationships and internal tensions between the Targets, and their failure to provide the employees with appropriate tax documentation, the Cooperating Witnesses left en mass.

The employee exodus resulted in a law suit between the Targets and the former employees. (*Id.*)

The government surveilled the business location at 1111 Desert Lane and inspected its trash receptacle in March and April of 2007. The affiant then identifies the Cooperating Witnesses providing information in the affidavit, and a describes the various business entities used by the Targets. (S/W Aff pp. 16-28.) The affiant also mentions that when the Cooperating Witnesses left their employment they took business records and spreadsheets and provided these records to the IRSCI. Government agents contacted individuals identified as opening gambling accounts with the Internet gambling website through the Gateway and the individuals confirmed the funding of wagering accounts with the Internet gambling website. IRS agents interviewed Neil Gallagher who provided the initial contact at LG Card and confirmed the introduction of Dong Song Hoo to Target Carson-Selman for the purpose of obtaining an acquiring bank to handle credit card transactions to fund Internet gambling wagering accounts. (S/W Aff. pp. 16-17.) The IRS also contacted a merchant that provided the Targets with a Merchant Identification Number used by the Targets to code credit card transactions. (S/W Aff. p. 17.)

The affidavit alleges that "according to the witnesses, during the time they worked for Gateway Technologies and Hill Financial Services, the businesses were conducted in co-located offices at 12401 South 450 East, suite E-2 in Draper Utah." (S/W Aff. p. 28.) The affidavit then alleges that investigators confirmed that on March 30, 2006 a copier leased to Hill Financial was moved from Draper to the new location in Las Vegas. On March 19, 2007 a trash search was conducted on the premises to be searched and account payroll ledger pages for Hill Financial and Gateway Technologies were found. (S/W Aff. p. 28-29.) On April 23, 2007, a trash search was conducted on the described premesis. Mail addressed to Hill Financial, Gateway Technologies,

Baron Lombardo, Tina Hill and Gary Baldwin was found. Statements referring to Gateway Technologies' accounts payable and a letter from an airline to Richard Carson-Selman regarding lost baggage were also found. (S/W Aff. p. 12.)

The affiant concludes that there is probable cause to believe that the targets have conducted a racketeering enterprise in violation of 18 U.S.C §1962(d), bank fraud in violation of 18 U.S.C. §1344, aided and abetted the transmission of wagers and wagering in violation of the Wire Act, 18 U.S.C. §1084, used facilities in interstate commerce in violation of the Travel Act, 18 U.S.C. §1952, and laundered money in violation of 18 U.S.C. §§1956 and 1957, and there is probable to believe that evidence, fruits and instrumentalities of these crimes will be found at 1111 Desert Lane, Las Vegas, Nevada. (S/W Aff. pp. 30.)

## II.

**THE AFFIDAVIT LACKS PROBABLE CAUSE TO SUPPORT THE ISSUANCE OF THE WARRANT**

A. **Defendant Has Standing to Move for Suppression of All Evidence Illegally Seized During the Search of 1111 Desert Lane, Las Vegas, Nevada.**

A defendant has standing to move for suppression of unlawfully seized items when he or she has a legitimate expectation of privacy in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421 (1978). With respect to law enforcement ("governmental") searches of a business office, in the leading case of *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124 (1968), state agents had conducted a warrantless search of a Teamster's Union office as a result of a

conspiracy and extortion investigation. The scope of the search included a large room used as an office by defendant DeForte, a union vice-president, as well as by several other union officers. Over the defendant's objections, papers belonging to the union were seized from the office. The papers were later used at trial to convict DeForte. On appeal, the Supreme Court held that DeForte had standing to assert a Fourth Amendment claim despite his failure to establish a property interest in the office or the papers seized. Since DeForte had no property rights to establish standing, the *Mancusi* Court inquired instead whether, in light of all circumstances, the office was a place in which there was a "reasonable expectation of freedom from governmental intrusion." DeForte spent considerable time in the office and, at the time of the search, had custody of the papers seized. The office, however, was not DeForte's private office and the records were not taken from an area that was reserved for his personal use.

