BRETT L. TOLMAN, United States Attorney (#8821)
D. LOREN WASHBURN, Assistant United States Attorney (#10993)
MARTY WOELFLE, Trial Attorney (AZ #009363)
Attorneys for the United States of America
185 South State Street, #300
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682
Facsimile:  (801) 524-6925

_____

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | : Case No: |
| | : |
| Plaintiff, | : |
| vs. | : GOVERNMENT'S JAMES HEARING |
| | : MEMORANDUM |
| BARON LOMBARDO,  et al., | : |
| | : |
| Defendants. | : |
| | : |

_____

The United States, by the undersigned attorneys, hereby presents its James Hearing

Memorandum, establishing the existence of the conspiracy charged in the Indictment, and

the participation of the named defendants in that conspiracy.  This memorandum

supplements the Government's previously filed Proffer in Support of the Admission of

Co-Conspirator Statements (Docket #70), and the Identification of Co-conspirator

Statements (Docket #160), which are incorporated herein by reference; the testimony that

was elicited at the James hearing, and the exhibits that were included with the Proffers

and discussed during the James hearing.

## GOVERNING LAW

In order to admit declarations of co-conspirators under Fed. R. Evid. 801(d)(2)(E), the Court must determine by a preponderance of the evidence that a conspiracy existed, that the declarant and the defendants against whom the statement will be offered were members of the conspiracy, and that the statement was made in the course of and in furtherance of the conspiracy. United States v. Urena, 27 F.3d 1487, 1490 (10th Cir. 1994). To prove a conspiracy existed, the government must establish: "1) that two or more persons agreed to violate the law, 2) that the defendant knew at least the essential objectives of the conspiracy, 3) that the defendant knowingly and voluntarily became a part of it, and 4) that the alleged coconspirators were interdependent." United States v. Evans, 970 F.2d 663, 668 (10th Cir. 1992).

The United States Supreme Court and Tenth Circuit decisions have held that the government may also use the actual coconspirator statements to establish that a conspiracy existed. Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Hernandez, 829 F.2d 988, 993 (10th Cir. 1987), cert.denied, 485 U.S. 1013 (1988). "The district court may consider and rely on the actual coconspirator statements the government seeks to admit to determine whether a predicate conspiracy existed within the meaning of Fed.R.Evid. 801(d)(2)(E)." United States v. Owens, 70 F.3d 1118, 1124 (10th Cir. 1995). Although independent evidence of the existence of the conspiracy is required, "such independent evidence may be sufficient even when it is not 'substantial.'" United States v. Rascon, 8 F.3d 1537, 1541 (10th Cir.1993).

In order to join a conspiracy, a defendant "need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role." United States v. Zimmerman, 943 F.2d 1204, 1209 (10th Cir. 1991); United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.1988). All that is required is that the "evidence supports the conclusion that the defendant knowingly and voluntarily became a part of the conspiracy." Zimmerman, 943 F.2d at 1209; United States v. Fox, 902 F.2d 1508, 1514 (10th Cir.1990). "The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." United States v. Tranakos, 911 F.2d 1422, 1430 (10th Cir.1990)(citation and quotation omitted).

## ESSENCE OF THE CONSPIRACY

The Indictment alleges a conspiracy between all of the named defendants. The essence of the conspiracy was an agreement to conduct the affairs of an enterprise through a pattern of racketeering activity. The Defendants were employees or associates of the alleged racketeering enterprise (the "Gambling Gateway Enterprise," or "the Enterprise"). The Enterprise and its client Internet gambling web site operators disguised online gambling transactions, to conceal those transactions from the U.S. government, and from financial institutions involved in the transactions, including Western Union, and U.S. credit card-issuing entities. The Gambling Gateway Enterprise and its co-conspirators disguised the transactions because the Defendants knew that the transactions were illegal, and that U.S. financial institutions would not process the transactions if they

were properly identified as gambling-related transfers.  The Enterprise further laundered the proceeds of the bank fraud, in order to make payments to its co-conspirator clients, and return the proceeds of the fraud to the Defendants in the United States.

