BRETT L. TOLMAN, United States Attorney (#8812)
D. LOREN WASHBURN, Assistant United States Attorney (#10993)
MARTY WOELFLE, Trial Attorney (AZ #009363)
Attorneys for the United States of America
185 South State Street, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BARON LOMBARDO, et al.,<br><br>Defendants. | Case No. 2:07CR00286 TS<br><br>**GOVERNMENT REPLY TO RESPONSE BY DEFENDANT BARON LOMBARDO REGARDING ADMISSION OF COCONSPIRATOR STATEMENTS** |

_____

The United States of America, through counsel undersigned, hereby states its reply to responses filed by defendant Baron Lombardo (Doc. #187) to the Government's <u>James</u> Hearing Memorandum (Doc. #177). This reply is filed pursuant to the Court's Order (Doc. #189), filed June 24, 2008.

**I.     PROCEDURAL SUMMARY**

The defendants are charged with, <u>inter alia</u>, racketeering conspiracy (Count 1), Title 18, U.S.C. §1962(d). The United States intends to offer evidence at trial pursuant to Fed. R. Evid. 801(d)(2)(E), and therefore made an initial proffer regarding the existence of the alleged conspiracy and each defendant's connection to the conspiracy on October 5, 2007 (Doc. #70). In

its initial proffer, the Government offered 14 Exhibits (filed under seal), establishing the conspiracy and illustrating the range of coconspirator statements that will be offered at trial. A <u>James</u> hearing was held on April 14, 2008, during which 13 additional Exhibits were offered, along with the testimony of Internal Revenue Service Criminal Investigation Special Agent Jamie Hipwell. Per order of the Court, the United States filed a listing, by bates number, of the potential coconspirator statements in this case (Doc. #160, filed February 29, 2008) and a hearing memorandum (Doc. #177) on May 19, 2008. Defendants Francisco Lombardo (Doc. #160), Kimberlie Lombardo (Doc. #181) and Baron Lombardo (Doc. #187) filed responses to the Government's hearing memorandum.[1] Defendants Tina Hill (Doc. #184), Count Lombardo (Doc. #185) and Carson-Selman (Doc. #188) joined in Baron Lombardo's response. The Court ordered the Government to file its reply to these responses (Doc. #189) no later than July 7, 2008.

The United States by this motion replies to the response filed by defendant Baron Lombardo, which was joined by Defendants Tina Hill and Richard Carson-Selman. The United States will file a separate reply to the responses of defendants Kimberlie Lombardo and Francisco Lombardo, which are similar in character. The United States hereby incorporates by reference its previous filings related to co-conspirator statements including: Government's Proffer in Support of the Admission of Co-Conspirator Statements (Doc. #70) and the accompanying exhibits (Doc #71); Notice of Identification of Statements to be Introduced Pursuant to FRE 801(d)(2)(E) (Doc. #160); and <u>James</u> Hearing Memorandum (Doc. #177).

---

[1] The Court ordered the defendants to respond to the government's memorandum by June 16, 2008. Defendant's Baron Lombardo's response was originally filed June 19, 2008 (Docket #182) and is therefore not timely. Nonetheless, given the ample time before trial begins and the fact that there was no prejudice to the government due to the untimely filing, the United States does not object to the Court considering the defendant's motion.

# ARGUMENT

**I.  The Exhibits Cited by the Defendant Support a Finding of the Existence of the Conspiracy Alleged in the Indictment.**

In his memorandum in opposition to the United States' James Hearing Memorandum, Defendant Lombardo points to four exhibits, Exhibits 17A, 17B, 17C, and 15, that he argues were misconstrued by the government.  When viewed in context and in their entirety, these documents demonstrate the existence of the alleged conspiracy.

