IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BARON LOMBARDO, et al.,<br><br>Defendants. | ORDER ON *JAMES* ISSUES<br><br><br><br>Case No. 2:07-CR-286 TS |

This matter comes before the Court subsequent to a *James*[1] hearing that addressed issues related to the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). As discussed below, the Court finds that a conspiracy existed and that each of the Defendants, as well as unindicted coconspirator BetOnSports, were members of the conspiracy.

I. BACKGROUND

In addition to other substantive offenses, Defendants in this case are charged with conspiring to conduct a RICO[2] enterprise through a pattern of racketeering activity consisting of multiple acts in violation of 18 U.S.C. § 1084 (Wire Act), 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1956 (money laundering), and multiple state anti-gambling statutes.

---

[1] *United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917 (1979).

[2] Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. § 1961 et seq.

1

This Court held a *James* hearing on April 14, 2008, for the purpose of determining whether a conspiracy existed and, if so, who the members of that conspiracy were. The Government submitted a written proffer prior to the hearing. At the hearing, the Government submitted an oral proffer and called Agent Hipwell to testify regarding the Government's investigation. After hearing Agent Hipwell's testimony, the Court set briefing schedule on the conspiracy issues and set a subsequent hearing to address the admissibility of specific alleged coconspirator statements for March 10, 2009. The Government and Defendants Francisco Lombardo, Kimberlie Lombardo, and Baron Lombardo filed memoranda.[3] Defendants Carson-Selman, Count Lombardo, and Hill joined in Defendant Baron Lombardo's memorandum. Defendant Bankey did not submit a memorandum related to the Rule 801(d)(2)(E) issues.

## II.  FINDINGS OF FACT

For purposes of determining the admissibility of coconspirator statements under Rule 801(d)(2)(E) only, the Court enters the following findings of fact:

Defendants Baron Lombardo, Carson-Selman, and Bankey co-founded a business by the name of CurrenC. CurrenC LTD, also known as CurrenC Worldwide, LTD, is a Defendant in this case. CurrenC was in the business of providing payment processing services to Internet businesses, most of which were Internet gambling websites. CurrenC provided the payment processing services in large part through two associated businesses, Hill Financial Services and Gateway Technologies, both of which are also Defendants in this case.

In essence, CurrenC's business model was to act as a payment processing intermediary for gambling websites in a market where banks routinely declined to process credit card charges

---

[3]Notably, each of Defendants' memoranda were filed after the deadline set by the Court and without any request for extension of time.

for online gambling. Among CurrenC's clients were Defendant BetUS, BetOnSports, and "several of the largest 'tier one' offshore (non US) Sportsbook corporations."[4] At one point, CurrenC was processing more than $80 million in transactions per month. CurrenC offered at least two methods of payment to its gambling website clients: credit card payments and Western Union wire transfers.

Through its proprietary Internet gateway software (the "Gateway"), CurrenC processed credit card transactions for its gambling website clients, using payment information provided by gambling patrons. According to Visa and MasterCard regulations, credit card transactions for charges related to gambling are to be assigned a "7995" code to identify them as gambling transactions. Due to higher levels of risk and regulatory concerns, many banks would routinely decline to process credit card transactions that were coded 7995. Accordingly, CurrenC sought to establish relationships with foreign banks that would process the gambling transactions without using the 7995 code. CurrenC paid a Korean national, Mr. Cho, to facilitate a banking relationship with LG Bank, a Korean bank. In 2004-2005, LG Bank processed more than $100 million in credit card transactions for CurrenC. CurrenC paid Mr. Cho nearly $600,000 in per transaction commissions. In a February 2005 letter, LG Bank notified CurrenC that Visa and MasterCard had discovered the erroneously coded transactions and, as a result, LG Bank would no longer process the gambling transactions with a non-7995 code. As stated in the LG Bank letter, "Now that Visa and MasterCard already have detailed information and can decide the gambling transaction by tracking the transaction record, we cannot avoid coding the proper MCC

---

[4] April 14, 2008 Hearing Transcript [hereinafter *Transcript*], Ex. 17A.

