MICHAEL PANCER
Lawyer for Defendant
105 West "F" Street, 4thFloor
San Diego, California 92 101-6087
Telephone: (619) 236-1826

LONI F. DeLAND (0862)
Local Counsel for Defendant
43 East 400 South
Salt Lake City, Utah 84111
Telephone: (801) 364-1333

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | MOTION TO DISMISS INDICTMENT BASED ON UNANTICIPATED EXPANSION OF CRIMINAL LIABILITY TO CREDIT CARD PROCESSORS |
| | : | Case No. 2:07CR286 |
| vs. | : : | |
| RICHARD CARSON-SELMAN, | | |
| Defendant. | : | Judge Ted Stewart |

Defendant Richard Carson-Selman, by and through counsel, hereby moves for this Court to dismiss the indictment on the grounds that its application to Mr. Carson-Selman's alleged conduct in the Indictment is an unanticipated expansion of criminal activity in violation of the due process clause of the Fifth Amendment to the Constitution of the United States.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS INDICTMENT**

Criminal prosecutions for the violation of an unclear duty violates the constitutional duty of the government under the due process clause to warn its citizens whether and what particular conduct is legal or illegal. See *James v. United States*, 366 U.S. 213, 221 (1961); *Mallas v. United States*, 762

F.2d 361, 363 (4th Cir. 1985). When the law is vague or highly debatable, a defendant actually or imputedly lacks the requisite intent to violate it. *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974). Given the complexity and novelty of the laws governing interstate and international gambling, the development of the Internet and the maintenance of websites on servers physically located where gambling is expressly legal in the host country and by international treaty, the importance of the defendant's knowledge that he is engaged in criminal activity is critical to the completion of the criminal offense as in comparable criminal tax cases. As stated by the Second Circuit in *United States v. Pirro*, 212 F.3d 86, (2nd Cir. 2000), a circuit which many circuits use for guidance on complex tax issues:

> This court has held in *United States v. Regan*, 937 F.2d 823 (2d Cir.1991):
>
> > One of the most esoteric areas of the law is that of federal taxation. It is replete with "full-grown intricacies", and it is rare that a "simple, direct statement of the law can be made without caveat." 1 *Mertens Law of Federal Income Tax* § 1.01.... [P]roof of guilt in such cases must be predicated upon a voluntary, intentional violation of a known legal duty.
>
> *Id*. at 827 (citations and internal quotations omitted); see also *United States v. Bok*, 156 F.3d 157, 165 (2d Cir.1998) ....While these cases refer to proof at trial, this principle has application as well to an indictment, where criminal liability for perjury turns on an underlying violation of tax law.
>
> The tax law provided Pirro no notice that failure to report an "ownership interest" was criminal. In *United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir.1991), the Seventh Circuit held that an indictment must be dismissed where "current law on the tax treatment of payments to mistresses provided Harris no fair warning that her conduct was criminal," and because "new points of tax law may not be the basis of criminal convictions." The court referred to a civil case discussing the distinction between income and gifts, and stated:
>
> > [C]riminal prosecutions are a different story. These must rest on a violation of a clear rule of law.... If "defendants [in a tax case] ... could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards." [Citation.]. *Id*.

Similarly in *Mallas*, the Fourth Circuit reversed the defendants' convictions for tax evasion that arose out of a tax shelter program because they rested "on an unsubstantiated theory of tax law." 762 F.2d at 363. The court stated:

> "It is settled," this court observed in the analogous criminal tax case of *United States v. Critzer*, "that where the law is vague or highly debatable, a defendant--actually or imputedly--lacks the requisite intent to violate it." 498 F.2d 1160, 1162 (4th Cir.1974). Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal. *Id.*

Given the ongoing legal controversy and discussion over whether the Wire Wager Act even applies to Internet casino and sports gambling,[1] a statute written well before there was such a thing as an Internet, and lively scholarly debate on the issue,[2] Mr. Carson-Selman submits that the criminal prosecution of the defendants, who purportedly acted as the credit card processors for Internet gambling websites created and maintained by computers located in sovereign nations where Internet gambling is legal, is an unanticipated expansion of criminal liability in violation of the due process clause of the Fifth Amendment. It is well settled that due process bars courts from applying "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Marks v. United States*, 430 U.S. 188, 191-192, 97 S.Ct. 990, 992-993 (1977); *Rabe v. Washington*, 405 U.S. 313, 92 S.Ct. 993 (1972) (per curiam).

