

# The University of Pittsburg
## JOURNAL OF TECHNOLOGY LAW & POLI

**HOME**

**JOURNAL NEWS**

*CURRENTS*

**ARCHIVE**

**EDITORIAL STAFF**

**SUBMISSIONS**

---

**University of Pittsburgh**



**School of Law**

---

<u>Citation Format</u>

[Vol.] PGH. J. TECH. L. &
Pol'y [Art. #]

---

**Permission To Reprint**

---

<u>Contact Information</u>

**Thomas Beline, Editor-in-Chief**

**Elana Kornblit, Executive Editor**

**George Ernst, Executive Editor**

Journal of Technology Law &
Policy
University of Pittsburgh School of
Law
3900 Forbes Avenue
Pittsburgh, PA 15260

---

# The Unlawful Internet Gambling Enforcem
# Act's Effects on the Online Gambling Indus

by Jessica M. Gulash
*University of Pittsburgh School of Law, J.D. expected 2008.*
04/01/2007

Internet gambling in the United States has become extremely p
over roughly the past ten years.[1] Although it is currently illega
Internet gambling companies to operate in the United States and for
the United states to place bets on the Internet, it is estimated that appr
eight million Americans gamble online.[2] The rise of Internet gam
the lack of adequate regulatory legislation has forced courts to "cobbl
precedent based on statutes and case law, neither of which are on poi
2006, legislators attempted to address this problem by passing the
Internet Gambling Enforcement Act (hereinafter "UIGEA" or the "
However, whether this law will ultimately have a meaningful i
Internet gambling remains to be seen, as online gamblers are alread
ways to circumvent it.

The first gaming websites, which allowed people to play for
imaginary money, appeared in 1995.[5] Soon after that, websit
allowing gamblers to play for prizes and some began to accept a
through the use of credit cards and wire transfers.[6] It had quickl
apparent that online gambling had the potential to surpass annual re
$10 billion, approximately the take of the Las Vegas Strip and Atl
combined.[7]

At about the same time that Internet gambling became a r
small island nation of Antigua created a free-trade zone, allowing cro
gambling operators to accept bets without paying corporate taxes.[
Internet betting companies set up in Antigua, advertised on the Inte
eventually went "virtual."[9] For example, by 1998, there were appr
twenty-five Internet "sportsbooks" – companies that advert
information and allow people to bet on sporting events – registered in
[10] Despite the fact that these companies were registered and li
Antigua, individuals in the United States could avail themselves
services by virtue of their websites' accessibility to people anywh
world.

The problem of the regulation of Internet gambling by offici

EXHIBIT "C"     0001

# The Unlawful Internet Gambling Enforcement Act's Effects on the Online Gambling Industry

by Jessica M. Gulash
*University of Pittsburgh School of Law, J.D. expected 2008.*
04/01/2007

Internet gambling in the United States has become extremely popular over roughly the past ten years.[1] Although it is currently illegal both for Internet gambling companies to operate in the United States and for people in the United states to place bets on the Internet, it is estimated that approximately eight million Americans gamble online.[2] The rise of Internet gambling and the lack of adequate regulatory legislation has forced courts to "cobble together precedent based on statutes and case law, neither of which are on point."[3] In 2006, legislators attempted to address this problem by passing the Unlawful Internet Gambling Enforcement Act (hereinafter "UIGEA" or the "Act")[4]. However, whether this law will ultimately have a meaningful impact on Internet gambling remains to be seen, as online gamblers are already finding ways to circumvent it.

The first gaming websites, which allowed people to play for free with imaginary money, appeared in 1995.[5] Soon after that, websites began allowing gamblers to play for prizes and some began to accept actual bets through the use of credit cards and wire transfers.[6] It had quickly become apparent that online gambling had the potential to surpass annual revenues of $10 billion, approximately the take of the Las Vegas Strip and Atlantic City combined.[7]

At about the same time that Internet gambling became a reality, the small island nation of Antigua created a free-trade zone, allowing cross-border gambling operators to accept bets without paying corporate taxes.[8] Many Internet betting companies set up in Antigua, advertised on the Internet, and eventually went "virtual."[9] For example, by 1998, there were approximately twenty-five Internet "sportsbooks" – companies that advertise odds information and allow people to bet on sporting events – registered in Antigua.[10] Despite the fact that these companies were registered and licensed in Antigua, individuals in the United States could avail themselves of their services by virtue of their websites' accessibility to people anywhere in the world.

