124 BLJ 483                                                                                          Page 1
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Banking Law Journal
June, 2007

**\*483** BETTING AND BUYING: THE LEGALITY OF FACILITATING FINANCIAL PAYMENTS FOR
INTERNET GAMBLING
**Andrea L. Marconi, Brian M. McQuaid [FNa1]**

Copyright © 2007 by A.S. Pratt & Sons; Andrea L. Marconi, Brian M. McQuaid

This article is intended to give an overview of the burgeoning Internet gambling industry and its particular impact on the financial institutions and financial transaction providers who facilitate funding for Internet gambling operations. In recent years, the Internet gambling industry has become a target of federal and state regulation. As most Internet casinos operate off-shore, the government's attention has largely been focused on restricting financial entities' ability to facilitate payment transactions on behalf of Internet gambling operators. Until recently, the government's efforts in this regard have been largely futile, although expensive for many entities who have had to defend against the government's unwarranted claims of unlawful conduct, because the myriad of federal and state laws intended to regulate gambling and financial entities' ability to process related payment transactions fall far short of their intent due to vague language and inconsistent application. In October 2006, however, the tide changed when President Bush signed into law the Safe Accountability for Every Port Act (the "SAFE Port Act"), which includes the Unlawful Internet Gambling Enforcement Act of 2006. This Act makes it plain, for the first time, that federal law prohibits Internet gambling and restricts financial transaction **\*484** providers and electronic payment systems that are based in the United States from accepting, distributing or otherwise honoring Internet gambling-related transactions. The UIGEA represents the culmination of years of attempts by the federal government to cut the heart out of the Internet gambling industry. Regulations and procedures which financial entities must implement will be implemented by July 10, 2007. Therefore, this is an emerging area of the law that financial entities must be aware of in order to ensure compliance with the Act.

This article, thus, analyzes the UIGEA, as well as other laws which may be interpreted to regulate Internet gambling and their particular impact on financial institutions and financial transaction providers. The article also discusses measures that financial entities should take to insulate themselves from potential liability.

The Internet has significantly changed commercial interaction. What was once a "hobbyist's plaything" has become an entirely new marketplace. [FN1] The Internet market has been embraced by almost all types

COPR. © 2008 Warren Gorham Lamont

EXHIBIT "D"    0001

124 BLJ 483                                                                    Page 2
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

of commercial enterprise, and Internet commerce generated almost $3 trillion in 2003. [FN2] Out of this market have emerged many new industries, including Internet gambling. The growth of the Internet gambling industry is staggering. In 2005 alone, a reported 2,500 Internet gambling Web sites [FN3] generated revenues of an estimated $10.9 billion. [FN4] In response to the growth and effects of this new market, the federal government has become increasingly interested in regulating the Internet gambling industry.

On Friday, October 13, 2006, President Bush signed into law the Safe Accountability for Every Port Act, otherwise known as the SAFE Port Act, which includes the Unlawful Internet Gambling Enforcement Act of 2006 (the "UIGEA" or the "Act") as Title VIII. [FN5] In essence, the UIGEA makes it plain that federal law prohibits Internet gambling and restricts financial transaction providers and electronic payment systems that are based in the United States from accepting, distributing, or otherwise honoring Internet gambling-related transactions. The UIGEA represents the culmination of years of attempts by the federal government to cut the heart out of the *485 Internet gambling industry.

The Internet gambling industry emerged on August 18, 1995, when the first online casino, Interactive Casinos, Inc., began accepting online wagers. [FN6] To gamble online, a gambler logs onto a casino Web site (e.g., www.gonegambling.com) and enters billing information to receive gambling credits. The gambler can then place wagers with these credits; subsequent losses or winnings are electronically debited from or credited to the gambler's account. The casino sends net winnings to the gambler or the gambler's bank account via wire transfer. These winnings are consummated through a variety of payment vehicles, including credit card purchases, debit card purchases, and Automated Clearing House ("ACH") transactions.

Payment transactions processed through the ACH network represent a significant component of Internet gambling purchases. Developed in 1972 by Federal Reserve Banks, the ACH network is one of the fastest growing technologies in the cash management industry. [FN7] The ACH network acts as an electronic form of a traditional check-processing system. [FN8] Customers of Internet gambling Web sites merely have to enter their bank account information in designated fields on the Web site to initiate an ACH transaction. Financial institutions and transaction providers, including third party payment processors, offer merchants online transaction processing services, including facilitating electronic funds transfers ("EFTs"), between the originating and receiving financial institutions. [FN9] Many gambling Web site operators use payment processors or other financial transaction providers to collect their payments from the bettor or buyer..

Another increasingly popular type of Internet payment is through electronic wallets, also known as "e-wallets." E-wallets are similar to stored value cards in that they maintain a "stored value" of funds available for use in consumer transactions. [FN10] Consumers fund e-wallets with a desired amount of

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

124 BLJ 483                                                                                    Page 3
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

money that the consumer may then use at participating merchants to purchase goods and services. Recently, in light of the departure of credit card companies from the Internet gambling industry, e-wallets have become a popular form of payment for Internet gambling transactions.

As technological innovations and Internet marketplaces continue to develop, so too do corresponding legal issues. [FN11] Presently, there is litigation pending around the country involving bettors, buyers, and Web site operators. *486 To date, this litigation has attempted to prosecute Internet gambling activities under the 1961 Wire Act. Soon, however, with the passage of the UIGEA, such litigation will likely focus on the new law's prohibitions. In recent years, claims have been verbalized (though not filed), alleging that financial institutions and other financial transaction providers such as credit card companies may be liable for processing transactions for merchants that offer Internet gambling. This article analyzes the ever-changing legal climate and force of such threatened litigation, particularly in light of the newly enacted UIGEA.

To begin, this article briefly identifies the various laws governing Internet gambling. It then analyzes to what extent new laws, in particular the UIGEA, affect financial institutions and transaction providers, including payment processors and e-wallet companies. In light of the passage of the UIGEA and the federal government's already aggressive actions taken in the name of enforcing the Act, financial institutions and financial transaction providers should take measures to insulate themselves from potential liability, as discussed below.

## THE LAW GOVERNING INTERNET GAMBLING

The legal landscape surrounding Internet gambling has recently undergone a substantial transformation in light of passage of the UIGEA. Prior to the UIGEA, the patchwork of vague federal laws and differing state laws created uncertainty as to which laws actually govern Internet gambling and related financial transactions. Before the UIGEA, no federal laws specifically prohibited Internet gambling activities, or restricted payment transactions related to these activities. Even so, in recent years, law enforcement officials repeatedly threatened prosecution of companies providing EFT and other payment services for Internet gambling operators. Such threatened prosecution is likely to increase with the passage of the UIGEA and regulations soon to be promulgated thereunder, which will be announced by July 10, 2007. In addition to the UIGEA, other federal and state statutes may be broadly interpreted to implicitly prohibit or regulate aspects of these transactions.