The Court focused on the question of whether the defendant had the right to exclude others from the place searched and the items seized. It concluded that it was immaterial that the workspace was shared as long as the defendant could still reasonably expect that access would be limited to the others with whom he shared the office and guests invited by those persons. The Court further noted that the defendant could reasonably expect that no one would have access to the records seized without the permission of the persons with whom he shared the office or without permission from his superiors. Therefore, DeForte had a reasonable expectation of freedom from governmental intrusion and had standing to assert a Fourth Amendment violation:

> "The record reveals that the office where DeForte worked consisted of one large room, **which he shared with several other union officials**. The record does not show from what part of the office the records were taken, and **DeForte does not claim that it was a part reserved for his exclusive personal use**. The parties have stipulated that DeForte spent 'a considerable amount of time' in the office, and that he had custody of the papers at the moment of their seizure.

> We hold that in these circumstances DeForte had Fourth Amendment standing to object to the admission of the papers at his trial. It has long been settled that one has standing to object to a search of his office, as well as of his home. [Citations.] Since the Court in *Jones v. United States, supra*, explicitly did away with the requirement that to establish standing one must show legal possession or ownership of the searched premises [citation], it seems clear that if DeForte had occupied a 'private' office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing. *Cf. Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182. In such a 'private' office, DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors. It seems to us that **the situation was not fundamentally changed because DeForte shared an office with other union officers. DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups.** This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in DeForte's custody. **It is, of course, irrelevant that the Union or some of its officials might validly have consented to a search of the area where the records were kept, regardless of DeForte's wishes**, for it is not claimed that any such consent was given, either expressly or by implication." [Emphasis added.]

*Id*. at 368-70. Professor LaFave observes in his Treatise with respect to business premises standing:

> "A somewhat different approach, also consistent with *Mancusi*, which is more likely to be relevant with respect to a greater variety of officers and employees of various business enterprises, is to inquire whether "there was a demonstrated nexus between the area searched and the work space of the defendant." If it is shown that the place searched was a desk or similar area which had been set aside for the exclusive use of the defendant, then quite clearly the defendant will have standing. **But *Mancusi* teaches that the use need not inevitably be exclusive for there to be an expectation of privacy, and consequently it has been held that standing will exist with respect to a regular work area even though that space is shared with others**." [Emphasis added.]

6 LaFave, *SEARCH AND SEIZURE: A Treatise on the Fourth Amendment*, §11.3(d), pp. 181-182

(4th Ed. West 2004). *Mancusi* has never been overruled and remains good law with respect to an individual's standing to contest searches and seizures in the workplace. It was cited with approval by the Court in *Rakas v. Illinois*, 439 U.S. 128, 142-143 & fn.10, 99 S.Ct. 421, 430 (1978).

There is no work-place exception to the Forth Amendment and to a businessman's expectation of privacy from governmental intrusion.[4] In this case, Mr. Carson-Selman had a subjective expectation that his records, files, computers and document that he maintained in his business and private office that he shared with Baron Lombardo would remain private subject only to the demands and vicissitudes of the work-place environment and an expectation that the files that he created or possessed would remain private where he stored them elsewhere on the business premises and that privacy expectation society recognizes as objectively reasonable. As stated by Court in *United States v. Lefkowitz*, 464 F.Supp. 227, 229 (D.C. Cal. 1979):

> The government urges this court to limit standing to the search conducted of Lefkowitz's and Sullivan's own offices and desks at the corporate offices and not to any other areas in the suite. The suggested limitation must be rejected by this court. The fact that Lefkowitz and Sullivan did not reserve exclusive use of the entire suite does not, in and of itself, vitiate a finding of a reasonable expectation of privacy. See *Mancusi v. DeForte, supra* at 368-9, 88 S.Ct. 2120. The suite was apparently not open to the general public. Both Lefkowitz and Sullivan could reasonably expect that the "private" suite, where both were employed, would be permissibly entered only by the employees of the corporations and those individuals receiving permission from the appropriate individuals. This expectation of privacy would be infringed, as it was in the case at bar, by the examination and seizure of such corporate records by government officials.

*See United States v. Leary*, 846 F.2d 592, 595-596 (10th Cir. 1988)(corporation vice president had standing re his search in his corporate office, citing *Lefkowitz* and LaFave with approval.) Later, the Tenth Circuit in *United States v. Anderson,* 154 F.3d 1225, 1230-32 (10th Cir.1998) expanded on the business nexus test adopted by other circuits[5] and stated:

---

[4] It appears from the affidavit in support of the search warrant and the Indictment that the government theory of the case is that Mr. Carson-Selman, with his co-defendants, owned, managed and supervised the entities and employees conducting business at 1111 Desert Lane, Las Vegas, California

[5] Most cases that discuss employee standing involve seizure of work-related documents from the workplace. In such cases, the relationship or "nexus" of the employee to the area searched is an

Therefore, in determining whether an employee has standing to challenge seizure of an item from the workplace, we do not limit our analysis to the "business nexus" test. Rather, we will consider all of the relevant circumstances, including (1) the employee's relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item.