The Indictment alleges that the defendants knowingly and intentionally conspired to violate Title 18, United States Code, §1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Gambling Gateway Enterprise through a pattern of racketeering activity, consisting of multiple acts involving gambling chargeable under various state statutes, and multiple acts indictable under Title 18, United States Code, §1084 (the Wire Wager Act); Title 18, United States Code, §1344 (Bank Fraud); and Title 18, United States Code, §1956 (Money Laundering).  It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in conducting the affairs of the Enterprise.

## EVIDENCE OF THE CONSPIRACY

Defendants Baron Lombardo, Carson-Selman, and Bankey were the principals of a business called CurrenC Ltd., which is also a defendant in this case.  (Exhibit 1 p. 9; Tr. 30).[1]  Baron Lombardo owned a 50 percent stake in the company, with the other two partners each owning a 25 percent share.  CurrenC had a number of associated businesses, both domestic and foreign.  Two businesses that provided services exclusively to CurrenC were Hill Financial Services ("Hill Financial") and Gateway Technologies ("Gateway"),

---

[1]All citations to the transcript of the James hearing are noted "Tr." followed by the page number of the transcript.

which are both defendants in this case.  (Tr. 14, 15, 34, 68, 82).  These business provided the technological and accounting services necessary to operate the Enterprise's payment processing business.  Id.  In 2004 and 2005, Hill Financial and Gateway were based in Draper, Utah.  (Exhibit 14 at 3-4; Tr. 20).

The Enterprise's role was to act as an intermediary between Internet gaming web sites and the Visa, MasterCard, and Western Union money transfer systems. (Government's proffer of facts, found at Tr. 12-13, and adopted by S.A. Hipwell at Tr. 19-20).  The bulk of the business involved processing Visa and MasterCard credit card transactions.  The Enterprise's main business was to process transactions for "the world-wide gaming industry."  (Exhibit 1 at SW-09–01224 to 01227).[2]  CurrenC described its customers as "several of the largest 'tier one' offshore (non US) Sportsbook corporations."  (Exhibit 17A).  According to CurrenC documents, its business primarily served "Sportsbook, Casino, [and] internet Poker site[s]."  Id. at 2.  Indeed, seized records identify more than 100 offshore gambling businesses, including Defendant BetUS, as clients of CurrenC (Exhibit 8 at SW-04-01383 to 01384; Exhibit 13 at SW-04-00092 to 00097; Exhibit 13 at SW-24-00859 to 00863).[3]  CurrenC, Gateway, Hill Financial, the individual Defendants, the Internet gambling web site BetUS, unindicted co-conspirator

---

[2]Documents bearing a bates stamp with numbers prefaced by "SW" were seized pursuant to a search warrant at the defendants' business office on Desert Lane, in Las Vegas, NV.

[3]A review of the records of the business also indicated that CurrenC processed a limited number of transactions for businesses selling pharmaceuticals over the Internet, and for purveyors of adult content.  (Tr. 13-14).

BetonSports plc, and four known unnamed Internet gambling web sites make up the Gambling Gateway Enterprise.

Agents interviewed approximately 100 U.S. Visa and MasterCard cardholders who had conducted transactions processed by the Defendants through the Gambling Gateway Enterprise. All of them stated that the charges processed by CurrenC related to Internet gambling. (Tr. 82). These cardholders uniformly explained that the only transactions they conducted with or through CurrenC involved Internet gambling with Gambling Gateway Enterprise client Internet gambling web sites.

Visa and MasterCard use numerical codes called Merchant Category Codes ("MCC"), to identify the types of transactions being processed through their systems. (Tr. 23-24). The code used to identify a gambling transaction is "7995." (Tr. 23-24). As the Defendants were aware, "[t]he regulations of Visa and MasterCard clearly state that MCC 7995 must be coded for the gambling transaction." (Exhibit 17C).