**A.  The Defendant Misconstrues the Conspiracy Alleged in the Indictment**

The defendant describes the conspiracy alleged in the Indictment as, "a Racketeering Conspiracy whose purpose was to facilitate on-line gambling by disguising or concealing the identity of monetary transactions for customers participating in on-line gambling."  The Indictment does allege the development an implementation of a bank fraud scheme as part of the racketeering enterprise, but the charges against the defendant are by no means limited to an allegation of conspiracy to commit bank fraud.  The Indictment alleges that, "[i]t was an the object of the Racketeering Conspiracy for the Defendants to make money illegally by helping Internet gambling Web sites conduct their illegal business.  The Defendants accomplished this by disguising credit card charges for gambling as charges for something else and by causing Western Union wires of funds to pay for Internet gambling to be disguised as payments to individuals rather than payments to gambling web sites." (Indictment at ¶4).

Thus, the essence of the Racketeering Conspiracy was an agreement to conduct the affairs of an Enterprise through racketeering activity, with an agreement that at least two racketeering acts of the types described in the Indictment would be committed by a member of the conspiracy.

The Indictment alleges that the racketeering acts consisted of violations of the Wire Wager Act, 18 U.S.C. § 1084; bank fraud, 18 U.S.C. § 1344; money laundering violations, 18 U.S.C. § 1956; and violations of state statues prohibiting gambling. (¶24).

>    **B.     Exhibits 17A is a Description of CurrenC's Business Plan to Help Internet gambling Web Sites Conduct their Illegal Business.**

Exhibit 17A is a document created by the defendants. The apparent purpose of the document was to describe the nature of CurrenC's business to banks with whom the defendants hoped to do business. The document described the "Expansion Goals" of CurrenC as "wish[ing] to expand relationships with banks outside of the US that have: Visa and Mastercard US dollar acquiring facilities." It further explains that CurrenC's customers include "several of the largest 'tier one' offshore (non US) Sportsbook corporations."[2] In the section of the document titled "Transactions", the defendants explain that "CurrenC would prefer to be viewed as an internet mall processing several types of transactions." CurrenC wanted to be viewed as an Internet mall – which it was not – because it wanted the banks it would create relationships with to "code the transaction as something other than 7995 (gaming)." The document continues, "Some banks may shy away from this type of business because of presumed charge backs, or because they are concerned that Visa or MasterCard might determine that the transaction is for gaming and may not want to clear it."

Defendant Baron Lombardo denies that this document shows any intent to engage in illegal conduct and instead describes Exhibit 17A as "a document describing what might occur

---

[2] The Defendant takes issue with the fact that the United States failed to cite in its memorandum the subsequent paragraph, "these sports corporations are all properly and legally licensed to do business in their respective countries." The United States did not include this paragraph because the crimes charged in the Indictment are not in any way related to the licensing of these businesses in jurisdictions outside the United States. Whether these businesses were licensed in other countries does not affect the fact that by offering their services to bettors in the United States the Internet gambling businesses violated U.S. law. It is no defense to the crimes the defendants are charged with that the defendants' clients may have been licensed in other countries.

and what procedures would be preferred." In fact, this opaque description encapsulates the essence of Exhibit 17A: "what might occur" is that credit card issuing banks "might" reject gaming transactions, and "what procedures would be preferred" were that CurrenC wanted the banks it did business with to mis-code the transactions as something other than 7995, the code they knew to be appropriate given the transactions they were processing. As such, Exhibit 17A supports the conclusion that the conspiracy alleged in the Indictment existed and that the defendants participated in it as described in the Indictment.

      C.      **Exhibit 17B Illustrates the Defendants' Efforts to Find Banks that Would Participate in Their Plan to Disguise Illegal Gambling Transactions**

Exhibit 17B is a letter from Felipe Barrios to Richard Carson-Selman. This letter communicates the details of planned actions by Barrios's company in Jamaica on behalf of CurrenC. In this document, Barrios lists various steps that he will take to accomplish the requests made of him by the defendants. One step he identifies is to, "[o]btain a commitment letter for a relationship with a Bank who will comply with your request for the non-use of the code 7995 for Gaming."