7995."[5]  Thereafter, the number of CurrenC credit card transactions conducted through LG Bank significantly declined.

The servers used to host the Gateway were, at one point in time, located in the United States. At least one server containing information related to CurrenC's business was located in Defendant Baron Lombardo's home in Las Vegas, Nevada. At some point the Gateway was moved to server space in London, England, which was owned by a company named Rackspace.[6] Defendant Count Lombardo was responsible for establishing CurrenC's relationship with Rackspace and paid for the server space with his credit card. Defendant Count Lombardo was also responsible for managing and overseeing the leased server space and was entrusted with sole authority to grant or deny other employees access to the CurrenC servers. At one point in late 2005, Defendant Count Lombardo used his control over the servers to ensure that he was properly compensated for his services, threatening to shut down the CurrenC servers.

Government agents interviewed approximately 100 Visa and MasterCard cardholders from the United States whose credit card transactions were processed through CurrenC. Without exception, each of these persons confirmed that the charges processed through CurrenC were for Internet gambling.

CurrenC also facilitated gambling payments via Western Union wire transfers by providing patrons of its gambling website clients with fictitious names of persons in the Philippines to whom the patron was to wire gambling payments. When patrons wired money to the name provided, an agent of CurrenC would receive the money in the Philippines on behalf of

---

[5] *Id.*, Ex. 17C.

[6] *Id.* at 21, 34-35.

CurrenC's gambling website clients and then notify them of the payment's receipt. None of the recipients were identified as Internet gambling websites. Unlike the credit card payments that were largely automated through the Gateway, the Western Union transactions required constant monitoring. Defendant Kimberlie Lombardo, with the assistance of Defendant Francisco Lombardo and others, monitored the Western Union transactions. Accordingly, Defendants Kimberlie and Francisco Lombardo provided gamblers with fictitious recipient names to facilitate the Western Union wire transfers. Defendant Kimberlie Lombardo also served as a liaison between CurrenC and its gambling website clients, transmitting contract drafts and setting up client accounts on the Gateway.[7] She even signed a payment processing agreement with BetOnSports on behalf of CurrenC, listing her title as "agent." Defendant Francisco Lombardo conversed with Defendant Carson-Selman regarding the monitoring. Defendants Kimberlie and Francisco Lombardo set up a corporation by the name of QualaSure Inc. to receive compensation for their services to CurrenC.

      Defendant Hill Financial was created to provide accounting services for the CurrenC payment processing operation. Hill Financial was primarily responsible for tracking individual transactions and the movement of funds, as well as reconciling accounts and creating statements. Hill Financial had no clients other than CurrenC. In providing these services, Hill Financial produced account reconciliations, detailing amounts remitted to CurrenC's gambling website clients. Hill Financial also produced client statements reflecting credit card payments processed by the Gateway. As its owner, Defendant Hill, directed Hill Financial, overseeing its employees and preparing and authorizing wire transfers to CurrenC's clients, including Defendant BetUS.

---

[7] *Id.* at 41-42 and Exs. 23-24.

She also arranged for funds to be wired to a trust account held by Defendant Baron Lombardo. Defendant Hill communicated with banks and gambling website clients on behalf of CurrenC and participated in management and staff meetings.

In exchange for its services, CurrenC charged a per transaction fee in the range of 6-7%, resulting in substantial profits. As mentioned above, Defendants Baron Lombardo, Carson-Selman and Bankey co-founded the CurrenC business. As the owners of the business, they received a distribution in the amount of $6 million in early 2005. Of this amount, Defendant Baron Lombardo received $3 million and Defendants Bankey and Carson-Selman each received $1.5 million, according to their CurrenC ownership interests.

Each of the owners played distinct roles in the CurrenC business. Defendant Baron Lombardo was the managing director of CurrenC, exerting significant control over the business enterprise. Accordingly, he participated in management and staff meetings and was responsible for a number of tasks. Defendant Baron Lombardo signed contracts, wire requests, and other documents on behalf of CurrenC.