The Supreme Court has likened the novel construction principle to an *ex post facto* law which has been defined as one "'that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action[.] ...'" *Bouie v. City of Columbia*, 378 U.S.

---

[1] See Exhibit A, pp. ____ .

[2] See Exhibit B, pp.___ ; Exhibit C ____; Exhibit D____.

347, 353, 84 S.Ct. 1697 (1964)[3] (quoting *Calder v. Bull*, 3 U.S.(3 Dall.) 386, 390, 1 L.Ed. Comparable (1798)). By a parity of reasoning, an "unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I., § 10, of the Constitution forbids." *Bouie*, 378 U.S. at 353, 84 S.Ct. 1697.

As far as the defendant is aware, there have no other Internet gambling cases where the credit card processors have been prosecuted rather than the "bookies" or the actual operators of the website where the bets and wagers were placed. In the past, the primary federal law enforcement tool employed against domestic and international gambling until the passage of the UEGIA in October 2006[4] was Title 18, United States Code, Section 1084(a), known colloquially as the "Wire Wager Act," enacted in 1961, which provides that:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers, or information assisting in the placement of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years or both.

The purpose of the Wire Wager Act, was two-fold: (1) to assist the various States and the District

---

[3] As the Court recognized in *Pierce v. United States*, 314 U.S. 306, 311, 62 S.Ct. 237, 239, 'judicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness.' Even where vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot 'be cured in a given case by a construction in that very case placing valid limits on the statute,' for the objection of vagueness is two-fold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. The former objection could not be cured retrospectively by a ruling either of the trial court or the appellate court, though it might be cured for the future by an authoritative judicial gloss." Freund, The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 541 (1951).

[4] The Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA") was enacted into law at 10 a.m. ET on Friday October 13, 2006 as title VIII of the SAFE Port Act, HR 4954, dealing with port security. (Pub.L. No. 109-347, Title VIII).

of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and [(2)] to aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information in interstate and foreign commerce. *United States v. McDonough*, 835 F.2d 1103, 1105 n.7 (5th Cir. 1988) (quoting legislative history).[5] Section 1084 of Title 18, which was enacted in 1961 as part of a series of anti-racketeering laws, compliments other federal anti-bookmaking statutes. See 18 U.S.C. § 1952 (interstate travel in aid of racketeering enterprises (including enterprises involving gambling)), 18 U.S.C. § 1953 (interstate transportation of wagering paraphernalia), and 18 U.S.C. § 1955 (prohibiting operation of illegal gambling businesses).

The UIGEA was added in 2006 as a last minute rider to the SAFE Port Act that passed under the suspension of the rules.[6] Sec. 802 of title VIII of that SAFE Ports Act that added the UIGEA to Chapter 53 of title 31, United States Code, succinctly states the purpose of the amendment to title 31 in its heading: PROHIBITION ON ACCEPTANCE OF ANY PAYMENT INSTRUMENT FOR UNLAWFUL INTERNET GAMBLING. (P.L. 109-347, 120 Stat. 1952.) Title 31, United States Code, Section 5363 bans and Section 5366 criminalizes the acceptance of funds from bettors by operators of most online gambling Websites. The operators affected are those who:

(1) being engaged in the business of betting or wagering

(2) knowingly accept

(3) proceeds from credit cards, electronic fund transfers and checks

(4) in connection with the participation of a bettor

---

5 "The purpose of the bill was described as follows: The purpose of the bill is to assist the various States and the District of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information in interstate and foreign commerce."

H.R.Rep. No. 967, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Adm.News 2631.

6 The UIGEA was passed at midnight the day Congress adjourned for the 2006 elections. The UIGEA was added in Conference Report 109-711 on September 29, 2006 at 9:29 pm which was passed by the House of Representatives by a vote of 409-2 and by the Senate by unanimous consent on September 30, 2005. Due to H. Res. 1064, the reading of this conference report was waived.