The problem of the regulation of Internet gambling by officials in the United States is illustrated by New York v. World Interactive Gaming Corp., in which the central issue was whether the State of New York could enjoin an Antiguan corporation from offering gambling to internet users in that state, where gambling not authorized by the state legislature is expressly prohibited.[11] World Interactive Gaming Corporation ("WICG"), a Delaware corporation with offices in New York, owned GCC, an Antiguan subsidiary that operated an online gambling website from Antigua.[12] Although users who entered a permanent address from a state that did not permit land-based gambling were not

granted access to GCC's services, the software did not verify the user's actual location. Thus, gamblers could circumvent this policy by entering an address from a state, such as Nevada, that does permit land-based gambling.[13] While New York's Attorney General sought to enjoin WIGC from conducting business in New York, WIGC argued that they were operating a legitimate business that was in compliance with Antiguan law and that no state or federal law regulated Internet gambling.[14] Additionally, WIGC asserted that all of the gambling took place outside the State of New York.[15] However, the court, recognizing the unique issues raised by Internet gambling, held that the "act of entering the bet and transmitting the information from New York via the Internet is adequate to constitute gambling activity within [that state]."[16] The court also held that WIGC's actions violated several federal statutes.[17]

The fact that the State of New York had to use several state and federal laws in order to enjoin WIGC from allowing New Yorkers to gamble online clearly indicated that statutory reform would be necessary in order to effectively regulate Internet gambling throughout the United States. By 2000, some members of Congress, such as Senator Jon Kyl, were advocating for a federal law that would ban or criminalize Internet betting.[18] Kyl alleged that Internet gambling was accessible to children, highly addictive, linked to organized crime, and subject to fraud.[19] Another, perhaps more pervasive, objection to online gambling was that it dodges the monopoly on gaming held by states and Native American tribes.[20]

From 1996 through 2002, Senator Kyl made several attempts to pass the Internet Gambling Prohibition Act, which would have criminalized the operation of a betting business and the placing of bets online.[21] However, Kyl's law was ultimately defeated.[22] In 2001, Representatives James Leach (R-IA) and John LaFalce (D-NY) introduced the Unlawful Internet Gambling Funding Prohibition, which would have criminalized credit card, check, and electronic funds transfers to online casinos.[23] This legislation did not pass Congress in 2001 or 2002.[24]

The UIGEA was initially introduced by Representative Leach on November 18, 2005.[25] The Act was passed by Congress on September 29, 2006, and enacted by President Bush on October 13, 2006.[26] The Act is Title VIII of the Safe Port Act, a completely unrelated bill that deals with port security.[27] In fact, the UIGEA was pushed through Congress so quickly that no one on the Senate-House Conference Committee ever saw the final language of the bill, according to Senator Frank R. Lautenberg (D-NJ).[28]

In short, the UIGEA regulates the use of certain financial instruments in online gambling.[29] It prohibits credit card companies, banks, and other financial institutions from processing online gambling transactions. It also forbids individuals engaged in the "business of betting or wagering" to accept credit, electronic funds transfers, checks, and other financial transactions in connection with Internet gambling.[30] The Act provides that within 270 days of enactment,

the Secretary and Board of Governs of the Federal Reserve System must prescribe regulations "to identify or block or otherwise prevent or prohibit restricted transactions through the establishment of policies and procedures reasonably designed to identify and block or otherwise prevent the acceptance of restricted transactions."[31] Thus, the regulations must be in place by July 10, 2007. In addition, the UIGEA provides for civil remedies[32] and criminal penalties[33] for violation of the Act.

Although the Internet gambling community's initial reaction to the Act was negative, several individuals have already identified potential loopholes and ambiguities that may allow at least some forms of online gambling to continue. For example, Professor I. Nelson Rose of Whittier Law School has noted the following:

· The Act does not expand the reach of the Wire Act, which is the federal statute most commonly used to combat Internet gambling. Courts have ruled that the Wire Act applies only to bets on sporting events and races. This means that online poker may not be entirely prohibited by the UIGEA.

· Tribal organizations may set up an Internet gaming system if it is authorized by the Indian Gaming Regulatory Act and is not open to the general public.

· States may decide for themselves whether their citizens are permitted to place bets on horse races from their home computers.