Before the UIGEA, the regulation of gambling was largely a matter of state law. [FN12] Because the

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**    0003

124 BLJ 483                                                                                                    Page 4
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Internet allows gambling to occur across state and *487 international borders, however, Internet gambling activities are more properly subject to federal regulation, as intended by the UIGEA. Although there will still be the risk that the laws of the individual states will be circumvented or ignored, federal legislation adds strength to gambling regulation. Federal regulation is also required because most gambling Web sites are located outside the United States. [FN13]

The UIGEA represents the culmination of multiple efforts in Congress to pass legislation prohibiting and/or regulating funding for Internet gambling. [FN14] Additionally, other federal and state statutes may be construed to limit gambling activities. Federal statutes include the Interstate Wire Wager Act (the "Wire Act"), [FN15] the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act (the "Travel Act"), [FN16] the Illegal Gambling Business Act (the "IGBA"), [FN17] and the Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"). [FN18]

## The Unlawful Internet Gambling Enforcement Act ("UIGEA")

The UIGEA contains various regulations to limit the activities of persons directly and indirectly involved in Internet gambling, including those engaged in the actual business of gambling (i.e. gambling web site operators), financial transaction providers and payment systems and interactive computer systems. The UIGEA provides that it is a federal crime for any person or entity "engaged in the business of betting or wagering" to "knowingly accept" credit (including debit and credit cards), EFTs, checks or similar instruments, or other forms of financing as payment "in connection with the participation of another person in unlawful Internet gambling." [FN19]

Section 5363 of the UIGEA expressly applies only to those engaged in the "business of betting or wagering." Although this phrase is not defined in the Act, the Act does provide that those engaged in the "business of betting or wagering" are not financial transaction providers, interactive computer services, or telecommunications services. [FN20] As such, financial transaction providers and payment systems who are merely engaged in the business of financing and payment processing are generally exempt from liability under § 5363. Financial entities must, however, comply with § 5364 of the Act, as discussed in detail below.

*488 Although financial transaction providers are generally exempt from liability under § 5363 of the Act, § 5367 provides that financial transaction providers (as well as interactive computer services and telecommunications services) may be liable for having "actual knowledge and control of bets and wagers" and (1) operating, managing, supervising or directing an Internet Web site where bets or wagers are offered

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**   0004

124 BLJ 483                                                                                        Page 5
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

and/or may be placed or received or otherwise made; (2) owning or controlling an Internet Web site where bets or wagers are offered and/or may be placed or received or otherwise made; or (3) being owned or controlled by one who operates an Internet Web site where bets or wagers are offered and/or may be placed or received or otherwise made. [FN21] Section 5367 prevents businesses from otherwise circumventing liability under § 5363 and makes liable those entities which operate an Internet Web site whereby bets and wagers may be placed or received. Specifically, § 5367 provides that a financial transaction provider "may be liable under this subchapter." [FN22] In particular, financial transaction providers that operate, manage, supervise or direct a Web site which allows Internet gambling merchants to send or receive transactions pertaining to bettors and/or use its Internet Web site to receive information and instructions related to Internet gaming merchant's accounts may face liability under § 5367 and thus § 5363. [FN23] The Act does not provide any penalty for violating § 5367 specifically, but violators may be liable under § 5363. Violators of § 5363 may be fined, imprisoned for up to five years, and/or permanently enjoined from further gambling activity. [FN24]

    Lawful Internet gambling activities, i.e., fantasy sports, state lotteries, horse racing and gambling on Native American lands, are exempted from the UIGEA's prohibitions. [FN25] The UIGEA prohibits Internet gambling businesses from accepting financial payment only for "unlawful Internet gambling." [FN26] However, the Act does not explicitly define "unlawful Internet gambling." Instead, the UIGEA relies on existing federal and state Internet gambling regulations (some of which are discussed below) to define what is considered "unlawful" Internet gambling. [FN27] Consequently, the Act may not be as effective at restricting Internet gambling as intended.

## *489The Wire Act

    Prior to the UIGEA, the principal statute that has been interpreted to regulate Internet gambling is the Wire Act of 1961, 18 U.S.C. § 1084. The Wire Act provides that:

    Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers ... shall be fined under this title or imprisoned not more than two years, or both. [FN28]
Companies engaged in Internet gambling in the United States have been prosecuted under the Wire Act. In United States v. Cohen, [FN29] Jay Cohen, president of Antigua-based World Sports Exchange, an online betting operation, was convicted of conspiracy to violate the Wire Act and seven counts of violating the Wire Act for operating an Internet sports gambling site. [FN30] Cohen was sentenced to 21 months in prison. [FN31] The Department of Justice "hailed the Cohen prosecution as evidence that current federal

EXHIBIT "D"

0005

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Page 6

laws can and should be used to prosecute Internet gambling." [FN32]

The Wire Act, however, by its terms applies only to those persons "engaged in the business of betting or wagering" on sporting events and contests. [FN33] A plain reading of the statute would thus preclude extension of liability under the Wire Act beyond gambling on sporting events or other contests. Moreover, under the Wire Act, the liable party must be "engaged in the business" of gambling in order to be held responsible. As such, it seems clear that financial institutions and financial transaction providers should not face liability under the plain language of the Wire Act. The UIGEA does not amend the Wire Act. UIGEA's prohibition of unlawful Internet gambling, however, likely includes sporting events and contests.

**\*490The Travel Act and the Illegal Gambling Business Act**

The UIGEA also likely incorporates the Internet gambling prohibitions included in the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act (the "Travel Act"), 18 U.S.C. § 1952, and the Illegal Gambling Business Act ("IGBA"), 18 U.S.C. § 1955.

The Travel Act establishes criminal penalties for anyone undertaking interstate or foreign commerce with the intent to distribute the proceeds of an unlawful activity. An unlawful activity includes "any business enterprise involving gambling in violation of the laws of the state in which they are committed or of the United States." [FN34] The Travel Act could be broadly interpreted to prohibit financial institutions and transaction providers from distributing the proceeds of unlawful gambling activities for Internet gambling merchants, because their processing of payments for Internet gambling Web site operators "involves" gambling. [FN35]

Under the IGBA, it is a federal crime, punishable by fine and/or imprisonment of up to five years, to operate an illegal gambling business. [FN36] An illegal gambling business is one that (1) violates the law of the state where it takes place, (2) involves at least five people at all times during a 30-day period, and (3) operates almost continuously for longer than 30 days or collects gross revenues of $2,000 in a single day. [FN37]

This statute has been interpreted broadly. Prior to the advent of Internet gambling, at least one court held in United States v. DiMuro that the statute may impose liability on all persons who are "necessary" or "useful" to a gambling business. [FN38] Based upon the First Circuit Court of Appeals' holding in DiMuro,

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

many legal commentators assert that computer operators, computer maintenance crews, accountants, and owners may be potentially liable under the statute as their services are arguably "necessary" or "useful" to the gambling business, even though their participation may not relate to the act of gambling itself. [FN39] This broad interpretation has not yet been applied to Internet transaction or financial providers.

Both statutes establish criminal penalties for business operations engaged in unlawful gambling -- gambling which is prohibited by the laws of the state where the transaction occurs. Violations of these acts have occurred when a bettor gambles in a state which prohibits Internet gambling. No prosecutors *491 have yet initiated proceedings under either statute against financial institutions or financial transaction providers for processing payment transactions for Internet casinos.

The Travel Act and IGBA are more expansive than the Wire Act because they are not limited exclusively to sports and contest gambling. Nevertheless, as with the Wire Act, financial institutions or financial transaction providers do not operate gambling businesses -- a requirement for a violation of the Travel Act -- and they arguably do not provide "gambling information" -- as required by DiMuro to violate the IGBA. [FN40] The transactions in which financial institutions and financial transaction providers are involved do not involve the placing of bets; rather, the act of gambling is independent of funding and establishing an account directly or indirectly with such Internet merchants. [FN41]

Nevertheless, in light of the enactment of the UIGEA, courts may interpret the IGBA to prohibit Internet gambling transactions. Financial institutions and financial transaction providers should thus keep abreast of developments in this area and any litigation that arises against similar institutions under these Acts.