In the instant case, Mr. Carson-Selman believed that the business records and computers at 1111 Desert Lane, Las Vegas, Nevada, his personal files and records that he kept in his office and in storage areas located there would be free from perusal by the general public and law enforcement agencies. Clearly, under *Mancusi* and its progeny, Carson-Selman had an expectation of privacy in the business records and computers on the business premises, as well as in his personal records and

---

important consideration in determining whether the employee has standing. *See United States v. Mohney,* 949 F.2d 1397, 1403-04 (6th Cir.1991)(en banc)(defendant did not have standing to challenge seizure of documents which he did not prepare when they were stored in offices he rarely visited); *United States v. Taketa,* 923 F.2d 665, 670-71 (9th Cir.1991)(defendant did not have standing to challenge search of coworker's desk in adjoining office even though he had access to it, but he did have standing to challenge search of his own desk); *United States v. Chuang,* 897 F.2d 646, 649-51 (2d Cir.1990)(defendant could not challenge seizure of documents found in another employee's office); *United States v. Torch,* 609 F.2d 1088, 1091 (4th Cir.1979)(defendant did not have standing to challenge search of building when he was not present at time of search, he did not work for building owner although he occasionally used the building, he did not have assigned work area, and the desk he occasionally used was not locked and all employees had access to it); *United States v. Britt,* 508 F.2d 1052, 1056 (5th Cir.1975)(corporate president did not have standing to challenge seizure of documents from off-site warehouse because he failed to demonstrate a "nexus between the area searched and [his] work space").

We endorse the "business nexus" test to the extent we share the belief that an employee enjoys a reasonable expectation of privacy in his work space. Certainly, an employee should be able to establish standing by demonstrating he works in the searched area on a regular basis. However, we do not believe the fact that a defendant does or does not work in a particular area should categorically control his ability to challenge a warrantless search of that area. Instead, the better approach is to examine all of the circumstances of the working environment and the relevant search. *See Mancusi,* 392 U.S. at 368, 88 S.Ct. 2120 (performing standing inquiry "in light of all the circumstances"). There are numerous circumstances which are highly relevant when considering whether an employee should have standing to contest the search and seizure of items from his workplace for which the "business nexus" test does not account.

files seized from his private office, and the business storage rooms, in that in the files, computers and records seized from the business premises would be free from intrusion by law enforcement agents.

**B.      Conclusionary Allegations by the Affiant or an Informant in a Search Warrant Affidavit must Be Based on Facts Set Forth in the Affidavit That Provide the Magistrate with a Sufficient Basis to Determine Probable Cause.**

The Supreme Court in *Giordenello v. United States*, 357 U.S. 485, 486, 78 S.Ct. 1245, 1250 (1958) cautioned:

> The Commissioner must judge for himself the persuasiveness of the <u>facts</u> relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere <u>conclusion</u> that the person whose arrest is sought has committed a crime. . . the issue of probable cause has to be determined by the commissioner, and an adequate basis for such findings has to appear on the face of the complaint. [Emphasis added.]

Subsequently, in *Illinois v. Gates*, 462 U.S. 213, 239-240, 103 S.Ct. 2317, 2332 (1983), the Supreme Court reiterated that the function of the neutral and detached magistrate is to draw or refuse to draw reasonable inferences from the material submitted to him by the applicant for the warrant and not to rely on the bare conclusions of the affiant:

> An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusionary statement at issue in *Nathanson* failed to meet this requirement. An officer's statement that 'affiants have received reliable information from a credible person and believe' that heroin is stored in a home, is likewise inadequate (citation omitted). As stated in *Nathanson*, this is a mere conclusionary statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be provided to the magistrate to allow that official to determine probable cause; **his action cannot be a mere ratification of the bare conclusions of others.** [Emphasis added.]