During the time period alleged in the Indictment, U.S. banks that issue credit cards to American cardholders generally would not approve transactions coded "7995." (Exhibit 1 at SW-09-01226; Tr. 13, 64-65).[4] The Defendants' own statements demonstrate that they were aware of that fact that U.S. banks would not process transactions that were labeled with a "7995" code:"

> Some banks may shy away from this type of business because of presumed
> charge backs, or because they are concerned that Visa or MasterCard might

---

[4]The Unlawful Internet Gambling Enforcement Act, Title 31, United States Code, §§ 5361 to 5367, now specifically prohibits facilitating funds transfers to or from Internet gambling businesses.

determine that the transaction is for gaming and may not want to clear it.

Exhibit 17A.

> The increased political pressure and higher risk associated with online
> gaming have caused the banks that acquire the on-line wager transaction
> [sic] to approach gaming transactions with caution.

(Exhibit 1 at SW-09-01226). In fact, each of the card-issuing banks[5] who are victims in

this case had policies in place at the time of the transactions that required them to decline

to authorize credit card transfers if they involved Internet gambling transactions. (Tr. 29).

As a result, the Defendants sought out non-U.S. banks whose operations would

allow the Enterprise to illegally facilitate Internet gaming transactions (Exhibits 17A,

17B ("obtain a commitment letter for a relationship with a Bank who will comply with

your request for the nonuse of the code 7995 for gaming")). Eventually, the Enterprise

paid a Korean national, Mr. Cho, to facilitate a banking relationship with LG Bank (also

known as LG Card), a large Korean bank. (Tr. 26-27). Mr. Cho had been introduced to

Defendant Carson-Selman by Neil Gallagher, a former Congressman from New Jersey.

Id. In return for facilitating this banking relationship, the Enterprise paid Cho a

percentage of each transaction processed by the Gambling Gateway Enterprise. Id. The

Defendants paid Cho almost $600,000 in commissions. (Exhibit 13, handwritten memo

from "Bethany" to "Richard").[6]

---

[5]The term "bank" used here includes bank-equivalent institutions, such as credit unions.

[6]"Bethany" is believed to be Bethany Bassler, an employee of CurrenC. It is believed
that "Richard" refers to Defendant Richard Carson-Selman.

From September, 2004, to at least February, 2005, LG Card processed gambling transactions for the Gambling Gateway Enterprise.  (Exhibit 17C).  However, in February 2005, LG Card informed the Defendants that, "[n]ow that Visa and MasterCard already have detailed information and can decide the gambling transaction by tracking the transaction record, we cannot avoid coding the proper MCC 7995."  Id. at SW-18-00003.  After that date, LG Card used the 7995 MCC for all the transactions it processed on behalf of the Enterprise.  Id.  Consequently, the number of transactions the Gambling Gateway Enterprise processed through LG Card dropped off significantly.  (Tr. 28).

The Defendants took steps to avoid detection of the Gambling Gateway Enterprise operations.  In June, 2005, Defendant Carson-Selman sent an email to Defendants Baron Lombardo and Bankey.  (Exhibit 15).  The email contained an attached article from the New York Times, reporting that PartyGaming, an online gambling business, purposefully located all its assets, and even its computer servers, outside the United States, to make it impossible for U.S. authorities to seize assets or enforce U.S. anti-gambling laws against PartyGaming's owners and operators.  Id.  In the body of the email, Defendant Carson-Selman stated that this article, "speaks volumes as to why we should not have our email servers in the US.  Any presence is a bad idea."  Id.  The Defendants subsequently moved the Enterprise's web site hosting from the United States to Rackspace, a web site hosting company with servers in the United Kingdom.  Prior to moving the Gambling Gateway Enterprise's web servers offshore, at least some of the servers used by the Gambling Enterprise had been located at Defendant Baron Lombardo's home.  (Tr. 21, 34-35).

Defendant Count Lombardo was responsible for establishing the relationship with Rackspace. (Tr. 38, 67). Defendant Count Lombardo paid for the Rackspace service using an American Express credit card in his name. (Exhibit 13 at SW-21-00869).