Defendant Lombardo does not address the specifics of this document other than to argue that it does not support the government's argument and that, "[a] complete reading of the [Exhibits 17A and 17B] in context establishes this defendant was attempting to operate his business in a lawful manner."

The defendant's argument that Exhibit 17B does not prove the existence of the conspiracy is unsupported by the contents of the document. As noted above, one of the specific steps the author of this document identifies is that he will "[o]btain a commitment letter for a relationship with a Bank who will comply with *your* request for the non-use of the code 7995 for Gaming."

(Emphasis added). Exhibit 17B, therefore, illustrates that the request to miscode the credit card transactions originated with the defendants. The defendants were seeking a bank that would code the gambling transactions as something other than gambling; they were not simply seeking to "operate [their] business in a lawful manner."

> **D.    Exhibit 17C Together with Other Evidence Introduced During the James Hearing Proves that the Defendants Orchestrated the Mis-Coding of Credit Card Transactions to Facilitate Illegal Internet Gambling.**

Exhibit 17C was a letter from an official at LG Card to the attention of Richard Carson-Selman at CurrenC WorldWide, and copied to Dong Sun Cho. The letter explained that LG Card had come under scrutiny by Visa and MasterCard because LG Card was not using the correct code for the gambling transactions they were processing for the Enterprise. As a result of this scrutiny by Visa and MasterCard, LG Card concluded they could no longer code gambling transactions as anything other than 7995.

Defendant Lombardo argues that, "The defendant did not participate in the providing of the wrong MCC code," and that, "[t]here is nothing nefarious about this memo." Finally, Defendant Lombardo implores the Court to consider this document "completely and in context."

In order to understand the context of Exhibit 17C, the Court must consider the other evidence offered by the government. As noted above, Exhibits 17A and 17B demonstrate that the defendants' Enterprise was actively seeking assistance from banks to process their gambling transactions using merchant codes other than 7995, the appropriate code for gambling transactions. As part of these efforts, the Defendants offered to pay Dong Sun Cho, a Korean National, a commission if he could arrange a banking relationship that would meet their needs. (Tr. 26-27). The banking relationship Mr. Cho arranged was with LG Card. Mr. Cho was paid almost $600,000 in commissions for arranging this relationship. (Exhibit 13). LG Card

processed approximately $100,000,000 in credit card transactions for CurrenC between 2004 and early 2005. (Tr. 25, 27-28). During this time the transactions conducted by the Enterprise were coded as "Direct Marketing-Catalog Merchant" rather than the code that actually applied to these gambling transactions: 7995. Due to Visa and MasterCard scrutiny resulting from increased sales volume, LG Card determined in February, 2005 that it could no longer code transactions other than as 7995. (Exhibit 17C). Shortly thereafter the volume of transactions CurrenC processed using LG Card decreased significantly. (Tr. 28).

Read in the context of their previous efforts to find banks that would code gambling transactions as something other than 7995, Exhibit 17C is a letter informing the defendants that LG Card could no longer accommodate the defendants' request to disguise the nature of their business. The defendants sought, paid for, and profited from the relationship with LG Card based upon LG Card's willingness to code gambling transactions as something other than 7995. Once again, Exhibit 17C demonstrates the defendants intent in disguising transactions and their knowledge of the importance of misleading card-issuing banks.

> E. **Defendant Carson-Selman's Reaction to the Article Attached to Exhibit 15 Proves that the Defendants Were Knowingly Engaged in Illegal Conduct and were Concerned with Avoiding Detection and Prosecution for their Acts.**

Exhibit 15 is an email from defendant Richard Carson-Selman to defendants Baron Lombardo and Henry Bankey. Attached to the email was a New York Times article from June 26, 2005 discussing PartyGaming, an Internet gambling company. The article, which starts with the observation that, "[as] a rule, companies don't often draw attention to business practices that could land their executives in jail," discusses the practice of Internet gambling businesses locating their operations and assets outside of the United States because of the fear of prosecution.