Defendant Carson-Selman was also a director of CurrenC, taking primary responsibility for developing relationships with gambling website clients and banks, particularly with banks who would process gambling transactions without using the 7995 code. Defendant Carson-Selman was responsible for developing CurrenC's relationship with LG Bank and Mr. Cho and he was CurrenC's primary contact for a number of banking institutions. He also participated in management and staff meetings and was assigned responsibilities.

Defendant Bankey was responsible for overseeing the day-to-day operations of the CurrenC business, managing the employees of Hill Financial and Gateway Technologies in Draper, Utah. As his role required frequent interaction with these employees, Defendant Bankey

maintained a home in Salt Lake City.  Until late 2005 when discord erupted between the CurrenC owners, Defendant Bankey served as the Chief Financial Officer and the Chief Technical Officer for Gateway Technologies.[8]

Notably, correspondence in June 2005 between Defendants Baron Lombardo, Carson-Selman, and Bankey indicates their awareness of the legal issues associated with the CurrenC business.  In an email to Defendants Baron Lombardo and Bankey, Defendant Richard Carson-Selman directs attention to a newspaper article regarding online gambling and the position of the Justice Department and a number of states that such gambling is illegal.  Defendant Carson-Selman then states, "I think this speaks volumes as to why we should not have our email servers in the US.  Any presence is a bad idea.  Lets talk about it."[9]

### III.  ANALYSIS

Under Federal Rule of Evidence 801(d)(2)(E), statements by co-conspirators are properly admissible as non-hearsay at trial if the Court determines, by a preponderance of the evidence, that (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy.[10]  It is the burden of the government to prove each of the elements by a preponderance of the evidence and it is the Court that determines admissibility.[11]  In deciding

---

[8]Docket No. 73, Ex. 14, at 6.  Docket No. 73 comprises the sealed exhibits to the Government's James proffer and will be referred to hereafter as the "*Proffer*."

[9]*Transcript*, Ex. 15.

[10]*United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994).

[11]*Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).

whether the prerequisites for admission of coconspirator statements have been satisfied, the Court may consider the coconspirator statements sought to be admitted as evidence of the conspiracy.[12] The Tenth Circuit has held, however, that "there need . . . be some independent evidence linking the defendant to the conspiracy."[13] "Such independent evidence may be sufficient even when it is not 'substantial.'"[14] The Tenth Circuit has defined "independent evidence" as "evidence other than the proffered [coconspirator] statements themselves."[15]

"To prove conspiracy, the government must show (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent."[16]

   *A. Agreement*

"'To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence.'"[17] However, it is not enough for the government to show only mere association with conspirators known to be involved in crime.[18]

---

[12]*United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996).

[13]*United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987).

[14]*Lopez-Gutierrez*, 83 F.3d at 1242.

[15]*Martinez*, 825 F.2d at 1451.

[16]*United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).

[17]*United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004)).

[18]*United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992).

The Court finds the evidence presented by the Government establishes by a preponderance of the evidence that each of the Defendants, as well as unindicted coconspirator BetOnSports, agreed to violate the law by conducting a gambling payment processing enterprise through a pattern of racketeering activity, including bank fraud, money laundering, and violations of the Wire Act. More specifically, Defendants Baron Lombardo, Carson-Selman, and Bankey, agreed to create and operate the CurrenC business to process illegal gambling transactions for gambling websites through a payment system designed to hide the gambling nature of the transactions from the Government and from various financial institutions—including credit card issuing banks—that were thereby induced to disburse funds. Defendant Hill agreed to facilitate the operation of CurrenC's gambling transaction processing operations by providing the necessary accounting services. Defendant Count Lombardo agreed to facilitate the operation of CurrenC by managing the server on which the Gateway operated. Defendants Francisco and Kimberlie Lombardo agreed to facilitate the operation of CurrenC by managing the process through which gambling payments were made by Western Union wire transfer. CurrenC was operated through Defendants CurrenC Ltd., Gateway Technologies, and Hill Financial, and in concert with CurrenC's gambling website clients, including Defendant BetUS and unindicted coconspirator BetOnSports. Accordingly, the Court finds that the government has established an agreement to violate the law.