  (5) in unlawful Internet gambling, which is the sponsorship of online gambling that violates any other federal or state anti-gambling law.

Section 5364 requires financial institutions to adopt procedures and policies designed to block the flow of prohibited funding to the operators of the affected online gambling Websites. This provision does not become mandatorily effective until the federal regulators adopt implementing regulations.[7] In order to establish a violation of Section 1084(a), the government must prove four things:

First, that the defendant was engaged in the business of betting or wagering -- in other words, that unlike a casual bettor, he or she derived all or much of his income from the business of gambling. Thus, the statute typically has been enforced against bookmakers in connection with taking bets or wagers on sporting events or contests.[8] For example, proprietors of service which gave

---

[7] Under the UIGEA, any acceptance of a funds transfer by an Internet gambling business would be a violation of the law. However, a financial institution would not necessarily be liable for a violation of the UIGEA if it permitted a funds transfer to be made to an Internet gambling business. The obligation of a financial institution will be to implement a system to identify and prevent Restricted Transactions. "The term 'restricted transaction' means any transaction or transmittal involving any credit, funds, instrument, or proceeds described in any paragraph of section 5363 which the recipient is prohibited from accepting under section 5363." 31 U.S.C. 5362(7). A financial institution would be in violation of the UIGEA only 1) it did not implement a system reasonably designed to identify and prevent transactions, or (2) the system in place was found to be inadequate.

Financial institutions are not required to implement new policies and procedures to comply with the UIGEA until the Treasury and the Federal Reserve Board ("the Fed") issue final regulations. The regulations must require a participant to identify and block any Restricted Transaction through the establishment of policies and procedures reasonably designed to identify and block Restricted Transactions. At a minimum, the regulations must provide for nonexclusive, alternative methods that would allow a participant to identify and block Restricted Transactions.

[8] In United states. v. Baborian, 528 F.Supp. 324, 327-328 (D.C.R.I.1981, the court held that an individual who placed bets was not engaged in business of betting or wagering and could not be convicted of knowingly using wire communication facilities for transmission in interstate commerce of bets, even though individual wagered average of $800 to $1,000 per day, three or four times per week.:

> "The sine-qua non of conviction under this statute is proof that the defendant was in the "business" of betting or wagering. When such a business exists is not easy to determine. There are no sharp contours in a general term such as "business," and the

(continued...)

horse race results over telephone by means of recording which played when advertised telephone number was dialed were not "engaged in the business of betting or wagering" within subsec. (a) of this section forbidding the use of wire communications facilities for the transmission of bets or wagers or information assisting in the placing of bets or wagers on sporting events or contests. See *Telephone News System, Inc. v. Illinois Bell Tel. Co.*, 210 F.Supp. 471 (N.D.Ill.1962), *affirmed* 84 S.Ct. 1134, 376 U.S. 782.

---

[8](...continued)

> present state of the law is indeed amorphous.
>
> The legislative history does not help solve the problem at hand. I do not believe the legislators were thinking of a situation such as exists in this case when they enacted section 1084. They used words interchangeably, thus obfuscating the meaning of their various statements. Referring to "professional" gamblers, the legislative history of the Act contains the following observation:
>
> * * *
>
> It is not too difficult to say from this legislative history that the bill does not encompass discussions between friends as to their opinions on the outcome of sporting events. On the other hand, one cannot say with certainty what was intended by the term "professional gambler." However, "professional gambler" was used in connection with layoff betting, which has a clear meaning in the gambling world-it is nothing more than the process whereby a gambler accepts bets from bettors and then in turn places a portion of these bets with another gambler to balance his books. In other words, he bets with another gambler to minimize potential losses. Whatever meaning the Congress had in mind, it certainly did not appear to include a mere bettor." [footnotes omitted.] [cont'd]
>
> * * *
>
> I conclude, after considering all of the foregoing legislative history, that Congress intended the business of gambling to mean bookmaking, i.e., the taking and laying off of bets, and not mere betting. The provocative question is whether this is still the proper definition when the bettor wagers substantial sums and displays the sophistication of an expert in his knowledge of odds making. I conclude the statute simply does not cover such a situation. I find that Congress never intended to include a social bettor within the prohibition of the statute and that Congress did not contemplate prohibiting the activities of mere bettors, even where, as with Mr. Baborian, they bet large sums of money with a great deal of sophistication....