· While banking institutions based in the United States will most likely comply with the Act, companies based in other countries will most likely not comply because they are not subject to United States' regulations.

· Payment processors who are entirely overseas may not be subject to the jurisdiction of the United States courts.[34]

Additionally, the UIGEA does not specifically outlaw betting on Internet casino-style games, such as blackjack and poker. In fact, sports betting is the only form of online gambling specifically prohibited by the Act.[35] Cardplayer.com noted that the Act does not prohibit anyone from playing online poker.[36] Moreover, the Act allows a state to house an online gaming site for its citizens.[37] Prepaid Visa cards may also be used to pay for Internet gambling.[38]

Although the effects of the UIGEA on Internet gambling are somewhat unclear, numerous loopholes and modes by which determined online gamblers may circumvent the Act have already been identified. Once the regulations are in place at the beginning of July, 2007, internet gamblers and companies will surely mount various challenges to the UIGEA in court.

For additional information, please see the following:

· Two Plus Two Publishing: http://www.twoplustwo.com

**EXHIBIT "C"**    0004

· Online Gambling Legislation News: http://www.cardplayer.com/poker_law

· Gambling and the Law: http://www.gamblingandthelaw.com

· Poker Prof's Poker Blog:
http://www.lasvegasvegas.com/pokerblog/archives/003634.php

---

[1] Joseph J. McBurney, To Regulate or Prohibit: An Analysis of the Internet Gambling Industry and the Need for a Decision on the Industry's Future in the United States, 21 Conn. J. Int'l L. 337, 337 (2006).

[2] Id. at 337-38; Julia Kollewe & Stephen Foley, Online Gaming Shares Plummet as U.S. Lawmakers Threaten Clampdown, The Independent (Feb. 15, 2006), http://news.independent.co.uk/business/news/article345547.ece (last visited March 22, 2007).

[3] McBurney, supra Note 1, at 337.

[4] 31 U.S.C. §§ 5361-5366 (2006).

[5] David G. Schwartz, Cutting the Wire: Gaming Prohibition and the Internet 178 (William R. Eadington, ed. Univ. of Nevada Press) (2005).

[6] Id.

[7] Id.

[8] Id.

[9] Id.

[10] McBurney, supra Note 1, at 340.

[11] New York v. World Interactive Gaming Corp., 714 N.Y.S. 2d 844, 846 (N.Y. App. Div. 1999).

[12] Id. at 847.

[13] Id.

[14] Id. at 848.

[15] Id. at 850.

[16] Id.

[17] World Interactive Gaming Corp., 714 N.Y.S. 2d at 851-53.

[18] Schwartz, supra Note 5, at 186.

**EXHIBIT "C"**    0005

[19] Id.

[20] Id.

[21] McBurney, supra Note 1, at 348.

[22] Id.

[23] Id. at 348-49.

[24] Id. at 349.

[25] Id. at 364.

[26] Frank Ahrens, New Law Cripples Internet Gambling; Banks Are Barred from Handling Transactions, TechNews, Oct. 14, 2006, at A01.

[27] I. Nelson Rose, Gambling and the Law: The Unlawful Internet Gambling Enforcement Act of 2006 Analyzed, at http://www.gamblingandthelaw.com/columns/2006_act.htm (last visited Mar. 21, 2007).

[28] Id.

[29] Andrew Serwin, The Battle Over Online Gambling, Cyberspace Lawyer (Dec. 2006), at http://www.foley.com/files/tbl_s31Publications/FileUpload137/3754/The%20Battle%20Over%20Online%20Gambling.pdf (last visited Mar. 22, 2007).

[30] 31 U.S.C. § 5363.

[31] 31 U.S.C. § 5364.

[32] 31 U.S.C. § 5365.

[33] 31 U.S.C. § 5366.

[34] Rose, supra Note 27.

[35] Catherine Holahan, Online Gambling Still in the Cards?, at http://www.msnbc.msn.com/id/15118962/ (last accessed Mar. 21, 2007).

[36] CardPlayer.com Explains Unlawful Internet Gambling Enforcement Act, at http://www.cardplayer.com/poker_news/article2787 (last accessed Mar. 22, 2007).

[37] Id.

[38] See generally Poker Legislation, 2 + 2 Forums, at http://forumserver.twoplustwo.com/postlist.php?Cat=0&Board=law (last accessed Mar. 22, 2007).

**EXHIBIT "C"**   0006