**The RICO Act**

The UIGEA likely also incorporates potential Internet gambling prohibitions in the Racketeer Influenced and Corrupt Organizations Act (the "RICO Act"), 18 U.S.C. § 1961. The RICO Act may attach federal civil or criminal liability to violations of state gambling laws when the activities establish a "pattern of racketeering activity" [FN42] and affect interstate commerce. The RICO Act prohibits "racketeering activity," which is defined to include any act involving gambling or the collection of unlawful gambling debts. [FN43] Accordingly, if a financial institution or financial transaction provider violates state gambling laws, and such violations constitute a pattern of racketeering activity and affect interstate commerce, they may form the foundation for federal prosecution under RICO. [FN44]

COPR. © 2008 Warren Gorham Lamont

124 BLJ 483                                                                      Page 8
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

To prove a RICO violation, there must be evidence of "a pattern of racketeering activity" based on "two or more predicate acts" and a "threat of continued criminal activity." [FN45] A predicate act is a violation of another statute, [FN46] so *492 the government must establish some other basis for finding financial entities' activities criminal before bootstrapping RICO charges. Absent sufficient claims under the UIGEA, Wire Act, the Travel Act, the IGBA, or other mail and wire fraud acts, there is no predicate act upon which to base RICO liability.

As the definition of "unlawful Internet gambling" is unclear, the UIGEA fails to clarify federal law to the extent it intended and only further clouds the distinction between permissible and punishable Internet activities. This lack of clarity regarding the definition of "unlawful Internet gambling" may pose enforcement problems and may, eventually, nullify the intended effectiveness of the Act. Notwithstanding, those who engage in, facilitate or participate in Internet gambling, including financial institutions and financial transaction providers, should be cautious as the law continues to evolve because law enforcement officials may seek to interpret the law as broadly as possible.

**Select State Laws**

Prior to the UIGEA, gambling legislation was primarily a matter of state law. Two states -- Utah and Hawaii -- prohibit all forms of gambling. [FN47] New York and Wisconsin prohibit all forms of gambling not operated by the state. [FN48] The New York law was strictly enforced in People v. World Interactive Gaming Corp. [FN49] In that case, the operators of an Antigua-based Internet gambling casino argued that their activities were not subject to New York law because the gambling did not occur in New York, but rather in Antigua where the computer terminals were located. The court disagreed, ruling that "the act of entering the bet and transmitting the information from New York via the Internet [was] adequate to constitute gambling activity within New York State." [FN50] As a result, World Interactive Gaming Corporation was enjoined from conducting any further business in the State of New York.

Some states, such as Arizona, do not expressly prohibit Internet gambling, but regulate gambling in general. [FN51] For instance, current Arizona gambling laws impose criminal liability on persons who promote gambling, other than for amusement, regulated, or social gambling, if they knowingly do either of the following for a benefit: (1) conduct, organize, manage, direct, supervise or finance gambling; or (2) furnish advice or assistance for the conduct, *493 organization, management, direction, supervision or financing of gambling. [FN52]

COPR. © 2008 Warren Gorham Lamont

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Recently, the State of Washington enacted a law that expressly prohibits Internet gambling. [FN53] Nevada on the other hand, now expressly allows for Internet gambling, despite being the first state to expressly prohibit it in 1997. [FN54] Wagering or accepting a wager online in Nevada is now legal provided that the Internet Web site operator is licensed by the state. [FN55]

## REGULATING FINANCIAL INSTITUTIONS AND FINANCIAL TRANSACTION PROVIDERS

Although § 5363 of the UIGEA only applies to those engaged in an Internet gambling business and not to financial institutions or financial transaction providers, § 5364 of the Act should be of substantial concern to financial transaction providers and payment systems. Under this section of the UIGEA, the Secretary of the Treasury, the Board of Governors of the Federal Reserve System, and the Attorney General will proscribe policies and procedures requiring "designated payment systems, and all participants therein" to "identify and block or otherwise prevent or prohibit" restricted Internet gambling transactions. [FN56] These policies and procedures are to be implemented by July 10, 2007 -- 270 days from the date of the enactment of the law. [FN57] The to-be-enacted policies and procedures are intended to compile a nonexclusive list of ways to identify and block restricted Internet gambling transactions and will permit any participant in a payment system to choose among the alternatives. When these policies and procedures are implemented, no gambling credit, funds, instruments, other proceeds or payments may be transmitted to any person engaged in an unlawful Internet gambling business. [FN58]

The extent of liability for a financial institution or financial transaction provider's failure to comply with the policies and procedures to be promulgated later this year under the UIGEA is presently unknown. Notwithstanding, it is clear that some form of liability is contemplated. All financial entities should thus remain alert to the policies and procedures to be enacted, even during the time they are being developed, for provisions discussing and imposing liability on financial institutions and financial transaction *494 providers. Although currently unknown, it is anticipated that financial transaction providers who violate the policies and procedures to be promulgated will be, at a minimum, fined and that their future business activities will be closely monitored or restricted.

To hold financial institutions and financial transaction providers responsible for the actions of individual Internet bettors and Internet gambling businesses is a strict departure from existing law. It does appear, however, to be the direction in which the law in the United States is evolving.

Prior to the UIGEA, the seminal case regarding financial entities' liability for Internet gambling was In

COPR. © 2008 Warren Gorham Lamont

EXHIBIT "D"

124 BLJ 483                                                                                    Page 10
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

re Mastercard International, Inc. [FN59] In finding for Mastercard and other credit card companies, the Eastern District Court of Louisiana held that RICO "is not intended to provide a remedy to [a credit card user]." [FN60] RICO was intended to provide a remedy for victims of fraud, not "independent actors who made a knowing and voluntary choice to engage in a course of conduct." [FN61] Financial institutions and financial transaction providers do not attempt to fraudulently process payment transactions; rather, they only accept and process payment transactions as instructed with the information provided by the buyer and thus should not be held liable for participating in a fraudulent scheme without knowledge of the scheme. [FN62]

The Mastercard court further opined that gamblers' online gambling activities were separate from the gamblers' credit card transactions paying for gambling bets. The court dismissed the civil RICO charges against Mastercard and other credit card companies, stating: "It is a temporal impossibility for the [defendant credit card companies] to have completed their transaction with the plaintiff before he gambled and then to be prosecuted for collecting the proceeds ... which can only take place after some form of gambling is completed." [FN63] In so holding, the court found there were two steps in a transaction -- the bet and the payment. The payment is separated from the bet such that the financial institution or financial transaction provider -- here, the credit card company -- is not liable for how the money is used, even if the money is used for an illegal activity. The court also found that "limited involvement" in gambling, such as funding, is not sufficient to give rise to RICO liability. [FN64] Therefore, because the credit card was only used to initially fund the gambler's account with the Internet merchant before any *495 gambling occurred, Mastercard and other credit card companies would not be held liable.

Prior to the enactment of the UIGEA, it has been said that arguments to hold financial entities liable for processing payments for Internet gambling are based on an extremely attenuated theory of liability. Indeed, the Supreme Court has stated that "a plaintiff cannot complain of harm so remotely caused by a defendant's actions that imposing legal liability would transgress our ideas of what justice demands, or of what is administratively possible and convenient." [FN65]

The UIGEA abrogates this liability analysis. Under the Act, "designated payment systems" will be required to identify, block, and otherwise prohibit the transfer of funds to unlawful Internet gambling businesses. [FN66] A "designated payment system" is "any system utilized by a financial transaction provider that ... could be utilized in connection with, or to facilitate any restricted transaction." [FN67] "Financial transaction providers" include credit card issuers, financial institutions, operators of terminals where EFTs may be initiated, money transmitting businesses, payment networks utilized to effect credit transactions, EFTs, stored value product transactions or money transmitting services, and any participants in such payment networks. [FN68] E-wallet providers are also arguably considered to be "financial transaction providers." The UIGEA expressly prohibits such "financial transaction providers" from utilizing any designated payment

COPR. © 2008 Warren Gorham Lamont

124 BLJ 483                                                                                    Page 11
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

system to fund a restricted transaction. A "restricted transaction" involves transmitting credit, EFTs, checks or similar instruments, and the proceeds of any other financial transactions in connection with unlawful Internet gambling. [FN69] Under the Act, the bet and the payment are thus no longer considered separate transactions. Again, however, it is not yet clear what punishment or liability financial institutions or financial transaction providers may face for improperly authorizing restricted transactions. It is nonetheless clear that some liability will exist.