Consequently, the affiant's bald request for a search warrant for 1111 Desert Lane, Las Vegas, Nevada, is entitled to no weight in the magistrate's probable cause determination. Where the police do not present oral testimony to the issuing magistrate, the reviewing court must ascertain the

11

existence of probable cause to support a warrant exclusively from the affidavit's four corners. *See Whiteley v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 565, n.8, 91 S.Ct. 1031 (1971). "A search warrant must be supported by probable cause, requiring 'more than mere suspicion but less evidence than is necessary to convict.' " *United States v. Danhauer,* 229 F.3d 1002, 1005 (10th Cir.2000). "In reviewing whether probable cause existed for issuing a search warrant, [t]he test is whether the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *United States v. Tisdale,* 248 F.3d 964, 971-72 (10th Cir.2001)(internal quotations omitted). Furthermore, "'[p]robable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched.'" *United States v. Rowland,* 145 F.3d 1194, 1203 (10th Cir.1998). Here, there is no corroboration of any of the alleged criminal activity violating the cited federal statutes occurring at the Desert Lane premises.

C.  **The Uncorroborated Allegations of the Affiant and the Disgruntled Former Employees Provide Insufficient Cause to Believe That Evidence of the Specified Federal Crimes Would Be Located at 1111 Desert Lane, Las Vegas, Nevada.**

The instant affidavit is barren of any corroborated facts connecting the 1111 Desert Lane, Las Vegas, Nevada, businesses with the federal crimes alleged in the affidavit. *See United States v. Bailey*, 458 F.2d 408, 412 (9th Cir. 1972). *See also United States v. Lockett*, 674 F.2d 843 (11th Cir. 1982); *Gillespie v. United States*, 368 F.2d 1 (8th Cir. 1966).

Even a cursory review of the affidavit here shows that there was absolutely no corroboration of the facts presented by the affiant or of the allegations presented by the disgruntled former employees of the businesses at the location to be searched to support the violation of the federal

statutes listed in the search warrant affidavit.[6] As result, the affidavit was devoid of facts that rose to the level of probable cause to believe there was illegal activity occurring at 1111 Desert Lane, Las Vegas, Nevada. Other than the uncorroborated allegations of the former employees who were provided with use and derivative use immunity, there was no factual nexus between the crimes charged in the affidavit and this location; the affiant merely requested that a search warrant issue for this business location with no legal elaboration or analysis to support the magistrate's determination of probable cause.

In Section III of IRSCI Special Agent Hipwell's affidavit, pp. 6-28, entitled "Facts Establishing Probable Cause", the affiant describes the alleged processing of credit card information and the use of Western Union transfers, pp. 7-9, to fund wagering accounts at "illegal" Internet gambling web sites. The affiant also discusses the operation of Hill Financial Services where most of the former employees worked which used the data from the Targets' Gateway website to determine how much money was owed the to each client gambling web site and how much money was due the targets. (S/W Aff. pp. 9-10.) The Targets also allegedly used domestic and off shore companies to receive and transfer proceeds from their operation. (S/W Aff. p. 10.) As noted above, the affiant does not set forth the source of the conclusionary information contained in Section III.

The affiant then relates that in March of 2005, the Targets lost the services of LG Card as an acquiring bank because LG Card had too many suspicious credit card transactions. *Id*. According

---

[6] The affiant claims that there is probable cause to believe that the "Targets" conspired to conduct a racketeering enterprise in violation of 18 U.S.C §1962(d), bank fraud in violation of 18 U.S.C. §1344, aided and abetted the transmission of wagers and wagering in violation of the Wire Act, 18 U.S.C. §1084, used facilities in interstate commerce in violation of the Travel Act, 18 U.S.C. §1952, and laundered money in violation of 18 U.S.C. §§1956, 1957. *See* Attachment A to Search Warrant; Search Warrant Affidavit pp. 2, 5, 30.

to the former employees, the Targets were forced to close in April of 2005 their bank account in Jamaica used as the dispersion point for money paid to Internet gambling web sites. (S/W Aff. p. 11.) Because of the crippled banking relationships and internal tensions between the Targets, and their failure to provide the employees with appropriate tax documentation, the employees left en mass. The employee exodus resulted in a law suit between the Targets and the employees. (*Id*.)