In addition to processing credit card transactions, the Gambling Gateway Enterprise assisted its coconspirator clients in making Western Union wire transfers available as a method of funding Internet gambling. (Tr. 16-17). In order to avoid scrutiny by Western Union, the Enterprise caused gamblers to wire money to named recipients in the Philippines. None of the named recipients were identified as Internet gambling operations. (Id.; Tr. 75-76).

Unlike the credit card processing operation, the Western Union portion of the Gambling Gateway Enterprise's business was not automated; it required real time monitoring of payments around the clock. Defendant Kimberlie Lombardo was primarily responsible for monitoring the Western Union portion of the Gambling Enterprise's operations. (Tr. At 41). Defendant Francisco Lombardo was also involved in the Western Union wire transfer portion of the Enterprise's operations. Defendants Kimberlie and Francisco Lombardo, who are married, were often paid for their participation in the Gambling Gateway Enterprise through payments to Qualasure, a company Kimberlie Lombardo created, which apparently had no other business purpose.

The successful operation of the Gambling Gateway Enterprise required a sophisticated accounting system, to keep track of the credit card and Western Union transactions, and to calculate payments to be made to the Enterprise's Internet gambling

9

web site client coconspirators. To that end, Defendant Hill created Hill Financial Services.[7] Defendant Hill Financial had no clients other than the Gambling Gateway Enterprise. (Tr. 68, 82). Hill Financial's main role was to track millions of transactions conducted by CurrenC, to allow CurrenC to identify the source of each transaction conducted through the gateway, and to reconcile its assets and accounts payable each month. Defendant Hill Financial produced lengthy account reconciliations tracking the funds paid to each gambling web site client. (Exhibit 5). These data were used to create statements that were sent to the various clients. (Exhibit 6). In addition, Hill Financial was responsible for collecting the data that was used to make wire transfers to the Enterprise's clients. (Exhibit 12). These wire transfer requests were then authorized by Defendant Hill, Defendant Baron Lombardo, or Defendant Richard Carson Selman. Id.

The Defendants made significant profits from the operation of the Gambling Enterprise. CurrenC charged its clients a fee calculated as a percentage of the total amount of money processed by the Enterprise. (Exhibit 4 at SW-04-00173; Exhibit 7 at SW-04-00162). This fee was between 6 and 7 percent of the total transactions processed on behalf of each client, with additional per-transaction fees. Id. Between 2004 and 2005, the Gambling Gateway Enterprise processed Internet gambling payments at a pace of more than $100,000,000 annually. (Tr. 28).

---

[7]Evidence indicates that Defendant Tina Hill and various employees of the Gambling Enterprise fulfilled this same function even prior to the formal incorporation of Defendant Hill Financial.

In early 2005, the Gambling Enterprise made a distribution of $6,000,000 to Defendants Baron Lombardo, Henry Bankey and Richard Carson-Selman, to trust accounts they had established through an attorney named Carl Lovell.  (Tr. 31-34; Exhibit 18).  Defendant Baron Lombardo received approximately $3,000,000.  Id.  Defendant Carson-Selman received $1,500,000.  (Tr. 35).  Defendant Bankey received the remaining $1,500,000.

Some of the evidence gathered by law enforcement agents in the course of this investigation came from former employees of the Gambling Gateway Enterprise, who are now Cooperating Witnesses in this case.  These Cooperating Witnesses have subsequently been sued by several of the Defendants.[8]  However, much of the information the former employees provided was corroborated by documents obtained from other sources, including the search warrants served at the Gambling Gateway Enterprise's business office, and Defendant Baron Lombardo's home.  (Tr. 49-51,  71-72, 76-78).