Defendant Lombardo argues that the New York Times article, far from putting the defendants on notice that their conduct was illegal, instead demonstrated that the law related to Internet gambling was unsettled.[3]

The probative value of Exhibit 15, however, arises from Carson-Selman's statement in the body of his email: "I think this speaks volumes as to why we should not have our email servers in the US. Any presence is a bad idea." Even assuming that a reader of the New York Times article could reach the conclusion Lombardo reaches in his memorandum, that "the question of whether on-line gambling was legal or not was still an unanswered question," the Defendants' reaction demonstrates their intent. In response to an article that strongly suggested that their business was illegal, the defendants responded by moving key portions of their business outside of the United States to avoid detection and to place the business outside the jurisdiction of U.S. authorities. (Tr. 21, 34-35; Exhibit 13 at SW-12-00869). This reaction proves that the defendants operated their business without regard for its legality.

## II.     The Additional Exhibits and Testimony Offered by the United States Establish the Existence of the Conspiracy by a Preponderance of the Evidence

While defendant Baron Lombardo focuses on only four of the exhibits offered by the United States, the United States offered 29 total exhibits as well as the testimony of Special Agent Hipwell to establish the existence of the conspiracy. As explained in the United States James Hearing Memorandum, (Doc. #177), the testimony and exhibits establish the existence of the conspiracy alleged in the Indictment.

---

[3] Defendant Lombardo particularly points to the portion of the email that discusses a ruling from a federal judge in New Orleans that the Wire Wager Act, "does not prohibit internet gambling on a game of chance." (Defendant Baron Lombardo misquoted this passage of the article substituting "or" where the article actually read "on"). The defendant does not explain how this ruling would have been at all reassuring to the defendants who had provided detailed assurances to LG Card that their clients directed only sports-betting transactions to CurrenC. (See, e.g. Exhibit 9 at SW-24-02262-63).

## CONCLUSION

Based on the exhibits and testimony offered by the United States, the United States has proved the existence of a conspiracy involving all of the defendants charged in the Indictment. As such, the Court should rule that for the purposes of Federal Rule of Evidence 801(d)(2)(E) the conspiracy alleged in the Indictment has been proven and all statements made by the defendants during and in furtherance of the alleged conspiracy should be admitted as admissions of all other defendants.

Respectfully submitted this 7th day of July, 2008.

> BRETT L. TOLMAN
> United States Attorney
>
> /s/ *D. Loren Washburn*
> D. LOREN WASHBURN
> Assistant United States Attorney
>
> /s/ *Marty Woelfle*
> MARTY WOELFLE
> Trial Attorney
> Organized Crime & Racketeering Section

## CERTIFICATE OF SERVICE

      I hereby certify that on July 7, 2008, the foregoing was filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

D. Gilbert Athay
43 East 400 South, Suite 325
Salt Lake City, UT 84111-2767

David V. Finlayson
David V. Finlayson, LLC
43 East 400 South
Salt Lake City, UT 84111

Scott C. Williams
Scott C. Williams LLC
43 East 400 South
Salt Lake City, UT 84111

Mark R. Gaylord
Ballard Spahr Andrews & Ingersoll, LLP
One Utah Center - Suite 600
201 South Main Street
Salt Lake City, UT 84111-2221

G. Fred Metos
McCaughey & Metos
10 West Broadway, Ste. 650
Salt Lake City, UT 84101

Vanessa M. Ramos
Utah Federal Defenders
46 W. Broadway, Ste. 110
Salt Lake City, UT 84101

Michael Pancer
4th Floor
105 West F Street
San Diego, CA 92101-6036

Fred D. "Pete" Gibson III
Lionel Sawyer & Collins
1700 Bank of America Plaza
300 South Fourth Street
1700 Bank of America Plaza
Las Vegas, NV 89101

Christopher Mathews
Lionel Sawyer & Collins
300 South Fourth
1700 Bank of America Plaza
Las Vegas, NV 89101

/s/   S. Tycz