*B. Knowledge of Conspiracy Objectives*

"To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy."[19] "Rather,

---

[19] *Yehling*, 456 F.3d at 1240.

the government only needs to demonstrate the 'defendant shared a common purpose or design with his alleged coconspirators.'"[20]

The essential objectives of the conspiracy in this case were to operate an ongoing business enterprise for profit by processing illegal online gambling transactions for Internet gambling websites through methods designed to disguise their nature, thereby inducing intermediaries, including credit card issuing banks, to disburse funds or otherwise process the transactions.

The evidence presented by the Government shows that each of the Defendants and unindicted coconspirator BetOnSports had knowledge of CurrenC's objectives. Defendants Baron Lombardo, Carson-Selman, and Bankey were the owners of CurrenC and were closely involved in its promotion, management, and day-to-day operation. Clearly they had knowledge of the above objectives. Likewise, the entities through which the gambling transaction processing business was conducted—CurrenC, Gateway Technologies, and Hill Financial—had knowledge of these objectives. In her role as head of Hill Financial where she had responsibility to move and track the gambling proceeds that were the heart of CurrenC's business, Defendant Hill knew the objectives of the conspiracy. The evidence above also shows that Defendant Count Lombardo knew of the objectives of the conspiracy as demonstrated by his control over the servers on which the Gateway operated, as well as his participation in an April 2006 staff meeting where the nature of the business was discussed. Defendants Francisco and Kimberlie Lombardo also had knowledge of the enterprise's objectives by virtue of their management of the

---

[20] *Id.* (quoting *Evans*, 970 F.2d at 669).

Western Union wire transfers, correspondence with gambling website clients,[21] and interaction with others in the enterprise.[22]  Finally, the gambling website clients, including Defendant BetUS and unindicted coconspirator BetOnSports, had knowledge of the objectives of the enterprise, as demonstrated by their hiring of the CurrenC business to process online gambling transactions.[23]

### C. Participation

"A defendant may be convicted of a conspiracy only if the government proves that the defendant had knowledge of the conspiracy and voluntarily participated therein.  A conspirator need not know of the existence or identify of the other members of the conspiracy or the full extent of the conspiracy, but he or she must have a general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator."[24]

The Court finds by a preponderance of the evidence, that each of the Defendants and unindicted coconspirator BetOnSports knowingly and voluntarily participated in the conspiracy. Defendants Baron Lombardo, Carson-Selman, and Bankey owned and operated the gambling transaction processing business through which the conspiratorial objectives were accomplished. Defendant Hill owned and operated Hill Financial, the sole function of which was to provide accounting services to the CurrenC business.  On an ongoing basis, Defendant Count Lombardo managed the server on which the Gateway operated.  Defendant BetUS and unindicted coconspirator BetOnSports voluntarily engaged CurrenC to process their gambling transactions.

---

[21] *Transcript*, Exs. 23, 24.

[22] *Proffer*, Exs. 8, 10; *Transcript*, Ex. 25.

[23] *Proffer*, at 6; *Transcript*, Exs. 23-24.

[24] *Evans*, 970 F.2d at 669–70 (internal quotation marks and citation omitted).

Defendants Francisco and Kimberlie Lombardo also knowingly and voluntarily participated in the conspiracy, although their involvement merits more discussion.  Defendant Kimberlie Lombardo contends that she was just an employee of the enterprise and, as such, merely carried out her employer's instructions.  Even assuming that this is the case, "play[ing] only a minor role in the conspiracy" does not exclude her from membership therein.[25]  More important, the evidence reveals that Defendant Kimberlie Lombardo was actively maintaining client relationships and communicating with clients regarding their contractual relationship with CurrenC.[26]  She even signed an agreement for gambling transaction processing services as an agent of CurrenC.[27]  Additionally, she was primarily responsible for running the "tracking portion of [money transfers] on Gateway."[28]  This evidence clearly shows that Defendant Kimberlie Lombardo knowingly and voluntarily participated in the conspiracy.