Second, that the defendant transmitted, in interstate or foreign commerce, any one of the following types of material: (a) bets or wagers; (b) information assisting in the placement of bets or wagers; or (c) a communication that entitled the recipient to receive money or credit as a result of the bet or wager.

Third, that the defendant used a "wire communication facility" to transmit these materials. A "wire communication facility" is defined in Section 1081 as:

> any and all instrumentalities, personnel, services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kind by aid of wire, cable, or other like connection between the points of origin and reception of such transmission.

Fourth, that the defendant acted "knowingly."

Therefore, given the fact that the Wire Wager Act was passed at a time when the Internet did not exist, the application of the Wire Wager act to international Internet websites hosted from computers located in countries where such gambling is legal, is problematical at best. A reasonable person could believe that the Wire Wager Act did not apply to a rapidly developing technology that was significantly different from prior transmissions over wire based telephone systems, particularly when Congress was in the process of enacting a new law that specifically targeted Internet transactions and the financial support network necessary to its operation.[9] Why pass a law when

---

[9] The legislative history of UIGEA and its predecessor bills suggests that the Wire Act does not cover the conduct at issue– the wire act violations alleged in Counts 16 to 19 of the Indictment. The direct predecessor to UIGEA, the Internet Gambling Prohibition and Enforcement Act, H.R. 4411, 109th Cong. (as passed by House, July 11, 2006), contained several provisions that would have amended the Wire Act to cover the transmissions alleged in Counts 16 to 19. One such provision would have amended the definition of "bet or wager" to extend the Wire Act's coverage to non-sports gambling, *see* H.R. 4411, § 101, while another provision would have amended the Wire Act to prohibit electronic fund transfers associated with Internet gambling. *See id.* § 102.

Although the language from H.R. 4411 prohibiting non-sports gambling and electronic fund (continued...)

there was already one in effect that covers the conduct at issue over the Internet unless the old law arguably does not apply? In addition, as noted in recent congressional action, the UIGEA has been criticized as being too vague to be enforced and needs to clarified. *See* testimony before the House committee on the Judiciary, November 15, 2007; April 2, 2008 hearing: "Proposed UIGEA Regulations: Burden Without Benefit?" Chm. Barney Frank. *See also* H.R. 5767 and 6663. The congressional response is collectively attached Exhibit A.

Further, as noted in the United States General Accounting Office Report to Congressional Requesters, December 2, 2002, GAO-03-89, a report to the House Committee on Financial Services and Subcommittees on Financial Institutions and Consumer Credit, and Oversight and Investigations, *Internet Gambling -- An Overview of the Issues*:

> Although some Internet gambling businesses, including foreign entities, have been successfully prosecuted under the Wire Act, **courts do not agree on the applicability of certain sections of the statute**.
>
> First, individual **courts have reached different conclusions about the types of gambling covered by the act**. The statute prohibits the transmission of "information assisting in the placing of bets or wagers on any sporting event or contest." This language has led some courts to interpret the Wire Act as covering bets only on contests that involve sports.
>
> Second, **the phrase "transmission of a wire communication" is somewhat ambiguous as it applies to the Internet**. Depending on how the phrase is interpreted, **the act might not apply to Internet gambling** in some instances—for example, when information is only received over the Internet. Some courts have held that "transmission" means receiving as well as sending information, while others have held that it means only sending.
>
> Third, some **disagreement exists among the courts** concerning the second paragraph of the

[9](...continued)
transfers was incorporated directly into UIGEA, Congress *omitted* all references to the provisions amending the Wire Act and *that statute was left unaltered. See* 31 U.S.C. §§ 5362-5363. That Congress chose to incorporate into UIGEA language from H.R. 4411 without amending the Wire Act indicates its intention that UIGEA, rather than the Wire Act, govern transmissions of the kind alleged in Counts 16 to 19.

Wire Act, 18 U.S.C. § 1084(b), which provides that:

> [n]othing in this section shall be construed to prevent the transmission . . . of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal."

In other words, transmitting information to assist in placing bets on a certain event is legal if two conditions are met: (1) betting on the event is legal in both the place where the transmission originates and the place where it is received, and (2) the transmission is limited to information that assists in the placing of bets—that is, it does not include the bets themselves. **Certain courts have stated that this language means that when the betting activity is legal in both jurisdictions, interstate gambling would not be a violation of the Wire Act**. Most courts disagree with this interpretation of Section 1084(b), and based upon the language of Section 1084(b) and clear statements in the legislative history, DOJ disagrees with this interpretation as well.

Finally, the Wire Act mandates that a wire communication facility must be involved in order for a violation to occur. Currently, all Internet communications are dependent in some way on some type of wire communication, such as telephone or data lines. Depending on how Internet technology develops, however, future Internet communications may no longer be wire communications covered under the Wire Act. [footnotes omitted; emphasis added.][GAO Rpt. to Congress, pgs. 20-21.][10]

---

[10] In 1996, Congress created the National Gambling Impact Study Commission to examine the social and economic impacts of gambling, including Internet gambling, by conducting a comprehensive legal and factual study. In its 1999 report, the commission recommended (1) that the federal government prohibit any Internet gambling not already authorized and encourage foreign governments not to harbor Internet gambling organizations, and (2) that Congress pass legislation prohibiting the collection of credit card debt for Internet gambling.[2] [Fn. 2 National Gambling Impact Study Commission, "Final Report" (June 1999).] The social and economic concerns about Internet gambling raised in the report included underage gambling, pathological gambling, lack of consumer protections, and criminal abuse. In response to these concerns, numerous bills were introduced in Congress to prohibit Internet gambling. [GAO Rpt. To Congress, p.1.]... Internet gambling is an essentially borderless activity that poses regulatory and enforcement challenges. The legal framework for regulating it in the United States and overseas is complex. U.S. law as it applies to Internet gambling involves both state and federal statutes. In general, gambling is regulated at the state level, with each state determining whether individuals can gamble within its borders and whether gaming businesses can legally operate there. Five states (Illinois, Louisiana, Nevada, Oregon, and South Dakota) have enacted laws that specifically prohibit certain aspects of Internet gambling, but laws in other states that prohibit some types of gambling activities generally apply to Internet gaming as
(continued...)

Further, the patent ambiguity inherent in applying the Wire Wager Act to businesses associated with Internet gambling websites was recently noted in Gambling Law an Overview, Cornell University Law School, as follows:

> Since current gambling law (18 U.S.C. 1084) focuses on wire transmissions, its application to the Internet is far from explicit. Legislation has been proposed to address the problem, but it hasn't yet passed. **Until it does, an uncertain mix of Federal and state law must cope with the issues complexities**.

www.law.cornell.edu/wex/index.php/Gambling (last modified June 28, 2007)

Another respected legal commentator has described the application of federal gambling laws to Internet gambling sites as "murky":

> The law surrounding Internet gambling in the United States has been murky, to say the least. For years, the Department of Justice has contended that all forms of Internet gambling are illegal under United States federal law, as is the marketing, promotion, or advertising thereof. However, the statutory language and judicial precedent pertaining to online gambling does not necessarily support the governments broad pronouncements of illegality.[11]

As of this date, the regulations governing the financial institutions have not been issued by the Treasury and the Fed and been the subject of hearings chaired by Rep. Barney Frank questioning whether the Regulations should be issued. See attached Exhibit B. As noted by Jessica M. Goulash in her April 1, 2007 law review article in the University of Pittsburg Journal of Technology Law & Policy entitled: The Unlawful Internet Gambling Enforcement Act Effects on the Online Gambling

---

[10](...continued)
well. Federal law recognizes that state laws vary and seeks to ensure that neither interstate nor foreign commerce is used to circumvent them.... According to an interactive gaming industry services group, Internet gambling has been legalized in over 50 countries and jurisdictions, mostly in Europe, the Caribbean, and the Australia/Pacific region. A few countries and jurisdictions have prohibited it, but we were unable to determine the exact number. [GAO Rpt. to Congress, pgs. 5-7.]

[11] *See* Lawrence G. Walters, Esq., a partner in the law firm of Weston Garrou, DeWitt & Walters, *Basic Information Regarding Online Gambling*, http://gameattorneys.com/OnlineGambling.php.

<u>Industry</u>:

> Additionally, the UIGEA does not specifically outlaw betting on Internet casino style games, such as blackjack and poker. In fact, sports betting is the only form of online gambling specifically prohibited by the act. Cardplayer.com noted that the act does not prohibit anyone from playing online poker. Moreover, the act allows the state to house an online gaming site for citizens. Prepaid Visa cards may also be used to pay for Internet gambling.
>
> Although the effect of the UIGEA on Internet gambling are somewhat unclear, numerous loopholes and modes by which determined online gamblers may circumvent the act have already been identified. Once the regulations are in place at the beginning of July, 2007, Internet gamblers and companies will surely mount various challenges to the UIGEA in court.

The University of Pittsburg School of Law article is attached as Exhibit C, pp.___ .

Another recent exhaustive and authoritative law review article published in the Banking Law Journal, 124 Banking L.J. 483, analyzes the history and purpose of the Wire Wager Act and the UIGEA is attached as Exhibit D. Finally, a copy of the proposed complex and lengthy regulations (50 single spaced pages) that have yet to be issued by Treasury and the Fed are attached as Exhibit E. The authors of <u>Betting and Buying: The legality of Facilitating Financial Payments for Internet Gambling</u> unequivocally state in the Banking Law Journal published in June 2007, at pp. 483-484 & 486-487 (see attached Exhibit D, pp. ___):

> This article is intended to give an overview of the burgeoning Internet gambling industry and its particular impact on the financial institutions and financial transaction providers who facilitate funding for Internet gambling operations. In recent years, the Internet gambling industry has become a target of federal and state regulation. **As most Internet casinos operate off-shore, the government's attention has largely been focused on restricting financial entities' ability to facilitate payment transactions on behalf of Internet gambling operators. Until recently, the government's efforts in this regard have been largely futile, although expensive for many entities who have had to defend against the government's unwarranted claims of unlawful conduct, <u>because the myriad of federal and state laws intended to regulate gambling and financial entities' ability to process related payment transactions fall far short of their intent due to vague language and inconsistent application</u>.** In October 2006, however, the tide changed when President Bush signed into law the Safe Accountability for Every

> Port Act (the "SAFE Port Act"), which includes the Unlawful Internet Gambling Enforcement Act of 2006. This Act makes it plain, for the first time, that federal law prohibits Internet gambling and restricts financial transaction providers and electronic payment systems that are based in the United States from accepting, distributing or otherwise honoring Internet gambling-related transactions.
>
> * * *
>
> The legal landscape surrounding Internet gambling has recently undergone a substantial transformation in light of passage of the UIGEA. **<u>Prior to the UIGEA, the patchwork of vague federal laws and differing state laws created uncertainty as to which laws actually govern Internet gambling and related financial transactions. Before the UIGEA, no federal laws specifically prohibited Internet gambling activities, or restricted payment transactions related to these activities</u>. Even so, in recent years, law enforcement officials repeatedly threatened prosecution of companies providing EFT and other payment services for Internet gambling operators.** Such threatened prosecution is likely to increase with the passage of the UIGEA and regulations soon to be promulgated thereunder, which will be announced by July 10, 2007. In addition to the UIGEA, other federal and state statutes may be broadly interpreted to implicitly prohibit or regulate aspects of these transactions.
>
> Before the UIGEA, the regulation of gambling was largely a matter of state law. Because the Internet allows gambling to occur across state and international borders, however, Internet gambling activities are more properly subject to federal regulation, as intended by the UIGEA. Although there will still be the risk that the laws of the individual states will be circumvented or ignored, federal legislation adds strength to gambling regulation. Federal regulation is also required because most gambling Web sites are located outside the United States.

[Emphasis added; footnotes omitted.]

Obviously, even with the enactment of the UIEGA in October of 2006 and the lengthy proposed regulations (12 CFR Part 233; 31 CFR Part 132, "Prohibition on Funding of Unlawful Internet Gambling," attached hereto as Exhibit E)--that have still not issued despite passing the deadline for their issuance by Treasury and the Fed-- this is not a body of law that is clear and definite even at this juncture, let alone clear as to the culpability of the defendant's actions under the earlier and more vague and ambiguous application of the Wire Wager Act to the defendant's purported actions in allegedly doing business with Internet gambling websites. One need only

compare and contrast the findings of the Sixth Circuit in *Sanders v. Freeman*, 221 F.3d 846, 853 (6th Cir. 2000) and the nebulous holdings by the other federal circuits on the application of §1084 to Internet gambling and the above cited comments in the legal community :

> Sanders relies heavily on *Mallas* and its progeny, arguing that the state of Tennessee failed to provide him with notice in the form of a judicial decision, regulation, or revenue ruling that his business transactions were subject to state sales tax. In the *Mallas* line of cases, however, the reviewing courts found that the complex statutory provisions at issue were legitimately subject to contrary interpretations that were both reasonable and well-supported. In this case, both the Tennessee court of appeals and the federal district court agreed that the statutory provision at issue was not ambiguous, **and noted that other courts that have interpreted similar statutory provisions have all agreed that transactions of the kind at issue in this case are subject to state sales tax**. [citations.].
>
> ...Notice of potential tax liability may be provided by "authoritative constructions sufficiently illuminating the contours of an otherwise vague provision." *Dombrowski v. Pfister*, 380 U.S. 479, 490-91, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Although the Supreme Court stated in *United States v. Lanier* that "due process bars courts from applying a novel construction of a criminal statute that neither the statute nor any prior judicial decision has disclosed to be within its scope," 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), the lower courts did not convict Sanders based on a novel construction of the statute, but rather **interpreted the applicable tax provisions in a manner consistent with state administrative opinions and judicial decisions from other states**. In short**, the lower courts' construction of the statute was not novel, but entirely foreseeable in light of the statutory language and the many cases from other jurisdictions in which courts considering similar tax provisions have found the exchange of coins and bullion for cash to be taxable**."

Here, there was anything but an established body of law and administrative opinions and regulations such that the criminal applicability of the Wire Wager Act to Mr. Carson-Selman was foreseeable in light of the statutory language, relevant international trade Treaties, and judicial decisions from other circuits. See, e.g *In re Mastercard Int'l. Inc. Internet Gambling Litig.,* 132 F. Supp. 2d 468, 480 (E.D. La. 2001), *aff'd,* 313 F.3d 257 (5th Cir. 2002).

Thus, prior to and after the passage of the UIEGA it is well acknowledged the laws pertaining to Internet gambling were a complex, patchwork of state and federal statutes that contained

ambiguities limiting its applicability that were still unresolved at the time of the enactment of the UIEGA. **Since all of defendant Carson-Selman's actions alleged in the Indictment long predated the adoption of the UIEGA**, the application of the Wire Wager Act to defendant's activities as a credit card processor was unforeseeable in light of the plain meaning and history of the statute and its interpretation at the time by the courts and knowledgeable governmental bodies.

Speaking for a unanimous Supreme Court in *Boulware v. United States*,___U.S.___, 128 S.Ct. 1168, 76 USLW 4119 (March 3, 2008), Justice Souter recently admonished: "Even if there were compelling reasons to extend § 7201 to cases in which no taxes are owed, it bears repeating that "[t]he spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute," *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (opinion for the Court by Jackson, J.). If § 301, § 316(a), or § 7201 could stand amending, Congress will have to do the rewriting." *Boulware*, Slip Op. p. 13.

## CONCLUSION

In that reasonable minds can differ and respected legal scholars can debate the applicability of the Wire Wager Act to Internet gambling transactions in light of the statute's plain meaning and legislative history, to criminalize the defendant's alleged acts in processing credit card transactions over the Internet would violate the due process clause of the Fifth amendment. Consequently, the indictment must be dismissed.

Respectfully submitted,

DATED: October __, 2008

/s/ Loni F. DeLand
Loni F. DeLand Lawyer for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on October __, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Loren Washburn
Assistant United States Attorney 185 South State Street, Suite 400 Salt Lake City, Utah 84111

/s/ Heather M. Stokes