**The Departure of Traditional Payment Mechanisms for Internet Gambling-Related** Transactions

Until recently, approximately 95 percent of Internet bets or wagers were made through the use of credit cards. [FN70] Many credit card companies, however, *496 have taken steps to prohibit Internet gambling transactions. [FN71] For instance, American Express, Chase Manhattan Bank, Direct Merchants Bank, Discover, Fleet, MasterCard, MBNA, Providian, and VISA now restrict or completely prohibit Internet gambling transactions. [FN72] Many major financial institutions have also taken similar steps to prohibit Internet gambling transactions. For example, Wells Fargo modified its VISA and MasterCard credit agreements to ban the use of its cards for Internet gambling. Wachovia Bank adopted a policy of declining Internet gambling transactions after several of its cardholders filed lawsuits against Wachovia. [FN73] Bank of America and Citibank have also established policies denying authorization for any transaction identified as an Internet gambling transaction. [FN74] Not all self-regulation has been completely voluntary, however. Citibank agreed to block Internet gambling transactions as part of a settlement agreement when the New York Attorney General initiated an inquiry into Citibank's business practices regarding Internet gambling activities in 2002. [FN75] In Florida, state authorities negotiated an agreement with Western Union to stop wire transfers to offshore Internet gambling operations. [FN76]

**The Rise of New Payment Mechanisms and How They Are Affected by the UIGEA**

In response to the declining availability of credit cards for Internet gambling wagers, consumers turned to electronic fund transfers and e-wallets as an alternative means of payment. [FN77] For instance, Internet payment transactions for gambling Web sites have since been processed (knowingly and unknowingly) by third-party payment processors, among other financial institutions and transaction providers. With the departure of the credit card and major financial institution companies from this industry, many Internet gambling Web site operators incorporated companies that used the services of third-party payment processors to process payments from gamblers. This practice, however, is now threatened as these third-party payment processors and others who process ACH payments and/or EFTs are likely included in the definition of "designated payment systems" and "financial transaction provider" and, thus, are intended to be regulated

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**    0011

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

under the UIGEA.

E-wallets are also included in the definition of "designated payment systems" *497 and "financial transaction providers." E-wallets are a type of electronic wallet in which a consumer can store money by placing conventional funds or credit into an account. The e-money can then be stored in the e-wallet until the consumer is ready to spend it. E-wallets are quick and flexible and enable consumers to purchase a range of goods and services on the Internet with the same freedom as cash. E-wallets have become increasingly popular, and many e-wallet applications operate successfully on the Internet to fund activities and purchases, including Internet gambling. [FN78] For instance, companies such as CryptoLogic, Inc. ("CryptoLogic") and PayPal, Inc. ("PayPal") have developed e-wallet solutions that permit consumers to transfer funds into a secure account that were previously used to fund Internet purchases. [FN79]

The government, on at least one occasion, has alleged violations of gaming law against CryptoLogic for certain business activities. As a result, on October 16, 2001, CryptoLogic entered into a settlement agreement with the State of New Jersey that it would no longer accept Internet sports wagers from persons in New Jersey (where state law prohibits such gambling). [FN80]

PayPal, one of the most successful e-wallet companies, was also targeted for liability by the government. [FN81] In July 2002, PayPal entered into a settlement with the New York Attorney General's Office for its transactions with Internet gambling merchants. [FN82] Although PayPal denied any wrongdoing, it agreed to cease processing New York customers' Internet gambling payments (Internet gambling is illegal under New York law) and pay a $200,000 fine. [FN83] PayPal and its parent company eBay also entered into a $10 million civil agreement to settle allegations that it aided illegal offshore Internet gambling activities [FN84] in violation of the federal Wire Act and various states' statutes prohibiting online gaming. [FN85]

Under the UIGEA, e-wallets, even those not directly related to Internet gambling activities, will be encompassed within the Act's definition of "designated payment systems" and "financial transaction providers" and, thus, prohibited from processing Internet gambling payments. [FN86] Since passage of the UIGEA, the government has signaled it will take an aggressive stance to enforce the law against financial entities who are involved in financial transactions related to Internet gambling. Notably, in January of this year, the two founders of the popular money transfer business NETeller, Stephen Lawrence and John LeFebvre, were arrested and charged with money laundering in *498 connection with handling of billions of dollars in Internet gambling proceeds.. [FN87] Two days later, NETeller stopped allowing American players to use its services to transfer money to and from Internet gambling sites. [FN88] Following NETeller, other payment processors decided to exit the U.S. Internet gambling market, including Citadel Commerce,

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

124 BLJ 483                                                                                              Page 13
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Central Coin, and Nexum Financial. All of these companies have decided to cease allowing U.S. players to conduct transactions with Internet gambling companies. [FN89]

Additionally, shortly after the NETeller arrests, the United States Justice Department issued subpoenas to at least four (and some sources report many more) Wall Street Investment banks as part of what the New York Times reported as "a widening investigation into the multibillion-dollar online gambling industry." [FN90] The banks said to be involved in the inquiry include industry giants such as HSBC, Credit Suisse, Deutsche Bank and Dresdner Kleinwort. [FN91] These firms participated in underwriting the initial public offerings of some of the most popular online gambling sites that operate abroad. [FN92] At present it is unclear whether these subpoenas are part of a government fact-finding effort or signal a plan to prosecute the banks. [FN93]

These subpoenas and arrests are indicative of the federal government's ongoing and aggressive effort to enforce the Internet gambling regulations codified in the Wire Act, UIGEA and other laws. These laws and the Government's recent actions taken in their name make clear that the federal government interprets these laws to prohibit Internet gambling in the United States and to restrict United States-based financial transaction providers and electronic payment systems from accepting, distributing, or otherwise honoring Internet gambling-related transactions.

**The Possibility of Aiding and Abetting Liability**

In addition to liability under § 5364 of the UIGEA, the question arises whether, as with other laws, a financial institution or financial transaction provider may be liable for aiding and abetting a violation of § 5363 if it facilitates a violation of § 5363 by a person or entity engaged in the business of betting or wagering. Although financial entities are generally immune from direct liability under § 5363 (as long as the financial entity is not subject to the provisions of § 5367), such financial entities may potentially face liability under *499 general federal and/or state principles of aiding and abetting liability.

Because § 5363 expressly does not apply to financial transaction providers (who are not subject to the provisions of § 5367), it is not likely that a claim of aiding and abetting will overcome this express exemption. If that were the case, then to find aiding and abetting liability would obviate the need for any exemption. Furthermore, § 5365(d) provides that actions may not be brought against financial transaction providers to prevent or restrict restricted transactions.

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0013

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Page 14

However, financial institutions and transaction providers may be subject to liability under § 5363 if the provisions of § 5367 apply and/or under general federal or state law principles. It is well established that conviction as an aider and abettor "requires proof the defendant willingly associated himself with the venture and participated therein as something he wished to bring about." [FN94] If a financial institution or financial transaction provider has knowledge of its merchants' Internet gambling-related activities and continues to process payments for them and/or transfer funds to them, the financial entity may be seen as aiding and abetting a violation of the law. [FN95]

Internet gambling merchants are prohibited under § 5363 from accepting funds in connection with a bet or wager. A financial institution or financial transaction provider's transfer of Internet gambling funds to merchants or processing payments on their behalf could subject such financial entities to liability for aiding and abetting a violation of § 5363 if the financial entity has knowledge of the merchant's Internet gambling-related activity and continues to conduct payment transactions for that merchant.

Under federal law, aiders and abettors are punished as a principal offender. [FN96] As such, if a financial entity is found liable as an aider and abettor, it may be subject to the same penalty as the principal Internet gambling business violator of the Act.

## COMPLIANCE WITH THE UIGEA: SPREADING THE "WEALTH" AND COSTS OF REGULATION

As the government is unable to prosecute the casinos themselves, which are based overseas, it has now turned to targeting the casinos' American financial providers. The extent of liability and penalties for failure to identify *500 and block restricted transactions will be an important policy developed in the upcoming regulations and procedures to be implemented soon. If designated payment systems and financial transaction providers adhere to the policies and procedures to be implemented under the UIGEA, there will be a presumption of compliance with the Act. [FN97] Thus, financial institutions and financial transaction providers, i.e., banks, credit card companies, e-wallets, third-party payment processors, and others based in the United States, must remain alert to the policies and procedures that are formulated and will govern their activities. Moreover, such financial institutions and financial transaction providers must police the transactions that they process to ensure that they are not unknowingly processing transactions related to any restricted transaction.

All financial institutions and financial transaction providers should be prepared for the financial burden

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**    0014

of the UIGEA. At present, the enforcement provisions of § 5364 do not include any appropriations for establishing these policies and procedures. The cost of compliance, therefore, will likely fall on the financial transaction providers and payment systems that are required to implement policies and procedures to restrict Internet gambling. If they have not already done so, financial institutions and financial transaction providers will be forced to establish internal systems and practices to ensure they are not processing Internet gambling payments. The diligent and regular review of merchants and related financial transactions to ensure compliance with the policies and procedures of the UIGEA is expected to be burdensome and costly.

Even before the official policies and procedures of the UIGEA are implemented later this year, financial entities should act proactively and take steps now to ensure that they are not currently processing payment transactions for Internet gambling merchants. Acting now to begin monitoring its merchant base and systems will likely minimize the financial burden of the federal policies once they are implemented. Whether an entity decides to act proactively or wait for the UIGEA policies and procedures to be implemented, in order to ensure compliance with the UIGEA, financial institutions and transaction providers will need to develop a review system for its clients/merchants to evaluate whether any of its clients are involved with Internet gambling businesses in any way. This system may require financial entities to *501 request assurances and other documentation from merchant clients requiring them to avow that they are not presently, and will not at any time thereafter, use the financial entity to process Internet gambling payment transactions. Such assurances can take the form of contract addendums whereby the client party will contractually agree not to request or instruct the financial entity to process any payment transactions related to Internet gambling in any way. In addition to contractual amendments, financial entities, including financial institutions and transaction providers, should require merchants to provide documentation of their legitimate sources of business and legitimate business activities.

Financial entities may also need to require their merchant customers to indemnify the financial entity if any of the merchant's representations are proven false. Although penalties are not currently known, the risk to financial entities that do not require such proof and assurances will likely include monetary penalties, conduct prohibitions, potential criminal liability, and other remedies that have yet to be defined. Also, financial entities should consider obtaining personal guarantees from their client's principals. Of course, it is important to note that neither indemnification provisions nor personal guarantees will protect the financial entity from potential criminal liability under the UIGEA or otherwise. Such provisions, however, will likely assist with deflecting the civil financial consequences of unlawful conduct to the culpable merchant.

Financial institutions and transaction providers should also begin, if they are not already, monitoring return rates for merchant clients who are suspected of conducting Internet gambling or related activities, as well as possibly all of its Internet-based merchants. Sharp increases in return rates may suggest fraudulent

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

or otherwise improper activity which should be immediately investigated by the financial entity. Furthermore, if a financial institution or financial transaction provider suspects that a merchant client is engaged in Internet gambling activities, the financial entity should block or restrict the suspected transactions as necessary to ensure its compliance with the UIGEA and impending policies promulgated thereunder. Title VIII, § 5364 of the Act provides that no person or entity required to comply with the regulations will be liable for blocking or refusing to honor what are, or are reasonably believed to be, restricted Internet gambling transactions. **502** Therefore, under the UIGEA, if a credit card company or third-party payment processor blocks or refuses to honor what it reasonably believes is a restricted Internet gambling transaction, the financial entity will not be subject to civil liability in contract or tort for blocking or refusing to honor such a transaction. This protection allows financial entities to act conservatively and refuse to process what may ultimately be allowable Internet transactions when it reasonably believes it may be violating the Act.

Providing proof and assurances of legitimate business activity is likely to be financially burdensome for those merchants who are engaged in legitimate Internet-based activities and the financial institutions who process payment transactions on their behalf. As such, the Act is likely to increase the costs of contracting with financial entities. Notwithstanding the necessary extra costs and time, financial institutions and transaction providers should perform appropriate due diligence when accepting new merchant clients, obtain assurances and documentation of legitimate business activity and should carefully negotiate contracts with a particular focus on liability, indemnification and personal guarantee provisions, to ensure compliance with the Act and protect the financial entities if merchants engage in unlawful activities. Of course, these proactive steps may need to be supplemented or modified when the UIGEA policies are implemented later this year depending on the precise text of the policies and procedures. One thing, however, is clear: the cost of doing business for both parties -- financial entity and merchant client -- is expected to increase as there are now greater risks for involvement in Internet gambling activities as well as any Internet transaction.

## CONCLUSION

It is important to remember that this is a constantly evolving area of the law. The UIGEA is the culmination of years of attempts by the government to restrict and/or completely prohibit Internet gambling activities. Now that the UIGEA has passed, it may have severe and far-reaching consequences for financial entities who do not comply with it. As a result, financial entities need to begin evaluating their due diligence systems and client base to assess whether any merchants are involved in Internet gambling-related activities and take immediate steps regarding such merchants. Financial entities also **503** need to consider amending their contracts to include indemnification, personal guarantee and other liability assurance provisions as well as developing addendums whereby merchant clients assure they will not request the financial entity to process any payment transactions for Internet gambling-related activities. Such steps, among others, will help

COPR. © 2008 Warren Gorham Lamont

EXHIBIT "D"    0016

124 BLJ 483                                                                                              Page 17
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

put financial entities in a better position to ensure compliance with the UIGEA policies once they are implemented later this year.

In the coming months, financial entities should closely monitor the proposed policies and procedures to be implemented under the UIGEA (including providing appropriate comments during the public comment period). Financial entities must also prepare to implement significant and costly policy and procedural changes to ensure compliance with the Act. Moreover, as noted in the recent examples discussed in this article, the Justice Department is likely to take aggressive and unprecedented actions to enforce the UIGEA and policies promulgated thereunder, including against financial entities who continue to process payment transactions for Internet gambling-related activities. In particular, financial entities who hold assets of those involved in Internet gambling should be aware that the Justice Department may also freeze or confiscate such assets, including reserve funds, as part of its aggressive attempts to curtail unlawful Internet gambling.

[FNa1]. Andrea L. Marconi is an associate and Brian M. McQuaid is a partner with Squire, Sanders & Dempsey L.L.P. Ms. Marconi and Mr. McQuaid practice in the Phoenix, Arizona office. Ms. Marconi focuses her practice on complex commercial litigation matters, including issues concerning the ACH Network and electronic payment transactions. Ms. Marconi can be reached at amarconi @ssd.com. Mr. McQuaid focuses his practice on complex commercial and toxic tort matters. Mr. McQuaid can be reached at bmcquaid@ssd.com.

[FN1]. John R. Michener, Steven D. Mohan, James B. Astrachan, and David R. Hale, "Snake-Oil Security Claims" the Systematic Misrepresentation of Product Security in the E-Commerce Arena, 9 MICH. TELECOMM. TECH. L. REV. 211, 221 (2003). Approximately 138 million people in the United States use the Internet. Michael L. Rustad & Thomas H. Koenig, Harmonizing Cybertort Law for Europe and America, 5 J. HIGH TECH. L. 13, 15 (2005).

[FN2]. Andres Rueda, The Implications of Strong Encryption Technology on Money Laundering, 12 ALB. L.J. SCI. & TECH. 1, 28 (2001) (estimating 2003 revenues at $2.8 trillion).

[FN3]. This number was reported by the American Gaming Association, a lobbying arm of the commercial casino entertainment industry. The same report indicated that the Internet gambling industry is growing at a rate of more than 20 percent a year, becoming a $20 billion worldwide industry by 2009. John P. Mello, Jr., Illegal Gambling Thrives on the Internet, TECHNEWSWORLD, May 25, 2006, at http://www.technewsworld.com/story/50739.html (last visited April 22, 2007).

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0017

124 BLJ 483                                                                                                    Page 18
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)


[FN4]. The $10.9 billion estimate, a 28 percent increase from 2004, was made by research firm eMarketer. Maria Starr, Internet Gambling Revenues Up 28 Percent, BODOG BEAT, Mar. 1, 2006, at http:// www.bodogbeat.com/archives/2006/03/inter-net_gambli.html (last visited April 22, 2007).


[FN5]. 31 USC Chapter 53, Title VIII of H.R. 4954, the Security and Accountability for Every Port Act, otherwise known as the SAFE Port Act, Public Law No. 109-347 (2006). ·


[FN6]. David H. Lantzer, Internet Gambling Tax Regulation: Can Old Laws Learn New Tricks?, 5 CHAP. L. REV. 281, 282 (2002); Jenna F. Karadbil, Note, Casinos of the Next Millennium: A Look into the Proposed Ban on Internet Gambling, 17 ARIZ. J. INT'L & COMP. LAW 413, 415 (2000).


[FN7]. Brian O'Keefe, Automated Clearing House Growth in an International Marketplace: The Increasing Flexibility of Electronic FundsTransfer and Its Impact on the Minimum Contacts Test, 15 U. PA. J. INT'L BUS. L. 105; Jane K. Winn, XML and the Legal Foundations for Electronic Commerce: Making XML Pay: Revising Existing Electronic Payments law to Accommodate Innovation, 53 SMU L. REV. 1477 (2000).


[FN8]. Randall W. Sifers, Note, Regulating Electronic Money in Small-Value Payment Systems: Telecommunications Law as a Regulatory Model, 49 FED. COMM. L.J. 701, 702 (1997); see also 2 FURASH & COMPANY, BANKING'S ROLE IN TOMORROW'S PAYMENT SYSTEM OVERVIEW 1, 29 (1994); Ronald J. Mann, Regulating Internet Payment Intermediaries, 82 TEX. L. REV. 681 (2004). The ACH network consists of over 30 different regional "clearing houses," where transmissions from member banks are electronically collected, sorted, and forwarded from the financial institution originating the transaction on behalf of its customer to the institution receiving the money transfer. In any given ACH transaction, there are generally five participating parties. The Originator is the entity or individual that initiates entries into the ACH network. The Originating Depository Financial Institution is the participating financial institution that originates ACH entries at the request of and by agreement with its customers. The ACH Operator or Payment Processor is an entity that processes ACH payments and provides clearing, delivery and settlement services between the originating and receiving financial institutions. The Receiving Depository Financial Institution is the financial institution that holds the account to be credited or debited and which is authorized to receive ACH entries. The Receiver is the entity or individual who has authorized the Originator and/or an ACH Operator or Payment Processor to initiate an entry to an account held by the RDFI.


COPR. © 2008 Warren Gorham Lamont


**EXHIBIT "D"**

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

[FN9]. See O'Keefe, supra note 7, at 105.

[FN10]. See Bryan S. Schultz, Comments: Electronic Money, Internet Commerce, and the Right to Financial Privacy: A Call for New Federal Guidelines, 67 U. CIN. L. REV. 779, 780 n.13 (1999). See also A. Michael Froomkin, Flood Control on the Information Ocean: Living with Anonymity, Digital Cash, and Distributed Databases, 15 J.L. & Com. 395, 456, n.230 (1996).

[FN11]. Lutz Appellate Serv. v. Curry, 859 F. Supp. 180, 181 (E.D. Pa. 1994) (referring to fax machine use prohibitions of the Telephone Consumer Protection Act); Michael D. McConathy, Destination Ventures, LTD v. FCC and Moser v. F.C.C.: How Much Should the Telephone Consumer Protection Act Restrict Your Phone, Fax, and Computer?, 26 GOLDEN GATE U.L. REV. 153, 153 (1996).

[FN12]. Agencies Join to Promote Problem Gambling Awareness Week; Education Key to Avoiding Problem Gambling, BUS. WIRE, Mar. 8, 2005. No form of gambling is legal in Hawaii or Utah.

[FN13]. Lantzer, supra note 6, at 285 (noting that most Internet gambling Web sites are in the Caribbean, Central and South America, and Australia).

[FN14]. Prior to the UIGEA, multiple pieces of federal legislation regulating Internet gambling have in recent years been introduced in the House of Representatives and the Senate. The previously introduced legislation may be grouped into two categories: (1) bills that advocated a complete prohibition of Internet gambling; and (2) bills that restricted funding for Internet gambling, including bans on the use of credit cards to make wagers or collect proceeds. For an evaluation of some of these pieces of legislation, see John Andrle, Note, A Winning Hand: A Proposal for an International Regulatory Schema with Respect to the Growing Online Gambling Dilemma in the United States, 37 VAND. J. TRANSNAT'L L. 1389, 1397-1400 (2004); Joseph M. Kelly, Internet Gambling Law, 26 WM. MITCHELL L. REV. 117, 134-39 (2000); Jon Patterson, Internet Gambling: Internet Gambling and the Banking Industry: An Unsure Bet, 6 N.C. BANKING INST. 665, 671-73 (2002).

[FN15]. 18 U.S.C. § 1804 (1994).

[FN16]. 18 U.S.C. § 1952 (1994).

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0019

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Page 20

[FN17]. 18 U.S.C. § 1955 (1994).

[FN18]. 18 U.S.C. § 1961 (2004).

[FN19]. Title VIII § 5363.

[FN20]. Title VIII § 5362(2) (emphasis added).

[FN21]. Id. at § 5367.

[FN22]. Id.

[FN23]. Id.

[FN24]. Id. at § 5366.

[FN25]. Id. at § 5361(b); 5362(1)(E).

[FN26]. Id. at § 5362(7); 5364(a).

[FN27]. Id. at § 5362(10)(A).

[FN28]. 18 U.S.C. § 1804.

[FN29]. 260 F.3d 68, 71 (2d. Cir. 2001).

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**    0020

124 BLJ 483                                                              Page 21
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

[FN30]. Id. at 70.

[FN31]. Id. at 71.

[FN32]. Peter Brown, Regulation of Cybercasinos and Internet Gambling, 610 PLI/PAT 607, 643 (June 2000), quoted in Patterson, supra note 14, at 668-69 (2002). In a similar federal case in Wisconsin, two Internet sports Web site operators pled guilty to violating the Wire Act and filing false tax returns. Their company, Gold Medal Sports, pled guilty to racketeering and criminal asset forfeiture. See Meg Jones, Two Plead Guilty to U.S. Charges Over Internet Sports Betting, MILWAUKEE J. SENTINEL, Dec. 4, 2001, quoted in Patterson, supra note 14 at 669.

[FN33]. 18 U.S.C. § 1804.

[FN34]. 18 U.S.C. § 1952(b)(1).

[FN35]. Internet gambling may be prohibited by some state laws, either outright as in New York, or restricted, as in Arizona. See infra for a discussion of possible gambling prohibitions under state law. If Internet gambling is found to violate current federal law, including but not limited to the Wire Act, the Travel Act may also prohibit processing activities for such merchants.

[FN36]. 18 U.S.C. § 1955.

[FN37]. Id.

[FN38]. 540 F.2d 503, 508 (1st Cir. 1976), cert. denied, 429 U.S. 1038 (1977) (holding defendants guilty of violating § 1955 by assisting others in placing horse racing and professional sports bets over the telephone).

[FN39]. See GAO Report 03-89, Internet Gambling: An Overview of the Issues, December 2002 [hereinafter,

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Page 22

"GAO Report"]; See also Seth Gorman and Antony Loo, Blackjack or Bust: Can U.S. Law Stop Internet Gambling?, 16 LOY. L.A. ENT. L.J. 667, 676(1996).

[FN40]. DiMuro, 540 F.2d at 508.

[FN41]. See In re Mastercard International, Inc., 132 F. Supp. 2d 468 (E.D. La. 2001), aff'd, 313 F.3d 257 (5th Cir. 2002), as discussed infra.

[FN42]. A "pattern of racketeering activity" is defined under the statute to require at least two acts of racketeering activity, one of which occurred after the effective date of the RICO statute and the last of which occurred within ten years after the commission of a prior act of racketeering activity. 18 U.S.C. § 1961(a)(5).

[FN43]. Id. at § 1961(a)(1).

[FN44]. RICO was intended to eradicate organized crime by attacking the sources of its revenue, such as syndicated gambling or bookmakers. It is essentially an aggressive initiative by Congress to supplement old methods for fighting crime and provide new weapons to attack organized crime and its economic support. Through RICO, Congress hoped to remove the profit from organized crime and separate the racketeer from the revenue source. It has been held that the provisions of RICO demand a liberal reading to effectuate the broad intent of Congress. See Jeffrey Rodefer, Internet Gambling in Nevada: Overview of Federal Law Affecting Assembly Bill 466, 6 GAMBLING L. REV. 18, 18- 23 (2002).

[FN45]. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 441 (5th Cir. 2000) (citing Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer, 90 F.3d 118, 122 (5th Cir. 1996)).

[FN46]. The types of crimes which may constitute predicate acts are defined in RICO, 18 U.S.C. § 1961. Violations of constitutional, antitrust, and civil rights laws are not predicate acts under RICO. Jennings v. Emry, 910 F.2d 1434 (1990).

[FN47]. Virtual Las Vegas: Regulate or Prohibit?, 2001 DUKE L. & TECH REV. 0021, ¶ 7, at http://www.law.duke.edu/journals/dltr/articles/2001dltr0021.html (last visited April 22, 2007).

COPR. © 2008 Warren Gorham Lamont

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

[FN48]. N.Y. Const, art. I, 9. Wisconsin similarly outlaws private, commercial gambling. Wis. Const, art. IV, 24(1). Indiana and New Jersey allow for some gambling operations so long as the state licensing and authorization procedures are followed. Neither State has yet to allow for Internet gambling. Joel Michael Schwarz, The Internet Gambling Fallacy Craps Out, 14 BERKELEY TECH. L.J. 1021, 1032, 1035-36 (1999).

[FN49]. 185 Misc. 2d 852, 714 N.Y.S.2d 844 (N.Y. County Sup. Ct. 1999) (holding a foreign corporation that was legally licensed to operate a casino offshore violated New York State law by offering gambling to Internet users in New York).

[FN50]. World Interactive Gaming Corp., 185 Misc. 2d at 852.

[FN51]. The only Arizona statute that expressly discusses Internet gambling is the Tribal-State Gaming Compact. It was enacted under Proposition 202, A.R.S. § 5-601.02. The Compact provides: "The tribe shall not be permitted to conduct gaming on the internet unless persons other than Indian tribes within the state or the state are authorized by state law to conduct gaming on the internet." Id. at § 5-601.02(3)(y).

[FN52]. A.R.S. § 13-3303(A). Most Internet gambling activities, wagering on games of chance, and/or sporting events are arguably not included in the types of gambling exempted from statutory prohibition. Arizona statutes exempt certain types of gambling, including "amusement gambling," "social gambling" and "regulated gambling" from criminal liability in certain instances. "Amusement gambling" is defined in A.R.S. § 13-3301(1) and generally does not include gambling where money is wagered during a game of chance. "Social gambling" is defined in A.R.S. § 13-3301 (7) and generally does not include any games where anyone other than the player receive a benefit. "Regulated gambling" is defined in A.R.S. § 13-3301(6) and refers to gambling legalized under the Tribal Gaming Compact or state or federal statute and on which organizers have paid any appropriate taxes, fees, or charges due. To be considered "regulated gambling" under Arizona law, Internet gambling merchants arguably should be engaging in activities on Native American reservations legalized by the Tribal Gaming Compact, as this is the only form of gambling that is expressly legalized by state statutes. No Arizona court has yet addressed whether Internet gambling and/or financial services related to Internet gambling are prohibited.

[FN53]. S.B. 6613, 59th Leg., 1st Reg. Sess. (Wa. 2006). The law mentions the possibility for legalized State

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0023

124 BLJ 483                                                                    Page 24
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Lottery exceptions where 60 percent of the Legislature votes for such legalization as well as other activities mentioned in the same chapter.

[FN54]. NRS 465.091-465.094.

[FN55]. Id.

[FN56]. Title VIII, § 5364.

[FN57]. The regulations should be available for public comment soon.

[FN58]. Id. at § 5362(7).

[FN59]. 132 F. Supp. 2d 468 (E.D. La. 2001), aff'd, 313 F.3d 257 (5th Cir. 2002).

[FN60]. Id. at 497. The same analysis can be extended to financial transaction providers who also only deal with the financing of transactions as instructed and do not operate gambling businesses themselves.

[FN61]. Id.

[FN62]. See, e.g., U.S. v. Piepgrass, 425 F.2d 194, 199-200 (9th Cir. 1970) (reversing a stockbrokers conviction when facts merely indicate that he could have been aware of the fraud); Windsor v. U.S., 384 F.2d 535, 536-37 (9th Cir. 1967) (reversing conviction of attorney for lack of knowledge in his client's schemes). The Ninth Circuit has remarked that mere "involvement in an unsavory, high-pressure, fly-by-night scheme" is not sufficient to establish "knowing participation in a scheme to defraud." Piepgrass, 425 F.2d at 199 (quoting Windsor, 384 F.2d at 535).

[FN63]. 132 F. Supp. 2d at 479.

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**    0024

124 BLJ 483
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

[FN64]. Id. (citing Goren v. New Vision Int'l, Inc., 156 F.3d 721, 728 (7th Cir. 1998) (stating, "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability ... instead, the individual must have participated in the operation and management of the enterprise itself")); Amsterdam Tobacco, Inc., v. Philip Morris, Inc., 107 F. Supp. 2d 210, 217 (S.D.N.Y. 2000) (stating, "providing important services to a racketeering enterprise is not the same as directing the affairs of an enterprise") (internal citations omitted). This analysis was followed in Cash Today of Tex., Inc. v. Greenberg, 2003 U.S. Dist. LEXIS 14, RICO Bus. Disp. Guide P10404 (N.D. Tex. Jan. 2, 2003).

[FN65]. 373 F.3d at 257 (quoting Commercial Cleaning, 271 F.3d at 380 (quoting Holmes, 503 U.S. at 268)) (quotations omitted). See also Cyco.Net, 2005 U.S. Dist. LEXIS at *109-110.

[FN66]. Title VIII, § 5364.

[FN67]. Id. at § 5362(3).

[FN68]. Id. at § 5362(4).

[FN69]. Id. at § 5362(7).

[FN70]. See Mark D. Schopper, Internet Gambling, Electronic Cash & Money Laundering: The Unintended Consequences of a Monetary Control Scheme, 5 Chap. L. Rev. 303 (2002).

[FN71]. Over the past few years it is reported that as many as 50 to 80 percent of Internet gaming transactions are being rejected by credit card companies. See Beth Cox, eBay to PayPal Gamblers: No Dice, Ecommerce-guide.com, July 12, 2002, at http://ecommerce.internet.com/news/news/article/0,,10375_ 1403631,00.html (last visited April 22, 2007). See also Lawrence G. Walters, Esq., Net Gambling Innovations, Gambling Law Update, May 2003 available at http://www.gameattorneys.com (last visited April 22, 2007).

[FN72]. See GAO Report, supra note 39 at 21; see also Office of New York State Attorney General Eliot

COPR. © 2008 Warren Gorham Lamont

124 BLJ 483                                                                          Page 26
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

Spitzer, Press Release: Financial Giant Joins Fight Against Online Gambling, Leading Credit Card Issuer Agrees to Block Key Internet Transactions, June 14, 2002 [hereinafter "Citibank Press Release"]. Among the credit card companies that have ceased allowing Internet gambling transactions is Delaware-based MBNA. According to a company spokesman, it "began prohibiting transactions from Internet gambling sites ... when it became apparent how the bank's cards were being used.'" Chet Bridger, Playing Without Plastic: Some Banks Are Refusing to Let Customers Use Their Credit Cards on Internet Gambling Sites Because Losses Can Be Legally Unenforceable, BUS. NEWS, Aug. 24, 2000, at 1E. A Providian spokesman noted: "We felt it was a good business decision on our part because of the potential conflicts that could arise." Id.

[FN73]. Internet Gambling Ban, Hearing on H.R. 556 Before the House Subcommittee on Fin. Inst. and Consumer Credit of the Committee on Financial Services, 107th Cong. (2001) (testimony by Michael L. Farmer, Senior Vice-President, Risk Management Services, of Wachovia Bank).

[FN74]. See Patterson, supra note 14, at 688-89. Other possible means of self-regulation include limiting involvement in Internet gambling to lotteries, horse racing, fantasy sports, and tribal gaming (all legal unless otherwise provided by state law).

[FN75]. See Citibank Press Release, supra note 72. Citibank also agreed to pay the State's costs incurred in the investigation and $400,000 to provide counseling and/or improve the well-being of persons who have been harmed by compulsive gambling. See Attorney General of the State of New York Internet Bureau, Assurance of Discontinuance, June 21, 2002, ¶¶ 25-26.

[FN76]. Dan McGraw, Super Sunday, Super Bets, U.S. NEWS, Jan. 26, 1998.

[FN77]. See Schopper, supra note 70.

[FN78]. See id.

[FN79]. See Press Release, Safe and Easy to Get Your Sterling into Sterling House Casino, Mar. 27, 2003, http:// www.winneronline.com/articles/march2003/sterling.htm (last visited April 22, 2007). See also http://www.moneybookers.com/app/ and http:// www.cryptologic.com/commerce/ecash.html for more information on these companies.

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0026

124 BLJ 483                                                         Page 27
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

[FN80]. See Press Release, Cryptologic Provides Details on New Jersey Suit Settlement, May 2, 2002, 2, available at http:// www.winneronline.com/articles/may2002/crypt_suit2.htm (last visited April 22, 2007).

[FN81]. See id. at 1. See also Carl Kaminski, PayPal: Online Peer-to-Peer Payments: PayPal Primes the Pump, Will Banks Follow?, 7 N.C. BANKING INST. 375, 397-98 (2003).

[FN82]. See Kaminski, supra note 81, at 397-98.

[FN83]. See id.

[FN84]. See Michael Burnham, Corralling Gamblers on the Net Frontier, Sep. 1, 2003, 1, available at http://pcworld.about.com/news/Sep012003id112268.htm (last visited April 22, 2007).

[FN85]. Id. Interestingly, the government originally also alleged that PayPal, Inc. violated the USA Patriot Act when it handled payments for Internet casinos under provisions that prohibit the transmission of funds that are known to have been derived from a criminal offense, or are intended to be used to promote or support unlawful activity, but these allegations were not ultimately part of PayPal, Inc.'s admission of guilt under the settlement agreement. See Walters supra note 71, at 9. If allowed in the future, this provision of the Patriot Act may be yet another avenue for the government to impose liability on companies handling payments for Internet casinos.

[FN86]. How an operator of an e-wallet is to know that money or credit in the e-wallet is used or will be used for Internet gambling is and remains an open question, however.

[FN87]. David Litterick, Neteller Closes US Payment Service After Founders' Arrest, at http://www.telegraph.co.uk/money/main.jhtml?xml=/ money/2007/01/19/cneteller19.xml, January 19, 2007 (last visited on April 18, 2007).

[FN88]. Aaron Todd, NETeller Exit Impacts US Internet Gambling Market, at

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0027

124 BLJ 483                                                                              Page 28
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)

http://online.casinocity.com/news/news.cfm?ArticleID=70015, January 18, 2007 (last visited April 18, 2007).

[FN89]. Id. Also, prior to NETeller, in the immediate aftermath of the UIGEA's passage, FirePay, a publicly traded third-party payment processor similar to NETeller, decided to stop allowing Americans to make transactions with Internet gambling sites.

[FN90]. Andrew Ross Sorkin and Stephanie Saul, Gambling Subpoenas on Wall St., THE NEW YORK TIMES, January 22, 2007, available at http:// www.nytimes.com/2007/01/22/business/22gaming.html (last visited on April 18, 2007).

[FN91]. Id.

[FN92]. Id.

[FN93]. Id. at 2.

[FN94]. United States v. Zemek, 634 F.2d 1159, 1174 (9th Cir. 1980); see also United States v. Groomer, 596 F.2d 356 (9th Cir. 1979).

[FN95]. See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund, 201 Ariz. 474, 485 (2002) (because aiding and abetting is a theory of secondary liability, the party charged with the tort must have knowledge of the primary violation, and such knowledge may be inferred form the circumstances); FDIC v. First Interstate Bank of Des Moines, N.A., 885 F.2d 423 (8th Cir. 1989) (bank can be held liable for aiding and abetting a customer who defrauded another bank if bank has a "general awareness" of the customers fraudulent scheme, notwithstanding the fact that the bank may not have had actual knowledge of the scheme or an intent to participate in the fraud; general awareness of the fraudulent scheme can be established through circumstantial evidence); Aetna Cas. And Sur. Co. v. Leahey Const. Co., Inc., 219 F.3d 519, 536 (6th Cir. 2000) ("[t]he knowledge requirement" can be met, "even though the [defendant] may not have known of all the details of the primary fraud, the misrepresentations, omissions, and other fraudulent practices.").

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**

0028

124 BLJ 483                                                                          Page 29
124 Banking L.J. 483
(Cite as: 124 Banking L.J. 483)


[FN96]. See 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.")


[FN97]. Title VIII, § 5364(c).


124 Banking L.J. 483


END OF DOCUMENT

COPR. © 2008 Warren Gorham Lamont

**EXHIBIT "D"**    0029