The balance of Section III describes government surveillance at the business location at 1111 Desert Lane and inspection of a trash receptacle in March and April of 2007, the naming of the former employees providing information to the affiant, and a description of the various business entities used by the Targets. (S/W Aff pp. 16-28.) The affiant also mentions that when the cooperating witnesses left their employment they took business records and spreadsheets and provided these records to the IRSCI. Government agents contacted individuals identified as opening gambling accounts with the Internet gambling website through the Gateway and the individuals confirmed the funding of wagering accounts with the Internet gambling website. IRS agents interviewed Mr. Gallagher who provided the initial contact at LG Card and confirmed the introduction of Mr. Hoo to Target Carson-Selman for the purpose of obtaining an acquiring bank to handle credit card transactions to fund Internet gambling wagering accounts. (S/W Aff. pp. 16-17.) The IRS also contacted a merchant that provided the Targets with a Merchant Identification Number used by the Targets to code credit card transactions. (S/W Aff. p. 17.)

Despite the enumeration of the various former employees who provided information to the government and the listing of the numerous companies and business entities allegedly used by the Targets in their business, the affidavit fails to set forth how the Targets' alleged conduct in funding Internet gambling web sites through credit card transactions and Western Union transfers was a

14

racketeering enterprise conspiracy, violated the Wire and Travel Acts, or constituted bank fraud or money laundering. For example, as set forth at length in defendant's Motion to Dismiss the Wire Act Counts, the Wire Act has been determined by the Fifth Circuit to apply only to sports wagering, *In re Mastercard Int'l Inc.,* 132 F. Supp. 2d 468, 480 (E.D.La. 2001), *aff'd,* 313 F.3d 257 (5th Cir. 2002)[7] ("[A] plain reading of the statutory language [of the Wire Act] clearly requires that the object of the gambling be a sporting event or contest."), none of which has been alleged in the instant affidavit. Further, the affidavit fails to establish the basic requirements of a RICO conpiracy. *See United States v. Smith,* 413 F.3d 1253, 1265-73 (10th Cir.) *cert. denied,* 413 F.3d 1253 (2005)( "we hold that in order to convict a defendant for violating § 1962(d), the Government must prove beyond a reasonable doubt that the defendant: (1) by knowing about and agreeing to facilitate the commission of two or more acts (2) constituting a pattern (3) of racketeering activity (4) participates in (5) an enterprise (6) the activities of which affect interstate or foreign commerce."). There was no facts set forth demonstrating the purported enterprise's continuity, structure and an existence separate and apart from the pattern of racketeering activity. *United States v. Smith*, *supra* at 1266-67; *United States v. Sanders*, 928 F.2d 940, 944 (10th Cir. 1991); *cf*. S/W Aff. p. 5. Nor is any pattern of racketeering alleged. *Id*. at 1269. *See* Defendant's Motion to Dismiss RICO Conspiracy, pp. 12-

---

[7] The *Mastercard* court found that this reading of the Wire Act was not only compelled by the plain language of the statute but was consistent with the relevant case law. 132 F. Supp. 2d at 480 (citing *United States v. Kaczowski,* 114 F. Supp. 2d 143, 153 (W.D.N.Y. 2000) (Wire Act "prohibits use of a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest"); *United States v. Sellers,* 483 F.2d 37, 45 (5th Cir. 1973), *overruled on other grounds by United States v. McKeever,* 905 F.2d 829 (5th Cir. 1990) ("the statute deals with bookmakers"); *United States v. Marder,* 474 F.2d 1192, 1194 (5th Cir. 1973) (first element of statute satisfied when government proves wagering information "relative to sporting events").

15

15, filed concurrently herewith.

Moreover, the affiant fails to describe how the alleged miscoding of credit card information as a purchase of goods or services rather than gambling defrauded the bank that issued the gambler's credit card. There is no factual allegation by the affiant that any of the issuing banks would not have authorized the credit card transactions if the transaction had been coded as a gambling charge. Similarly, there is no factual basis for the affiant's allegations that the Targets' violated the Travel Act and Money Laundering statutes. Thus, there was insufficient probable cause to issue the search warrant for the Desert Lane business premises for evidence, fruits and instrumentalities of the crimes alleged in the affidavit and search warrant.

D. **The Information Contained In The Affidavit Was Stale And/Or Remote, And It Fails To Established Ongoing Criminal Activity.**

The affidavit was also used as the basis for obtaining a search warrant on May 11, 2007 for the search of the premises at 2412 Plaza Grande, Las Vegas, Nevada is virtually identical to the affidavit used to obtain the Desert Lane warrant. Both search warrants should be quashed and the evidence obtained as a result thereof should be suppressed because the information contained in the affidavit was stale and remote in time, and therefore did not provide probable cause to establish that there was evidence of criminal activity located on the premises that were the subject of the search warrants.

The Tenth Circuit, in discussing the issue of staleness has said, "probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Jardine*, 364 F.3d 1200 (10th Cir. 2004) (citing *United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir. 1990)). Defendants herein submit that all of the

information alleging illegal activity on the part of any of the defendants precedes March 30, 2006. All information obtained from the cooperating witnesses was provided in relation to a period where the offices of Gateway Technologies and Hill Financial Services were in Utah. *See* S/W Aff. p. 28. This information was obtained at least 13 months prior to the issuance of the warrants in this case. Nothing about the information provided a reasonable basis to conclude that any of the activity described, or the fruits of such activity, would continue or exist at a Las Vegas location. Thus, even assuming that the affidavit supported a reason to believe that evidence of unlawful activity might have existed at the offices in Utah, such information was stale and provided no support for a conclusion that the same would be true of a Las Vegas location. The Tenth Circuit has said,

> The Fourth Amendment contemplates that probable cause for the issuance of a search warrant must exist at the time the search is sought to be made. Probable cause existing at some time in the past will not suffice unless circumstances exist which from which it may be inferred that the grounds continue to the time the affidavit was filed.

*United States v. Neal*, 500 F.2d 305 (10th Cir. 1974) (citing *Sgro v. United States*, 287 U.S. 206 (1932). Courts may certainly consider the nature of the alleged criminal activity and whether or not it is an ongoing criminal activity. And where criminal activity is ongoing and continuing the passage of time may not be critical. *United States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir. 2004). Additionally, "staleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material." *States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir. 1972) (cited in *Jardine* at 364 ). However, an affidavit in support of a search warrant based upon information which is stale cannot support the issuance of a search warrant unless the affidavit sets forth specific facts from which it can be concluded by the issuing court that criminal activity continued until the time of the issuance of the warrant. *See United States v. Neal*, 500 F.2d. 305.

17

It is apparent that the affidavits in the present case contain allegations of illegal activity based primarily upon information provided by cooperating witnesses. At some time prior to March 30, 2006 the cooperating witnesses left the employment of Gateway Technologies and Hill Financial Services. According to these witness' own accounts, the companies were left bereft of employees and infrastructure, and they no longer operated in Utah as they had. According to the affidavit, on March 30, 2006 a copier leased to Hill Financial Services was apparently moved from Draper to Las Vegas. Trash searches conducted in Las Vegas on March 19, 2007 and April 23, 2007 only produced information concerning accounts payable ledger pages for Gateway Technologies and Hill Financial, S/W Aff. p. 29, and mail addressed to Hill Financial Services, Gateway Technologies, Baron Lombardo, Tina Hill and Gary Baldwin. Statements referring to Gateway Technologies' accounts payable and a letter to Carson-Selman regarding lost luggage were also recovered. S/W Aff. p. 12. While such information may support a conclusion that one or more of the defendant's were conducting some kind of activity or business from the Las Vegas location, it certainly does not support any conclusion that such activity was the same as that which had been conducted 13 months before in Utah, nor that it was otherwise illegal.

Even if this Court were to find that the affidavits contained information sufficient to form a reasonable belief that criminal activity occurred prior to March 30, 2006 in Utah, any such information was clearly stale by the time the search warrants were issued for the Nevada locations. The information in the affidavits did not support an inference that criminal activity continued after March 30, 2006. In fact, they suggest the opposite, according to the information from the informants. Nor does any information developed in the trash covers fortify any conclusion that criminal activity occurred at the Nevada locations. Issuance of the warrants therefor violated the

constitutional rights of the defendants, and this Court should suppress all evidence derived from the searches conducted pursuant to the warrants.

## **CONCLUSION**

For all of the foregoing reasons, and such argument and evidence as may be presented to the Court at the hearing on said motion, the search warrant must be quashed, all the evidence seized during the search of 111 Desert Lane, Las Vegas, Nevada, and the fruit thereof, must be suppressed.

DATED: October 19, 2007          Respectfully submitted,

/s/ Loni F. DeLand

Loni F. DeLand Lawyer
for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Loren Washburn
Assistant United States Attorney 185 South State Street, Suite 400 Salt Lake City, Utah 84111


/s/ Heather M. Stokes