## ARGUMENT

The evidence described above establishes that each of the Defendants agreed to operate the Gambling Gateway Enterprise through a pattern of racketeering activity, as set out in the Indictment.  The Gambling Enterprise made millions of dollars for the Defendants, and funneled millions more to co-conspirator  Internet gambling web sites,

---

[8]Defendants have sought to show some motive on the part of the Cooperating Witnesses to be less than truthful (Motion for Franks Hearing, Docket #147, at page 5).  However, the misconduct alleged against  the Cooperating Witnesses, even if true, would not in any way alter the evidence that establishes the existence of the alleged conspiracy, or proof of the Defendants' connections to the Gambling Gateway Enterprise.

by disguising credit card and Western Union fund transfers as something other than Internet gambling transactions.  As outlined above, the Gambling Gateway Enterprise established banking relations with non-U.S. acquiring banks that processed these transactions for the Gambling Enterprise.  To obtain one such banking relationship, the Enterprise paid a consultant, Mr. Cho, to help them open credit card processing accounts at LG Card.

Through the Gambling Gateway Enterprise, the Defendants executed a scheme to make false representations to U.S. credit card-issuing banks, to induce the banks to authorize the release of funds to the Gambling Enterprise.  Through the Enterprise, the Defendants engaged in multiple transactions designed to launder the proceeds of the fraud, including transferring proceeds from banks outside the United States to banks inside the United States.

Each of the defendants agreed to play a specific role in the Gambling Gateway Enterprise:

### **Baron Lombardo**

Defendant Baron Lombardo was the managing director and a founding member of CurrenC.  (Exhibit 1; Tr. 77).  He owned a 50 percent share of the business.  (Tr. 30).  Former employees of CurrenC described his role as the ultimate decision-maker for each of the Gambling Enterprise operations.  (Tr. 34.).  In this role, Defendant Baron Lombardo participated in staff meetings and took responsibility for various tasks within the Enterprise.  (Exhibit 8).  Defendant Baron Lombardo was involved in correspondence

with businesses outside the Enterprise, including non-U.S. acquiring banks.  (Exhibit 10).
Defendant Baron Lombardo signed contracts, wire transfers requests, and other
documents that were required for the successful operation of the Gambling Enterprise.
(Exhibits 2, 4, 12).  As noted above, Defendant Baron Lombardo received at least
$3,000,000 in profits from the operation of the Gambling Gateway Enterprise.

Defendant Baron Lombardo participated in discussions with Defendants Bankey
and Carson-Selman regarding evading the attention of United States law enforcement, by
moving the Enterprise's servers offshore.  (Exhibit 15).  As a result, the Gambling
Gateway Enterprise servers were moved from Defendant Baron Lombardo's home to a
web hosting company with servers outside the jurisdiction of the United States.  (Tr. 34-
35).

Defendant Baron Lombardo was clearly aware that the affairs of the Enterprise
were to be conducted through a pattern of racketeering activity, and that at least two
instances of racketeering activity would be undertaken by himself or a co-conspirator
Baron Lombardo received the New York Times article described above, regarding the
Wire Wager Act and government efforts to enforce laws against Internet gambling.
Indeed, the Enterprise's own documents demonstrate the individual Defendants'
knowledge that U.S. banks would not process Internet gambling transactions.  (Exhibit 1,
17A).  Based on this evidence, the Court should conclude that the alleged conspiracy
existed, and that Defendant Baron Lombardo was a member of the conspiracy.

**Richard Carson-Selman**

Defendant Carson-Selman was also an owner and director of CurrenC. His responsibility within CurrenC was, "developing Merchant and Banking relationships." (Exhibit 1 at SW-09-01230). The board of directors of CurrenC signed a resolution authorizing him to seek banking relationships in Jamaica on behalf of the Enterprise, which he later pursued and established. (Exhibits 2, 10 at SW-09-00061 to 00062). Defendant Carson-Selman was responsible for establishing, with the assistance of Neil Gallagher and Mr. Cho, the relationship with LG Card. He was also the main point of contact for many of the banks the Gambling Gateway Enterprise used in the course of its business. (Exhibits 3; 10 at SW-18-01371; 16; 17B; 17C).

Defendant Carson-Selman was apparently the person responsible for finding non U.S. banks that would process Enterprise transactions. (Exhibit 17B, email to Richard Carson explaining that the sender would, "obtain a commitment letter for a relationship with a Bank who will comply with your request for the nonuse of the code 7995 for gaming."). Carson-Selman had a pre-existing relationship with Neil Gallagher that led to obtaining the services of Mr. Cho, and eventually to the relationship with LG Card. When LG Card was investigated by Visa and MasterCard for miscoded transactions, the bank wrote to Carson-Selman to inform him of the problem. (Exhibit 17C, "Now that Visa and MasterCard already have detailed information and can decide the gambling transaction by tracking the transaction record, we cannot avoid coding the proper MCC 7995. . . . so, please take a proper action at your end. And also, please be advised that

14

from now on, the new mids[9] will be coded with MCC 7995 to comply with the

Regulations" ).  After Visa and MasterCard threatened sanctions against LG Card,

Defendant Carson-Selman worked with them and with the Enterprise's coconspirator

clients to attempt to continue the relationship with LG Card.  (Exhibit 9).

Defendant Carson-Selman participated in many of the board meetings of CurrenC.

(Exhibit 8).  He also initiated a conversation that led to relocating all servers to offshore

web-hosting businesses.  (Exhibit 15).  Defendant Carson-Selman was aware of the

illegality of processing gambling transactions, and actively sought out non-U.S. banks

that would handle this type of transaction.  In short, Defendant Carson-Selman worked to

advance the operations of the Gambling Gateway Enterprise, knowing that the affairs of

the Enterprise were conducted through a pattern of racketeering activity.  Defendant

Carson-Selman also agreed that he, or another conspirator, would commit at least two

such acts of racketeering.  Therefore,  the Court should conclude that the alleged

conspiracy existed, and that Defendant Carson-Selman was a member of the conspiracy.

### Henry Bankey

Defendant Bankey was also a founder and part owner of CurrenC.  His role in the

Gambling Gateway Enterprise was to oversee the day-to-day operation of the business.

(Tr. 35-36).  He had frequent, direct contact with the employees of Hill Financial and

Gateway Technologies.  Id.  Defendant Bankey maintained an apartment in Utah, so he

---

[9]"Mids" (more properly MIDs) refers to Merchant Identification numbers issued by banks to merchants
who seek to have the banks process credit card transactions on the merchant's behalf.  These numbers are service
and product specific.

could have more contact with the Enterprise's employees.  Id.  Defendant Bankey was involved with Defendants Carson-Selman and Baron Lombardo in conversations about the security and management of the Gambling Gateway Enterprise.  (Exhibit 15).

Although Defendant Bankey had a falling out with the other defendants in late 2005, prior to that point he was actively involved in operating the illegal processing and transmittal business of the Enterprise as its "Chief Financial Officer and the Chief Technical Officer."  (Exhibit 14; Tr. 74-75).  In this role he participated in a discussion about moving the business's assets and intellectual property outside the jurisdiction of the United States, in order to avoid detection by U.S. law enforcement agencies.  (Exhibit 15).  Based on this evidence, the Court should conclude that the alleged conspiracy existed, and that Defendant Bankey was a member of the conspiracy.

### Francisco Lombardo

Defendant Francisco Lombardo's primary role in the Gambling Gateway Enterprise was to assist in facilitating Western Union transactions.  (Tr. 45).  The process of monitoring Western Union transactions involved providing recipient names to gamblers, to be used by the gamblers for the wires they sent to the Enterprise via Western Union.  (Tr. 75-76)  Employees of CurrenC who participated in monitoring the Western Union transactions – apparently including Francisco Lombardo – provided the recipient names so that no gambling business's name showed up on any Western Union records.  Id.

Defendant Francisco Lombardo participated in management of the real time monitoring of Western Union transactions.  (Exhibit 10 at SW-11-00222).  He was paid for this role in the business.  (Exhibit 6).  This payment included having his personal expenses paid by the Enterprise, as well as receiving a regular paycheck.  (Exhibit 25). Defendant Francisco Lombardo negotiated the terms of the payment with the staff of Hill Financial.  (Exhibit 6). Based on this evidence, the Court should conclude that the alleged conspiracy existed, and that Defendant Francisco Lombardo was a member of the conspiracy.

### Count Lombardo

Defendant Count Lombardo was responsible in part for the information technology used to run the Gambling Gateway Enterprise.  He located, paid for, and administered the offshore servers used to host the CurrenC website.  (Exhibit 13, Tr. 38).  When Defendant Count Lombardo became dissatisfied with Defendant Baron Lombardo over issues of compensation, Count Lombardo shut down the servers that allowed the Enterprise to operate, until his dispute with Defendant Baron Lombardo was resolved to his satisfaction.  (Exhibit 19; Tr. 39-40).

Count Lombardo was also responsible for the day-to-day operation of the Gambling Gateway website.  Defendant Count Lombardo had sole authority to provide access to the computer system for new employees and to remove access for employees who had left the company.  (Exhibits 20, 21, 22).  Defendant Count Lombardo also participated in board and staff meetings during which the nature of the Enterprise's

business was discussed.  (Exhibit 8).  Based on this evidence, the Court should conclude that the alleged conspiracy existed, and that Defendant Count Lombardo was a member of the conspiracy.

### Tina Hill

Defendant Hill was responsible for the accounting and financial services of the Gambling Gateway Enterprise.  She owned Hill Financial, which provided services solely to the Enterprise.  Defendant Hill was chiefly responsible for the day-to-day operations of the accounting arm of the business.  (Tr. 37).  She communicated with banks providing detailed wire instructions, and signed wire transfer authorizations.  (Exhibits 12 at SW-03-0387; 18).  Many of the recipients of the wire transfers she arranged were Internet gambling web sites, identified as such.  Id.

In addition to managing the financial aspects of the Enterprise, Defendant Hill communicated on behalf of CurrenC with banks and clients of the Enterprise.  (Exhibits 9, 10).  She also participated in CurrenC staff and management meetings.  (Exhibit 8). Defendant Hill provided the accounting services necessary to track the funds transferred by gamblers to the Internet gambling businesses.  She wired money from the Gambling Gateway Enterprise to the client gambling companies, and arranged to wire the proceeds of the fraud scheme back to the United States.  She knew the nature of the Gambling Gateway Enterprise, and conspired with the other defendants to conduct the affairs of the Enterprise through a pattern of racketeering activity.  Based on this evidence, the Court should conclude that the alleged conspiracy existed, and that Defendant Hill was a

member of the conspiracy.

### Kimberlie Lombardo

Defendant Kimberlie Lombardo had two roles in the Enterprise. First, she was primarily responsible for overseeing the real-time monitoring of the Enterprise's Western Union transactions. (Tr. 41-42). In this role she provided the gamblers with recipient names, to disguise the nature of the businesses that would ultimately receive the funds. (Tr. 75-76). Second, Defendant Kimberlie Lombardo acted as a liaison between the Enterprise and its coconspirator clients. In this role, she sent out drafts of contracts to clients, (Exhibits 23, 24); she assisted the gambling web sites in setting up their accounts with the Enterprise, Id; the communications clearly show that the Enterprise's clients were involved in Internet gambling. Id. Defendant Kimberlie Lombardo established a corporation to receive her payments from the Enterprise, as well as the Enterprise's payments to her husband. In short, Defendant Kimberlie Lombardo assisted clients that she knew to be involved in Internet gambling to establish accounts with the Gambling Gateway Enterprise, and facilitated wire transfer payments through Western Union using recipient names designed to disguise the nature of the transactions as gambling related. Based on this evidence, the Court should conclude that the alleged conspiracy existed, and that Defendant Kimberlie Lombardo was a member of the conspiracy.

### Associates of the Gambling Gateway Enterprise

The businesses CurrenC Ltd., Gateway Technologies, and Hill Financial, which are also defendants in this matter, were all part of the Gambling Gateway Enterprise.

CurrenC was the "corporate" umbrella under which the majority of the illegal activity took place. Hill Financial tracked every illegal transaction and transferred the proceeds of the bank fraud transactions to the Internet gambling businesses, and back to the Enterprise in the United States. Gateway Technologies created, hosted, and operated the software that automated the process of making false representations to the U.S. credit card issuing banks through the acquiring bank, LG Card. Each of these businesses was involved in providing technological and accounting expertise in furtherance of the illegal processing of Internet gambling transactions. Each was used to operate the Gambling Gateway Enterprise through a pattern of racketeering activity.

### BetUS

BetUS hired the Gambling Gateway Enterprise to process credit card and Western Union transactions, including transactions from bettors based in the United States. BetUS caused thousands of dollars in illegal gambling proceeds to be obtained from gamblers located in the United States through U.S. banks by way of the Enterprise's system. (Exhibit 6). It was one of many such clients that explicitly arranged with the Enterprise to process these illegal payments, including unindicted coconspirator BetonSports, and Internet Gambling Web Sites A through D.

## SUMMARY OF ARGUMENT

Each of the individuals and businesses identified above agreed to conduct and operate the Gambling Gateway Enterprise through a pattern of racketeering activity, specifically, violations of state anti-gambling statutes, and multiple acts in violation of the

alleged federal statutes..  As is clear from the descriptions of their involvement, the various conspirators were interdependent; they acted in concert to achieve their goals, relying on the other members of the conspiracy to conduct the operations of the Gambling Gateway Enterprise.

In addition, the Defendants relied on others who, either knowingly or without knowledge, assisted the operations of the Gambling Gateway Enterprise.  For example, LG Card assisted the Enterprise by processing Visa and MasterCard Internet gambling transactions.  U.S. Banks unwittingly approved credit card transactions destined to fund Internet gambling.  Western Union unknowingly made wire transfers to the Enterprise, which in turn sent the money on to Internet gambling web sites.  And United States and foreign banks transferred the proceeds of the Enterprise's operations to the Defendants and their co-conspirator clients.

## CONCLUSION

Based upon the testimony of Special Agent Jamie Hipwell,  the exhibits introduced in the United States' proffers and in the course of the James hearing, the Court should find that the preponderance of the evidence establishes the existence of the conspiracy charged in the Indictment for the purposes of admitting co-conspirator statements at trial.

Respectfully submitted this 19th day of May, 2008.

BRETT L. TOLMAN
United States Attorney

/s/ *D. Loren Washburn*
D. LOREN WASHBURN
Assistant United States Attorney

/s/ *Marty Woelfle*
MARTY WOELFLE
Trial Attorney
Organized Crime & Racketeering Section

## CERTIFICATE OF SERVICE

I hereby certify that on May 19th, 2008, the foregoing was filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

D. Gilbert Athay
43 East 400 South, Suite 325
Salt Lake City, UT 84111-2767

David V. Finlayson
David V. Finlayson, LLC
43 East 400 South
Salt Lake City, UT 84111

Scott C. Williams
Scott C. Williams LLC
43 East 400 South
Salt Lake City, UT 84111

Mark R. Gaylord
Ballard Spahr Andrews & Ingersoll, LLP
One Utah Center - Suite 600
201 South Main Street
Salt Lake City, UT 84111-2221

G. Fred Metos
McCaughey & Metos
10 West Broadway, Ste. 650
Salt Lake City, UT 84101

Vanessa M. Ramos
Utah Federal Defenders
46 W. Broadway, Ste. 110
Salt Lake City, UT 84101

Michael Pancer
4th Floor
105 West F Street
San Diego, CA 92101-6036

Fred D. "Pete" Gibson III
Lionel Sawyer & Collins
1700 Bank of America Plaza
300 South Fourth Street
1700 Bank of America Plaza
Las Vegas, NV 89101

Christopher Mathews
Lionel Sawyer & Collins
300 South Fourth
1700 Bank of America Plaza
Las Vegas, NV 89101

/s/      *Marty Woelfle*

23