Defendant Francisco Lombardo contends that his participation in the CurrenC business was limited to Western Union money transfers, which he argues were not illegal because the government proffered no evidence that those transfers originated in the United States.  Thus, according to Defendant Francisco Lombardo, his actions with respect to the wire transfers were not illegal and he did not knowingly and voluntarily participate in a conspiracy to commit bank fraud.  This argument overlooks the integrated nature of the conspiracy and the transaction processing services offered by CurrenC.

---

[25] *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005).

[26] *Proffer*, Ex. 8, at SW-04-01381, SW-10-00242; *Transcript*, Exs. 23-24.

[27] *Transcript*, Ex. 24.

[28] *Proffer*, Ex. 8, at SW-10-00242.

The objectives of the conspiracy included the processing of illegal Internet gambling transactions for a profit by disguising the gambling nature of both the transactions and their proceeds. This involved both credit card processing and Western Union wire transfers. As demonstrated by contracts between CurrenC and its gambling website clients, the credit card processing services and the Western Union wire transfer services were often provided together.[29] Defendant Francisco Lombardo was aware of this, as shown by correspondence he received.[30] Additionally, CurrenC was interested in the United States gambling market, and its clients accepted bets from persons in the United States.[31] In fact, Government agents interviewed approximately 100 persons from the United States who had credit card gambling transactions processed through CurrenC. Based on this evidence, the Court finds that the conspiracy was not limited to the processing of fraudulent credit card transactions and was also not limited to processing transactions involving gamblers outside the United States. Accordingly, that the government did not introduce evidence of any specific Western Union transactions originating in the United States does not preclude a finding that Defendant Francisco Lombardo was a member of the larger conspiracy.

Defendant Francisco Lombardo has admitted his involvement in the wire transfer service. He conversed with management regarding the monitoring of these transactions[32] and was paid for

---

[29] *Proffer*, Ex. 4; *Transcript*, Ex. 24.

[30] *Transcript*, Ex. 23.

[31] *Id.* at 23.

[32] *Proffer*, Ex. 10, at SW-11-00222.

his services.  Accordingly, the Court finds that Defendant Francisco Lombardo knowingly and voluntarily participated in the conspiracy.

*D. Interdependence*

"Interdependence exists when 'each alleged coconspirator . . . depend[s] on the successful operation of each 'link' in the chain to achieve the common goal.'"[33]  "In other words, each coconspirator's 'actions must facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole.'"[34]

The Court finds that the successful operation of the CurrenC business required the interdependence of the coconspirators.  Each of the coconspirators had a distinct and necessary role to make the business work.  Defendant Baron Lombardo was the primary decision maker regarding the operational activities of CurrenC.  Defendant Carson-Selman was tasked with building banking relationships with off-shore banks willing to process CurrenC transactions.  Defendant Bankey oversaw the day-to-day operation of Gateway Technologies.  Defendant Hill oversaw the accounting operations of Hill Financial.  Defendant Count Lombardo was responsible to procure and manage the server space on which the Gateway was operated.  Defendant Kimberlie Lombardo was responsible for managing the Western Union transactions and maintaining client relationships, as well as proliferating contracts.  Defendant Francisco Lombardo was also responsible for managing the Western Union transactions.  Finally, CurrenC's clients, including Defendant BetUS and unindicted coconspirator BetOnSports, provided the gambling transactions in need of processing.

---

[33] *Yehling*, 456 F.3d at 1241 (quoting *United States v. Dickey*, 736 F.2d 571, 582 (10th Cir. 1984)).

[34] *Id*. (quoting *Evans*, 970 F.2d at 670).

## IV.  CONCLUSION

For purposes of determining the admissibility of statements under Federal Rule of Evidence 801(d)(2)(E), the Court finds that a conspiracy existed for the purpose of processing illegal gambling transactions and disguising the gambling nature of both the transactions and their proceeds in order to induce financial intermediaries, including credit card issuing banks, to disburse funds or otherwise process the transactions.  The Court also finds that Defendants Baron Lombardo, Carson-Selman, Bankey, Hill, Count Lombardo, Francisco Lombardo, Kimberlie Lombardo, CurrenC, Gateway Technologies, Hill Financial, BetUS, and unindicted coconspirator BetOnSports were members of that conspiracy.

SO ORDERED.

DATED July 23, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge