**FEDERAL RESERVE SYSTEM**

**12 CFR Part 233**

**Regulation GG; Docket No. R-1298**

**DEPARTMENT OF THE TREASURY**

**31 CFR Part 132**

**RIN 1505-AB78**

**PROHIBITION ON FUNDING OF UNLAWFUL INTERNET GAMBLING**

**AGENCIES:** Board of Governors of the Federal Reserve System and Departmental Offices, Department of the Treasury.

**ACTION:** Notice of Joint Proposed Rulemaking.

**SUMMARY:** This notice is published jointly by the Departmental Offices of the Department of the Treasury (the "Treasury") and the Board of Governors of the Federal Reserve System (the "Board") (collectively, the "Agencies") and proposes rules to implement applicable provisions of the Unlawful Internet Gambling Enforcement Act of 2006 (the "Act"). In accordance with the requirements of the Act, the proposed rule designates certain payment systems that could be used in connection with unlawful Internet gambling transactions restricted by the Act. The proposed rule requires participants in designated payment systems to establish policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit transactions in connection with unlawful Internet gambling. As required by the Act, the proposed rule also exempts certain participants in designated payment systems from the requirements to establish such policies and procedures because the Agencies believe it is not reasonably practical for those participants to identify and block, or otherwise prevent or prohibit, unlawful Internet gambling transactions restricted by the Act. Finally, the proposed rule describes the types of policies and procedures that non-exempt participants in each type of designated payment system may adopt in order to comply with the Act and includes non-exclusive examples of policies and procedures which would be deemed to be reasonably designed to prevent or prohibit unlawful Internet gambling transactions restricted by the Act. The proposed rule does not specify which gambling activities or transactions are legal or illegal because the Act itself defers to underlying State and Federal gambling laws in that regard and determinations under those laws may depend on the facts of specific activities or transactions (such as the location of the parties).

**DATES:** Comments must be received on or before December 12, 2007.

**ADDRESSES:** You may submit comments by any of the following methods:

**BOARD:** You may submit comments, identified by Docket Number R-1298, by any of the following methods:

- Agency Web site: http://www.federalreserve.gov. Follow the instructions for submitting comments at http://www.federalreserve.gov/generalinfo/foia/ProposedRegs.cfm.

- Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.

- E-mail: regs.comments@federalreserve.gov. Include docket number in the subject line of the message.

- Fax: (202) 452-3819 or (202) 452-3102.

- Mail: Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, 20th Street and Constitution Avenue, N.W., Washington, DC 20551. All public comments are available from the Board's Web site at http://www.federalreserve.gov/generalinfo/foia/ProposedRegs.cfm, as submitted, unless modified for technical reasons. Accordingly, your comments will not be edited to remove any identifying or contact information. Public comments may also be viewed electronically or in paper in Room MP-500 of the Board's Martin Building (20th and C Streets, NW) between 9 a.m. and 5 p.m. on weekdays.

**TREASURY:**

- **Federal eRulemaking Portal – "Regulations.gov":** Go to http://www.regulations.gov, select "Department of the Treasury – All" from the agency drop-down menu, then click "Submit." In the "Docket ID" column, select "Treas-DO-2007-0015" to submit or view public comments and to view supporting and related materials for this notice of proposed rulemaking. The "User Tips" link at the top of the Regulations.gov home page provides information on using Regulations.gov, including instructions for submitting or viewing public comments, viewing other supporting and related materials, and viewing the docket after the close of the comment period.

- **Mail:** Department of the Treasury, Office of Critical Infrastructure Protection and Compliance Policy, Room 1327, Main Treasury Building, 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220.
  *Instructions*: You must include "Treas-DO" as the agency name and "Docket Number Treas-DO-2007-0015" in your comment. In general, the Treasury will enter all comments received into the docket and publish them without change, including any business or personal information that you provide such as name and address information, e-mail addresses, or phone numbers. Comments, including attachments and other supporting materials, received are part of the public record and subject to public disclosure. Do not enclose any information in your

**EXHIBIT "E"**    0002

comment or supporting materials that you consider confidential or inappropriate for public disclosure.

You may view comments and other related materials by any of the following methods:

- **Viewing Comments Electronically:** Go to http://www.regulations.gov, select "Department of the Treasury-All" from the agency drop-down menu, then click "Submit." In the "Docket ID" column, select "Treas-DO-2007-0015" to view public comments for this notice of proposed rulemaking.

- **Viewing Comments Personally:** You may personally inspect and photocopy comments at the Department of the Treasury Library, Room 1428, Main Treasury Building, 1500 Pennsylvania Avenue, N.W., Washington, D.C. You can make an appointment to inspect comments by calling (202) 622-0990.

Commenters are requested to submit copies of comments to both Agencies.

**FOR FURTHER INFORMATION CONTACT:**
**BOARD:** Christopher W. Clubb, Senior Counsel (202/452-3904), Legal Division; Jack K. Walton, II, Associate Director (202/452-2660), Jeffrey S. Yeganeh, Manager, or Joseph Baressi, Financial Services Project Leader (202/452-3959), Division of Reserve Bank Operations and Payment Systems; for users of Telecommunication Devices for the Deaf (TDD) only, contact 202/263-4869.

**TREASURY:** Charles Klingman, Deputy Director , Office of Critical Infrastructure Protection and Compliance Policy; Steven D. Laughton, Senior Counsel , or Amanda Wise, Attorney-Advisor, Office of the Assistant General Counsel (Banking & Finance), 202/622-9209.

**SUPPLEMENTARY INFORMATION:**

I.    **Background and Introduction**

The Act prohibits any person engaged in the business of betting or wagering (as defined in the Act) from knowingly accepting payments in connection with the participation of another person in unlawful Internet gambling. Such transactions are termed "restricted transactions." The Act generally defines "unlawful Internet gambling" as placing, receiving, or otherwise knowingly transmitting a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.[1]  The Act states that its

---

[1] From the general definition, the Act exempts three categories of transactions: (i) intrastate transactions (a bet or wager made exclusively within a single State, whose State law or regulation contains certain safeguards regarding such transactions and expressly authorizes the bet or wager and the method by which the bet or wager is made, and which does not violate any provision of applicable Federal gaming statutes);

**EXHIBIT "E"**    0003

provisions should not be construed to alter, limit, or extend any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States.[2] The Act does not spell out which activities are legal and which are illegal, but rather relies on the underlying substantive Federal and State laws.[3]

The Act requires the Agencies (in consultation with the U.S. Attorney General) to designate payment systems that could be used in connection with or to facilitate restricted transactions. Such a designation makes the payment system, and financial transaction providers participating in the system, subject to the requirements of the regulations.[4] The Act further requires the Agencies (in consultation with the U.S. Attorney General) to prescribe regulations requiring designated payment systems and financial transaction providers participating in each designated payment system to establish policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions. The regulations must identify types of policies and procedures that would be deemed to be reasonably designed to achieve this objective, including non-exclusive examples. The Act also requires the Agencies to exempt certain restricted

---

(ii) intratribal transactions (a bet or wager made exclusively within the Indian lands of a single Indian tribe or between the Indian lands of two or more Indian tribes as authorized by Federal law, if the bet or wager and the method by which the bet or wager is made is expressly authorized by and complies with applicable Tribal ordinance or resolution (and Tribal-State Compact, if applicable) and includes certain safeguards regarding such transaction, and if the bet or wager does not violate applicable Federal gaming statutes); and (iii) interstate horseracing transactions (any activity that is allowed under the Interstate Horseracing Act of 1978, 15 U.S.C. 3001 *et seq.*).

The Department of Justice has consistently taken the position that the interstate transmission of bets and wagers, including bets and wagers on horse races, violates Federal law and that the Interstate Horseracing Act (the "IHA") did not alter or amend the Federal criminal statutes prohibiting such transmission of bets and wagers. The horse racing industry disagrees with this position. While the Act provides that the definition of "unlawful Internet gambling" does not include "activity that is allowed under the Interstate Horseracing Act of 1978," 31 U.S.C. 5362(10)(D)(i), Congress expressly recognized the disagreement over the interplay between the IHA and the Federal criminal laws relating to gambling and determined that the Act would not take a position on this issue. Rather, the Sense of Congress provision, codified at 31 U.S.C. 5362(10)(D)(iii), states as follows:

> It is the sense of Congress that this subchapter shall not change which activities related to horse racing may or may not be allowed under Federal law. This subparagraph is intended to address concerns that this subchapter could have the effect of changing the existing relationship between the Interstate Horseracing Act and other Federal statutes in effect on the date of enactment of this subchapter. This subchapter is not intended to resolve any existing disagreements over how to interpret the relationship between the Interstate Horseracing Act and other Federal statutes.

---

[2] 31 U.S.C. 5361(b).

[3] See H. Rep. No. 109-412 (pt. 1) p.10.

[4] The Act defines "financial transaction provider" as a creditor, credit card issuer, financial institution, operator of a terminal at which an electronic fund transfer may be initiated, money transmitting business, or international, national, regional, or local payment network utilized to effect a credit transaction, electronic fund transfer, stored value product transaction, or money transmitting service, or a participant in such network or other participant in a designated payment system.

**EXHIBIT "E"**    0004

transactions or designated payment systems from any requirement imposed by the regulations if the Agencies jointly determine that it is not reasonably practical to identify and block, or otherwise prevent or prohibit the acceptance of, such transactions.

Under the Act, a participant in a designated payment system is considered to be in compliance with the regulations if it relies on and complies with the policies and procedures of the designated payment system and such policies and procedures comply with the requirements of the Agencies' regulations. The Act also directs the Agencies to ensure that transactions in connection with any activity excluded from the Act's definition of "unlawful Internet gambling," such as qualifying intrastate transactions, intratribal transactions, or interstate horseracing transactions, are not blocked or otherwise prevented or prohibited by the prescribed regulations.

The regulation being proposed by the Agencies in this notice (i) sets out definitions for terms used in the regulation; (ii) designates payment systems that could be used by participants in connection with, or to facilitate, a restricted transaction; (iii) exempts certain participants in certain designated payment systems from requirements of the regulation; (iv) requires the participants performing non-exempt functions in a designated payment system to establish and implement policies and procedures reasonably designed to prevent or prohibit restricted transactions, such as by identifying and blocking such transactions; (v) provides non-exclusive examples of policies and procedures for non-exempt participants in each designated payment system; and (vi) sets out the regulatory enforcement framework. Comments on all aspects of the proposed regulation are welcome; however, the Agencies are, in particular, seeking comment on the issues noted in the section-by-section analysis below.

The Agencies desire to achieve the purposes of the Act as soon as is practical, while also providing designated payment systems and their participants sufficient time to adapt their policies and practices as needed to comply with the regulation. The Agencies propose that the final regulations take effect six months after the joint final rules are published, and request comment on whether this period is reasonable. Commenters requesting a shorter period should explain why they believe payment system participants would be able to modify their policies and procedures, as required, in the shorter period. Similarly, commenters requesting a longer period should explain why the longer period would be necessary to comply with the regulations, particularly if the need for additional time is based on any system or software changes required to comply with the regulations.

**EXHIBIT "E"**   0005

## II.   Section by Section Analysis

### A.   Definitions

The proposed regulation provides definitions for terms used in the regulation. Many of the definitions (such as "bet or wager," "financial transaction provider," "Internet," "money transmitting business," "restricted transaction," and "unlawful Internet gambling") follow or refer to the Act's definitions. The proposed rule does not attempt to further define gambling-related terms because the Act itself does not specify which gambling activities are legal or illegal and the Act does not require the Agencies to do so. The Act focuses on payment transactions and relies on prohibitions on gambling contained in other statutes under the jurisdiction of other agencies. Further, application of some of the terms used in the Act may depend significantly on the facts of specific transactions and could vary according to the location of the particular parties to the transaction or based on other factors unique to an individual transaction. The purpose of the proposed regulations is to implement the provisions of the Act that instruct the Agencies to require participants in designated payment systems to establish policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions. For these reasons, and in consultation with the Department of Justice, the Agencies' preliminary view is that issues regarding the scope of gambling-related terms should be resolved by reference to the underlying substantive State and Federal gambling laws and not by a general regulatory definition.

The proposed rule includes definitions for some payment system terms (such as "automated clearing house system," "card system," "check collection system," "check clearing house," "money transmitting business," "money transmitting service," and "wire transfer system") because they relate to the designated payment systems, exemptions, and required policies and procedures. The definitions of most of these payment system terms are based on existing regulatory or statutory definitions, such as the Board's Regulation CC (12 CFR Part 229) or the Uniform Commercial Code (UCC).[5] Terms used in the context of particular payment systems are intended to be consistent with how those terms are used in those systems. The proposed rule incorporates by reference relevant definitions of terms regarding the automated clearing house (ACH) system as published in "2007 ACH Rules:  A Complete Guide To Rules & Regulations Governing the ACH Network" (the ACH Rules) by the National Automated Clearing House Association (NACHA). In accordance with the Act, the definitions of "money transmitting business" and "money transmitting service" have the meanings given the terms in the Bank Secrecy

---

[5] The Uniform Commercial Code is a model commercial law developed by the National Conference of Commissioners on Uniform State Law (NCCUSL) in conjunction with the American Law Institute. NCCUSL is a non-profit organization that promotes the principles of uniformity by drafting and proposing specific statutes in areas of law where uniformity between the States is desirable. No uniform statute is effective until a State legislature adopts it as part of its State law.

**EXHIBIT "E"**   0006

Act,[6] determined without regard to any regulations prescribed by the Treasury thereunder.[7]

In addition, the proposed regulation defines the term "participant in a designated payment system" as an operator of a designated payment system, or a financial transaction provider that is a member of, has contracted for services with, or is otherwise participating in, a designated payment system. The proposed regulatory definition clarifies that an end-user customer of a financial transaction provider is not included in the definition of "participant," unless the customer is also a financial transaction provider otherwise participating in the designated payment system on its own behalf.

The Agencies request comment on all of the terms and definitions set out in this section. In particular, the Agencies request comment on any terms used in the proposed regulation that a commenter believes are not sufficiently understood or defined.

B.    Designated Payment Systems

Section 3 of the proposed regulation designates the following payment systems as systems used by a financial transaction provider that could be used in connection with, or to facilitate, a restricted transaction: automated clearing house systems; card systems (including credit, debit, and pre-paid cards or stored value products); check collection systems; money transmitting businesses; and wire transfer systems. The broad range of the payment systems designated by the regulation reflects the fact that a restricted transaction may be made through many different payment systems. The designated payment systems are described in more detail below.

1.    Automated clearing house system

The ACH system is a funds transfer system, primarily governed by the rules and guidelines published by NACHA, that provides for the clearing and settlement of batched electronic entries for participating financial institutions.[8] ACH transfers can be either credit or debit transfers and can be either recurring or one-time transfers. Recurring ACH transfers typically occur on a set schedule and are pre-authorized by the individual or entity whose account is being credited or debited. Recurring credit transfers include payroll direct deposit payments, while recurring debit transfers include mortgage and other bill payments. One-time ACH transfers are authorized at the time the payment is initiated. One-time credit transfers include bill payments made through the bill payer's bank, while one-time debit transfers include bill payments made through the biller's payment site.

---

[6] 31 U.S.C. 5330(d).

[7] The Agencies believe that this cross-reference does not otherwise require the Act and the Bank Secrecy Act to be interpreted in light of each other.

[8] A primer on the ACH network is provided in the ACH Rules.

**EXHIBIT "E"**    0007

The designation of the originating and receiving institution in ACH terminology is based on the participants that initiate and receive the ACH entries, rather than the direction of the flow of funds. The originator of an ACH transfer generally sends the payment instruction to its bank, the originating depository financial institution (ODFI), so that the payment instruction can be entered into the ACH system. The ODFI combines the payment instructions with payment instructions from its other customers and sends them to an ACH operator for processing. The ACH operator will then sort and deliver the payments to the appropriate receiving depository financial institutions (RDFIs) and complete the interbank settlement process. The RDFIs then post the payments, either credits or debits, to the receivers' accounts. The fundamental difference between the ACH credit and debit transfers is that for ACH credit transfers funds are "pushed" to an account at the institution receiving the message, while in ACH debit transfers funds are "pulled" from an account at the institution receiving the message. In other words, for credit transfers, the originator is requesting that funds be credited to the receiver (the funds move in the same direction as the payment instruction), while for debit transfers, the originator is requesting that funds be debited from the receiver (the funds move in the opposite direction from the payment instruction).

In some instances, a "third-party sender" acts as an intermediary between an originator and an ODFI with respect to the initiation of ACH transactions where there is no contractual agreement between the originator and the ODFI. Under the ACH Rules, a third-party sender assumes the responsibilities of an originator and is obligated to provide the ODFI with any information the ODFI reasonably deems necessary to identify each originator for which the third-party sender transmits entries. The use of third-party senders in ACH transactions poses particular risks because the ODFI does not have a direct relationship with the originators.

The ACH Rules also include particular provisions governing cross-border ACH payments made in cooperation with another country's national payment system. Under the ACH Rules, the U.S. segment of a cross-border ACH transaction is settled separately between the U.S. participants and the U.S. gateway operator. The interface between the two national payment systems is commonly accomplished through an "originating gateway operator" in the originator's country and a "receiving gateway operator" in the receiver's country. Both the originating and receiving gateway operators are participants in their respective national payment systems and capable of clearing and settling payments in their respective systems. In the United States, the gateway operator can be an ODFI (for "inbound" transactions), an RDFI (for "outbound" transactions), or, with the appropriate agreements in place, an ACH operator. Additionally, a third-party sender may have proprietary arrangements with a foreign counterparty and accept instructions to submit cross-border ACH entries to the appropriate ACH operator or ODFI.

In the case of inbound transactions, the "originating gateway operator" in the country of the originator receives the entry from its national payments network and then transmits the entry to a receiving gateway operator in the receiving country. The receiving gateway operator then transmits the entry into its national payments system for delivery to the intended RDFI. If a U.S. ODFI acts as a receiving gateway operator, it

8

would be the first U.S. institution involved in the transaction and would submit the transaction to its U.S. ACH operator for further processing. Under the ACH Rules, a U.S. receiving gateway operator for a particular cross-border transaction must make warranties expected of an ODFI for that transaction and assumes liability for breaches of those warranties to every RDFI and ACH operator, so in effect it becomes the ODFI for the U.S. segment of the transaction.[9] Similarly, a U.S. depository financial institution or third-party sender receiving instructions to originate cross-border ACH entries directly from a foreign counterparty would be the first U.S. participant involved in the transaction and would originate the ACH entry in the U.S. ACH system.

### 2. Card systems

Card systems are systems for clearing and settling transactions in which credit cards, debit cards, pre-paid cards, or stored value products are used to purchase goods or services or to obtain a cash advance. In a typical card system transaction, there are three components to the transaction: authorization, clearance, and settlement.

The transaction begins when the payor provides his card or card number to the payee, either in person or through the Internet or telephone. The payee uses that information to create a card payment authorization request, which it sends to its bank (the "merchant acquirer") or the bank's agent. The merchant acquirer sends an authorization request through the card system network to the bank that issued the payor's card (the "card issuer") or its agent.[10] The authorization request includes, amongst other information, the card number, the transaction amount, a merchant category code, and a transaction code. The merchant category code describes generally the nature of the payee's business and the transaction code describes whether the card was present at the point of transaction (i.e., a point-of-sale transaction) or not present (i.e., a transaction over the Internet or telephone). The card issuer or its agent either authorizes or declines the transaction and the payee is immediately notified of the decision through the card network. If authorization is granted, then the payee completes the underlying transaction with the payor; otherwise, the transaction is cancelled.

After the transactions have been authorized, they must then be cleared. The clearing process for personal identification number (PIN)-based debit card transactions is different from the process for credit card and signature-based debit card transactions. For PIN-based debit card transactions, the authorization and clearing occur at the same time and thus a separate clearing transmission by the payee to the merchant acquirer is not necessary. For credit cards and signature-based debit cards, the payee batches its authorized transactions and transmits them, typically at the end of the business day, to the merchant acquirer to be cleared through the card network. Depending on the card type,

---

[9] See ACH Rules, Operating Rules §§ 11.6 and 11.7.

[10] This discussion generally relates to the card processing model of Visa and MasterCard, in which the merchant acquirer, the card network, and the card issuer are separate entities. Other card companies, such as American Express, may employ a model in which one company owns the card processing network and performs all major functions involved in issuing cards and acquiring merchants to accept its cards.

**EXHIBIT "E"**    0009

card issuer banks memo-post or charge transactions to their customers' accounts when the transactions are either authorized or cleared. Once the transactions have been cleared, they are settled at a time specified by the card network and the merchant acquirer and the card issuer are, respectively, credited and debited.

3.    Check collection systems

A check collection system is an interbank system for collecting, presenting, returning, and settling checks or an intrabank system for settling checks deposited and drawn on the same bank (i.e., "on-us checks"). A typical check transaction is initiated by the payor writing a check to the order of a payee and giving the signed check to the payee as payment. The payee deposits the check with its bank (the bank of first deposit or the "depositary bank"). Except for on-us checks, the depositary bank will then send the check to the bank on which it is drawn (the "paying bank") for payment.

The depositary bank may present the check for payment directly to the paying bank, may use a check clearing house, or may use the services of an intermediary bank, such as a Federal Reserve Bank or another correspondent bank (a "collecting bank").[11] These intermediaries handle large volumes of checks daily and typically rely on three pieces of information: the routing number of the bank from which it received the check; the routing number of the bank to which the check is destined (i.e. the paying bank); and the amount of the check. Upon presentment, the paying bank settles with the presenting bank for the amount of the check and debits the amount of the check from the account of the payor.

Checks may be cleared cross-border through correspondent banking relationships. If a U.S. payor writes a check to the order of an offshore payee, the payee will likely deposit the check in its home country bank. The home country bank may have a correspondent relationship with a U.S. bank for check collection and deposit the check with its U.S. correspondent bank. The U.S. bank will then collect the check through the U.S. check collection system. The first banking office located in the United States that receives a check from outside the United States for forward collection inside the United States is defined as the depositary bank for that check.[12] Accordingly, if a foreign office of a U.S. or foreign bank sends checks to its U.S. correspondent for forward collection, the U.S. correspondent is the depositary bank for those checks.

---

[11] Check clearing houses generally provide a facility or mechanism for banks to exchange checks for collection and return. The services provided by check clearing houses vary. Some merely provide space for banks to exchange checks. Others provide the capability to exchange between banks in electronic form. A check clearing house generally also facilitates settlement of the checks exchanged through it. Check clearing houses are not considered collecting or returning banks.

[12] 12 CFR 229.2(o) commentary. Foreign offices of U.S. and foreign banks are not included in Regulation CC's definition of "bank." 12 CFR 229.2(e) commentary.

**EXHIBIT "E"**    0010

4. Money transmitting businesses

A money transmitting business is a person (other than a depository institution) that engages as a business in the transmission of funds, including any person that engages as a business in an informal money transfer system or any network of people that engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system. Money transmitters commonly will facilitate money transmissions through agent locations, by phone, or through an Internet website and can be used for payments to some businesses as well as money transfers to individuals. This term includes networks such as Western Union and MoneyGram, on-line payment systems such as PayPal, and other electronic systems that engage in the business of transmitting funds.

Money transmitting businesses use various operational models. In networks with operations similar to Western Union and MoneyGram, the payor initiates the transaction in person at the money transmitting business's location, by phone, or through the money transmitting business's Internet site and generally can use cash, a credit card, or a debit card to fund a transfer. The money transmitter obtains identification from the payor, as well as identifying information for the intended payee and the location to which the payment should be sent. The money transmitter may provide the payor with a reference number that the payee will need in order to pick up the payment. Large money transmitters, such as Western Union or, MoneyGram, typically transmit the payment instructions through an internal proprietary system. The payor or the money transmitter notifies the payee of the availability of the payment. The payee goes to one of the money transmitting business's physical locations, provides the necessary information (such as personal identification and perhaps the transaction reference number), and receives the funds. Alternatively, some money transmitting businesses will transfer money directly into a payee's bank account in certain circumstances, such as when the recipient is a business that has been approved to receive funds through the money transmitting business (a "commercial subscriber"). Settlement between the sending and receiving accounts or locations is effected based on rules established by the money transmitting business.

Other money transmitters may follow the PayPal-type operational model and provide Internet electronic payment services to facilitate purchases over the Internet, either from vendors or through auctions. In such a model, a consumer establishes an account with the money transmitting business and uses a debit card, credit card, or ACH transfer to fund the account. In order to fund a purchase from a vendor with an account with the same money transmitting business, the consumer instructs the money transmitting business to transfer the funds to the vendor, identifying the vendor by e-mail address. The money transmitting business sends an e-mail notification to the vendor and transfers the funds from the consumer's account to the vendor's account. The vendor may keep the funds in its account with the money transmitting business (and subsequently use them to effect payments through the system) or may transfer the funds from its account to its bank account, such as through an ACH credit transaction.

**EXHIBIT "E"** 0011

Other money transmitting businesses may use operational models different than those set out above. The Agencies intend to apply the term "money transmitting business" to cover businesses that meet the definition of the term as used in the Act, regardless of operational model.

5. Wire transfer systems

A wire transfer system is a system through which the sender of a payment transmits an unconditional order to a bank to pay a fixed or determinable amount of money to a beneficiary upon receipt (or on a day stated in the order) by electronic or other means through a network, between banks, or on the books of a bank. Wire transfer systems are generally designed for large-value transfers between financial institutions, but financial institutions also send lower-value, consumer-initiated payment orders through wire transfer systems.

In a typical consumer-initiated wire transfer transaction, the consumer would initiate the transfer after obtaining wire transfer instructions from the intended beneficiary (such as the bank to which the beneficiary would like the funds transferred and the beneficiary's account number at the bank). The consumer provides that information in the payment order to its bank (the "originator's bank") to initiate the wire transfer. The originator's bank may transfer the payment directly to the beneficiary's bank if the banks have an account relationship.

Alternatively, the originator's bank may use the services of a wire transfer network, such as the Federal Reserve Banks' Fedwire system or The Clearing House's CHIPS system, to send the transfer either to the beneficiary's bank or to an intermediary bank that has an account relationship with the beneficiary's bank. In an automated wire transfer system such as Fedwire or CHIPS, typically the information used in processing the payment order is the routing information of the sending bank, the routing information of the receiving bank, and the amount of the wire transfer. Although additional information may be, and in some cases is required to be, included in fields of the payment order message format (such as the names of the originator and the beneficiary, their account numbers, and addresses), this information is not relied upon by the intermediary bank to process the transfer.

Wire transfer transaction proceeds may be sent cross-border through correspondent banking relationships. The last U.S. bank in the outgoing transaction may either have a correspondent banking relationship with the beneficiary's foreign bank or a foreign intermediary bank for further delivery to the beneficiary's bank. Alternatively, the U.S. bank may have a branch in the home country of the beneficiary and can make an "on-us" transfer to the branch for further processing through the beneficiary's home country national payment system.

**EXHIBIT "E"**     0012

6.    Other payment systems

The Agencies request comment on whether the list of designated payment systems in the proposed regulation is too broad or too narrow.  In particular, the Agencies request comment on whether there are non-traditional or emerging payment systems not represented in the proposed regulation that could be used in connection with, or to facilitate, any restricted transaction.  If a commenter believes that such a payment system should be designated in the final rule, the commenter should describe policies and procedures that might be reasonably designed to identify and block, or otherwise prevent or prohibit, restricted transactions through that system.

C.  Exemptions

The Act directs the Agencies to exempt certain restricted transactions or designated payment systems from any requirements imposed under the regulations if the Agencies find that it is not reasonably practical to identify and block, or otherwise prevent or prohibit the acceptance of, such transactions.  Section 4 of the proposed rule provides such an exemption for certain participants in ACH systems, check collection systems, and wire transfer systems.  The proposed regulation is structured to impose requirements on participants in designated payments systems with respect to the segments of particular transactions that those participants handle.  Therefore, rather than exempting entire categories of restricted transactions or entire payment systems, the Agencies have structured the exemptions to apply to particular participants in particular payment systems as described in greater detail below.  The Agencies believe that this limited application of their exemption authority better serves the Act's purposes of preventing the processing of restricted transactions.

The Agencies are proposing to exempt all participants in the ACH systems, check collection systems, and wire transfer systems, except for the participant that possesses the customer relationship with the Internet gambling business (and certain participants that receive certain cross-border transactions from, or send certain such transactions to, foreign payment service providers, as discussed further below).  The exemptions for these participants reflect the fact that these systems currently do not enable the exempted participants to reasonably identify and block, or otherwise prevent or prohibit, restricted transactions under the Act.  While other systems, such as the card systems, have developed merchant category and transaction codes that identify the business line of the payee (e.g., the gambling business) and how the transfer was initiated (such as via the Internet), so that the systems are able to identify and block certain types of payments in real time, the ACH systems, check collection systems, and wire transfer systems do not use such codes.  Moreover, as a general matter, a consumer can make payment by check, ACH, or wire transfer to any business with an account at a depository institution.  This is in contrast to card systems and money transmitting businesses, in which consumers can make direct payments only to those businesses that have explicitly agreed to participate in those payment systems.  As a result, the preliminary view of the Agencies is that it is not reasonably practical for the exempted participants in ACH systems, check collection systems, and wire transfer systems discussed below to identify and block, or otherwise

EXHIBIT "E"    0013

prevent or prohibit, restricted transactions under the Act. The Agencies intend to monitor technological developments in these payment systems and will consider amending the exemptions if, in the future, the technology prevalent in these payment systems permits such participants to identify and block, or otherwise prevent and prohibit, those restricted transactions.

No designated payment system is completely exempted by the proposed rule. The Agencies intend that the participant with the customer relationship with the Internet gambling business would have the responsibility in the ACH systems, check collection systems, or wire transfer systems to prevent or prohibit restricted transactions from being credited to the account of the gambling business through that particular payment system. The Agencies request comment on all aspects of the exemptions, but in particular, whether the exemptions for certain participants in the ACH systems, check collection systems, and wire transfer systems discussed in more detail below are appropriate. Commenters that believe that these participants should not be exempted from the requirements of the regulation should provide specific examples of policies and procedures that such participants could establish and implement that would be reasonably designed to identify and block, or otherwise prevent or prohibit, restricted transactions.

1. ACH systems

With regard to an ACH system, the proposal provides an exemption from the regulation's requirements for the ACH system operator, the originating depository financial institution (ODFI) in an ACH credit transaction, and the receiving depository financial institution (RDFI) in an ACH debit transaction (except with respect to certain cross-border transactions discussed below). The proposal does not exempt the institution serving as the ODFI in an ACH debit transaction or the RDFI in an ACH credit transaction because these institutions typically have a pre-existing relationship with the customer receiving the proceeds of the ACH transaction and could, with reasonable due diligence, take steps to ascertain the nature of the customer's business and ensure that the customer relationship is not used to receive restricted transactions.

The proposal would provide an exemption for the ACH system operator because it is not reasonably practical for the operator to identify and block a particular ACH transfer as a restricted transaction. The ACH system operator's function is to act as the central clearing facility for ACH entries. The ACH operator sorts the entries by RDFI routing information and transmits the payment information to the appropriate RDFI for posting. The ACH system operator would not have any direct interaction with either the gambler or the Internet gambling business and would not be in a position to obtain the necessary information to analyze individual transactions to determine whether they are restricted transactions. In addition, ACH operators use highly-automated systems to sort large volumes of ACH entries without manual intervention. A requirement to analyze each ACH entry manually to determine whether it is a restricted transaction would substantially increase processing times for all ACH entries, including entries that are not restricted transactions, and reduce the efficiency of the ACH system. Moreover, even if

**EXHIBIT "E"**    0014

the payee information on an ACH entry is analyzed manually, it is very difficult for an ACH operator to determine whether the ACH entry is related to a restricted transaction.

The proposal also would provide an exemption for the RDFI in an ACH debit transaction. In this case, the exempted participant would not have any direct interaction with its customer prior to processing the transaction. In a restricted transaction using an ACH debit transaction, a gambler could authorize the unlawful Internet gambling business to debit his account for the restricted transaction and the RDFI would not have an opportunity to obtain information from its customer (the gambler in this case) to determine whether the entry was in connection with a restricted transaction. Also, as discussed below, information obtained from the customer may be of limited value.

In addition, the proposal would provide an exemption for the ODFI in an ACH credit transaction. The Agencies carefully considered whether such an exemption would be warranted. Typically, a consumer would initiate an ACH credit transaction on-line with the ODFI, so there could be an opportunity for the ODFI to design a procedure to obtain information on an outgoing ACH credit transaction to determine whether it is a restricted transaction. For example, for each ACH credit transaction, the ODFI could require the originator to submit a statement that the ACH credit transaction is not a restricted transaction and/or a description of the nature and purpose of the transaction.

The Agencies' preliminary view, however, is that, while it may be possible at least in some cases for an ODFI in an ACH credit transaction to obtain information from the originator regarding whether the ACH credit transaction is a restricted transaction under the Act, any associated benefits would likely be outweighed by the associated costs that would be borne by ODFIs. Specifically, any process requiring the customer to describe the nature of the transaction and/or state that the transaction does not involve unlawful Internet gambling may be of limited value, either because a customer may knowingly mischaracterize the actual nature of the transaction in order to avoid the transaction being rejected or blocked, or because the customer may not actually know whether an Internet gambling transaction is a restricted transaction under the Act. The Agencies also believe that the ODFI would generally be unable to determine whether the originator's characterization of the transaction is accurate. Moreover, the burden on ODFIs in developing the necessary systems to obtain the information and determine whether to reject or block a transaction would likely be substantial.

The Agencies specifically request comment on whether it is reasonably practical to implement policies and procedures (including, but not limited to, those discussed above) for an ODFI in an ACH credit transaction, whether such policies and procedures would likely be effective in identifying and blocking restricted transactions, and whether the burden imposed by such policies and procedures on an originator and an ODFI would outweigh any value provided in preventing restricted transactions and a description of such burdens and benefits. If a commenter believes that an ODFI in an ACH credit transaction should not be exempted, the Agencies request that the commenter provide examples of policies and procedures reasonably designed for an ODFI in an ACH credit

**EXHIBIT "E"**    0015

transaction to identify and block or otherwise prevent or prohibit restricted transactions in the ACH system.

### 2. Check collection systems

With regard to check collection systems, the proposed rule would provide an exemption from the regulation's requirements for a check clearing house, the paying bank (unless it is also the depositary bank), any collecting bank (other than the depositary bank), and any returning bank. The proposal does not exempt the institution serving as the depositary bank (i.e., the first U.S. institution to which a check is transferred, in this case the institution receiving the check deposit from the gambling business) in a check transaction. The depositary bank is typically in a position, through reasonable due diligence, to take steps to ascertain the nature of the customer's business and ensure that the customer relationship is not used for receiving restricted transactions.

The proposed rule would provide an exemption for the check clearing house because the check clearing house generally does not have a direct relationship with either the payor or the payee and would not be in a position to obtain information from either party regarding the transaction that would permit the check clearing house to determine whether a particular check was a restricted transaction.

For similar reasons, the proposal would provide an exemption for a collecting bank (other than the depositary bank) and a returning bank in a check collection transaction. Collecting banks (other than the depositary bank) and returning banks are intermediary banks that generally do not have a direct relationship with either the payor or the payee in the check transaction and would not be in a position to obtain information from either party that would permit them to determine whether a particular check was a restricted transaction.

The proposal would also provide an exemption for the paying bank (unless the paying bank is also the depositary bank). The paying bank is generally the bank by or through which a check is payable and to which the check is sent for payment or collection. In a restricted transaction, this would generally be the bank holding the gambler's checking account. While the paying bank would have a direct relationship with the payor, it would not be in a position to obtain information from the payor prior to the transaction being settled. Checks are processed and paid by a paying bank's automated systems according to the information contained in the magnetic ink character recognition (MICR) line printed near the bottom of the check. The MICR line commonly includes the bank's routing number, the customer's account number, the check number, and the check amount, but does not contain any information regarding the payee. A requirement to analyze manually each check with respect to the payee would substantially increase processing times for all checks, including checks that are not restricted transactions, and reduce the efficiency of the check collection systems. Moreover, even if the payee information on checks is analyzed manually, it is very difficult for a paying bank to determine whether the check is related to a restricted

**EXHIBIT "E"**    0016

transaction. If the paying bank is also the depositary bank (i.e., an "on-us" transaction), the institution would still be required to comply with the regulations as a depositary bank.

### 3. Wire transfer systems

With regard to wire transfer systems, the proposal provides an exemption from the regulation's requirements for the originator's bank (i.e., the depository institution sending the wire transfer on behalf of the gambler) and intermediary banks (other than the bank that sends the transfers to a foreign respondent bank as discussed below). The proposal does not exempt the institution serving as the beneficiary's bank (i.e., the institution receiving the wire transfer on behalf of the gambling business) in a particular wire transfer system. The beneficiary's bank typically has a pre-existing relationship with the customer receiving a particular wire transfer and, accordingly, is in a position, through reasonable due diligence, to take steps to ascertain the nature of the customer's business and assess the risk that the customer may be involved in restricted transactions.

The proposal would provide an exemption for intermediary banks because it is not reasonably practical for institutions serving in this capacity in a wire transfer system to identify and block a particular wire transfer as a restricted transaction under the Act. The information normally relied upon by intermediary banks' automated systems in processing a wire transfer does not typically include information that would enable those systems to identify and block individual transfers as restricted transactions under the Act. In addition, intermediary banks process tremendous volumes of wire transfers in seconds or less on an automated basis, without manual intervention. A requirement to analyze each transaction manually to determine whether it is a restricted transaction would substantially increase processing times for all wire transfers, including transfers that are not restricted transactions, and reduce the efficiency of the wire transfer systems. Moreover, even if the beneficiary information in a wire transfer payment message is analyzed manually, it is very difficult for an intermediary bank to determine whether the wire transfer is related to a restricted transaction.

The Agencies also carefully considered whether to grant an exemption for portions of a wire transfer system involving the originator's bank. Similar to an ODFI in an ACH credit transaction, the originating customer in a particular wire transfer generally has some direct interaction with the originating institution, so there could be an opportunity for the originating institution to design a procedure to review an outgoing wire transfer to determine whether it is a restricted transaction. For example, for each wire transfer (or for each transfer originated by a consumer), the originator's bank could require the originator to submit a statement that the wire transfer is not a restricted transaction and a description of the nature and purpose of the transaction. This two-part submission could be made in writing for in-person originations, orally for phone originations, or on-line for automated originations. For the casual or impulse gambler, requiring such a statement may cause the gambler to consider carefully (or to investigate) whether the payment is legal and even whether engaging in gambling is prudent in light of the gambler's personal circumstances.

**EXHIBIT "E"**    0017

The Agencies' preliminary view is that, while it may be possible, at least in some cases, for an originating bank to obtain such a submission from the originator, any associated benefits would likely be outweighed by the associated costs for reasons similar to those described above regarding the exemption for ODFIs in ACH credit transactions.

The Agencies specifically request comment on whether it is reasonably practical for an originator's bank and an intermediary bank in a wire transfer system to implement policies and procedures (including, but not limited to, those discussed above) that would likely be effective in identifying and blocking or otherwise prevent or prohibit restricted transactions; whether the burden imposed by such policies and procedures on an intermediary bank, an originator, and an originator's bank would outweigh any value provided in preventing restricted transactions and a description of such burdens and benefits; and whether any policies and procedures could reasonably be limited only to consumer-initiated wire transfers and, if so, a description of any costs or benefits of so limiting the requirement. If a commenter believes that the originator's bank or an intermediary bank should not be exempted, the Agencies request that the commenter provide examples of policies and procedures reasonably designed for institutions serving in those functions to identify and block or otherwise prevent or prohibit restricted transactions in a wire transfer system.

D. Processing of Restricted Transactions Prohibited

Section 5 of the proposed regulations expressly requires all non-exempt participants in the designated payment systems to establish and implement policies and procedures in order to identify and block, or otherwise prevent or prohibit, restricted transactions. In accordance with the Act, section 5 states that a participant in a designated payment system shall be considered in compliance with this requirement if the designated payment system of which it is a participant has established policies and procedures to prevent or prohibit restricted transactions and the participant relies on, and complies with, the policies and procedures of the designated payment system. In other words, the Act and the proposed rule permit non-exempt participants in a designated payment system to either (i) establish their own policies and procedures to prevent or prohibit restricted transactions; or (ii) rely on and comply with the policies and procedures established by the designated payment system, so long as such policies and procedures comply with the regulation.

Section 5 also imports the Act's liability provisions, which state that a person that identifies and blocks, prevents, prohibits, or otherwise fails to honor a transaction is not liable to any party for such action if (i) the transaction is a restricted transaction; (ii) such person reasonably believes the transaction to be a restricted transaction; or (iii) the person is a participant in a designated payment system and prevented the transaction in reliance on the policies and procedures of the designated payment system in an effort to comply with the regulation.

Finally, section 5 implements the Act's requirement that the Agencies ensure that transactions in connection with any activity excluded from the Act's definition of

EXHIBIT "E"    0018

unlawful Internet gambling are not blocked or otherwise prevented or prohibited by the regulations (the "overblocking" provision). Section 5 makes clear that nothing in the regulation requires or is intended to suggest that non-exempt participants should block or otherwise prevent or prohibit any transaction in connection with any activity that is excluded from the definition of "unlawful Internet gambling" in the Act, such as qualifying intrastate or intratribal transactions, or a transaction in connection with any activity that is allowed under the Interstate Horseracing Act of 1978 (15 U.S.C. 3001 et seq.).[13] As noted above, it also seems clear that the Act was not intended to change the legality of any gambling-related activity in the United States.[14] Consequently, the proposed regulations neither require nor are intended to suggest that participants in designated payment systems should establish policies and procedures to prevent any Internet gambling transactions that are legal under applicable Federal and State law.

Some payment system operators have indicated that, for business reasons, they have decided to avoid processing any gambling transactions, even if lawful, because, among other things, they believe that these transactions are not sufficiently profitable to warrant the higher risk they believe these transactions pose.[15] The Agencies believe that the Act does not provide the Agencies with the authority to require designated payment systems or participants in these systems to process any gambling transactions, including those transactions excluded from the Act's definition of unlawful Internet gambling, if a system or participant decides for business reasons not to process such transactions. The Agencies request comment on the proposed approach to implementing the Act's overblocking provision.

E.  Reasonably Designed Policies and Procedures

Section 6 of the proposed regulations sets out for each designated payment system examples of policies and procedures the Agencies believe are reasonably designed to prevent or prohibit restricted transactions for non-exempt participants in the system. Generally, under the proposed rule, non-exempt participants in each designated payment system should have policies and procedures that (i) address methods for conducting due diligence in establishing and maintaining a commercial customer relationship designed to ensure that the commercial customer does not originate or receive restricted transactions through the customer relationship; and (ii) include procedures reasonably designed to prevent or prohibit restricted transactions, including procedures to be followed with respect to a customer if the participant discovers the customer has been engaging in restricted transactions through its customer relationship. These procedures are discussed in more detail below.

---

[13] See the discussion of the interplay between the Interstate Horseracing Act and federal gambling statutes contained in Footnote 1.

[14] 31 U.S.C. 5361(b).

[15] Designated payment system representatives have informally indicated to the Agencies that many participants in their systems prefer not to process gambling-related transactions because they have experienced higher-than-usual losses due, for example, to assertions that gambling transactions were "unauthorized."

19

**EXHIBIT "E"**    0019

### 1. Due diligence

The Agencies would expect non-exempt participants' policies and procedures addressing due diligence to be consistent with their regular account-opening practices. The Agencies anticipate that participants would use a flexible, risk-based approach in their due diligence procedures in that the level of due diligence performed would match the level of risk posed by the customer. The due diligence is intended to apply to a participant when the participant is directly establishing or maintaining a customer relationship, but not with respect to entities with which the participant does not have a direct relationship. For example, if a card network operator does not act as the merchant acquirer in the network, the operator would not be expected to conduct due diligence on the merchant customers. This function should be performed by the member institutions of the network that are acting as merchant acquirers. However, if a card network operator also acted as the merchant acquirer, it should conduct the appropriate due diligence on its merchants in establishing or maintaining the customer relationship. The Agencies expect that the most efficient way for participants to implement the due diligence procedures in the proposed rule would be to incorporate them into existing account-opening due diligence procedures (such as those required of depository institutions under Federal banking agencies' anti-money laundering compliance program requirements).[16]

The due diligence requirements for a participant establishing a customer relationship in an ACH system also apply to the establishment of a relationship with any third-party sender. Before establishing a relationship with a third-party sender, a participant should conduct appropriate due diligence with respect to the third-party sender. A third-party sender should conduct due diligence on its customers to ensure that it is not transmitting restricted transactions through an ODFI, and the ODFI should confirm that the third-party sender conducts such due diligence on its originators. In maintaining the customer relationship with the third-party sender, the participant should ensure that there is a process to monitor the operations of the third-party sender, such as by audit.

The Agencies request comment as to the appropriateness of participants incorporating into their existing account-opening procedures the due diligence provisions of the proposed rule. The Agencies also request comment on whether, and to what extent, the proposed rule's examples of due diligence methods should explicitly include periodic confirmation by the participants of the nature of their customers' business.

### 2. Remedial action

The Agencies also would expect a non-exempt participant to have policies and procedures to be followed if the participant becomes aware that one of its customer relationships was being used to process restricted transactions. These policies and procedures could include a broad range of remedial options, such as imposing fines, restricting the customer's access to the designated payment system or the participant's facilities, and terminating the customer relationship by closing the account. In addition,

---

[16] See, e.g., 12 CFR 208.63.

**EXHIBIT "E"**    0020

as provided in section 5(e) of the proposed rule, nothing in the proposed rule modifies any existing legal requirement relating to the filing of suspicious activity reports with the appropriate authorities. The Agencies request comment on the appropriateness of the proposed rule's examples of a participant's procedures upon determining that a customer is engaging in restricted transactions through the customer relationship, and whether any additional such procedures should be included as examples.

A participant also would be expected to take appropriate remedial action with respect to a business engaged in unlawful Internet gambling with which it does not have a customer relationship if the participant becomes aware that the gambling business is using the participant's trademark on its website to promote restricted transactions. For example, the participant could consider taking legal action to prevent the unauthorized use of its trademark by an unlawful Internet gambling business.

3. Monitoring

The policies and procedures of non-exempt participants in card systems and money-transmitting businesses are expected to address ongoing monitoring or testing to detect possible restricted transactions. Examples of such monitoring or testing include (1) monitoring and analyzing payment patterns to detect suspicious patterns of payments to a recipient, and (2) monitoring of web sites to detect unauthorized use of the relevant designated payment system, including unauthorized use of the relevant designated payment system's trademarks. Unlawful Internet gambling businesses may be able to access a designated payment system (such as a money transmitting business) that would otherwise deny them a commercial subscriber account, by using individuals as agents to receive restricted transactions and may advertise the use of these systems on their website. Certain money transmitting businesses have developed monitoring procedures to detect suspicious payment volumes to an individual recipient in order to address this risk.[17] In addition, certain money transmitting businesses subscribe to a service that will search the Internet for unauthorized use of the money transmitting business's trademark.

The proposed rule does not include ongoing monitoring and testing within the examples of the policies and procedures for ACH systems, check collection systems, and wire transfer systems because these systems currently do not have the same level of functionality for analyzing patterns of specific payments being processed through the system. Moreover, as mentioned above, these three systems are open, universal systems that do not require businesses to explicitly sign up in order to receive payments through them. The Agencies request comment on whether ongoing monitoring and testing should be included within the examples for the ACH, check collection, and wire transfer systems, and, if so, how such functionality could reasonably be incorporated into those systems. As a general matter, the Agencies will continue to monitor technological developments in all payment systems, and, as those developments warrant, will engage in

---

[17] As provided in the Act and the proposed rule, participants that are part of a money transmitting network may be able to rely on the network's procedures in this regard if the participants determine that the network's procedures comply with the requirements of the regulation as applied to the participant.

EXHIBIT "E"    0021

future rulemakings to address emerging means of identifying and blocking or otherwise preventing or prohibiting restricted transactions in the designated payment systems.

4. Coding

The policies and procedures of participants in a card system are expected to address methods for identifying and blocking restricted transactions as they are processed, such as by establishing one or more transaction codes and merchant/business category codes that are required to accompany the authorization request from the merchant for a transaction and creating the operational functionality to enable the card system or the card issuer to identify and deny authorization for a restricted transaction. Card systems may be able to develop one or more merchant category codes for gambling transactions that are not restricted transactions under the Act. For example, in certain cases it may be reasonably practical for card systems to develop merchant category codes for particular types of lawful Internet gambling transactions. The Agencies specifically seek comment on the practicality, effectiveness, and cost of developing such additional merchant codes.

The proposed rule does not include specific methods for identifying and blocking restricted transactions as they are being processed within the examples of procedures for any designated payment system other than card systems because the Agencies believe that only the card systems have the necessary capabilities and processes in place. The Agencies request comment on whether the procedural examples for the other designated payment systems should encompass identifying and blocking restricted transactions as they are being processed, and, if so, how such functionality could reasonably be incorporated into the systems. Again, the Agencies will monitor technological developments in all payment systems, and engage in future rulemakings as warranted to address emerging means of identifying and blocking or otherwise preventing or prohibiting restricted transactions in the designated payment systems.

5. Cross-border relationships

Based on the Agencies' research and statements by industry representatives, the Agencies believe that most unlawful Internet gambling businesses do not have direct account relationships with U.S. financial institutions. In most cases, their accounts are held at offshore locations of foreign institutions that are not subject to the Act, and restricted transactions enter the U.S. payment system through those foreign institutions. In two of the designated payment systems (card systems and money transmitting businesses), the proposed rule does not provide exemptions for any participants and the proposed rule's requirements would apply to all U.S. participants in both domestic and cross-border transactions. In the case of ACH, check collection, and wire transfer systems, exemptions are provided for certain participants and examples of special policies and procedures for cross-border transactions are provided.

In general, in the case of U.S.-only transactions, for the ACH, check collection, and wire transfer systems, the proposed rule would require the participant in a particular

**EXHIBIT "E"**    0022

payment system that has the direct relationship with the gambling business to have policies and procedures to prevent or prohibit restricted transactions through these systems. The other participants in each of these systems would otherwise be exempt from the requirements of the regulation. In the case of payment transactions for the benefit of offshore gambling businesses, none of the participants in the United States that process the transaction would have a direct relationship with the gambling business that receives the payment and would, under the general regulatory requirements, be exempt and not required to have policies and procedures to prevent or prohibit restricted transactions.

In the case of incoming cross-border ACH debit and check collection transactions, the proposed rule places responsibility on the first participant in the United States that receives the incoming transaction directly from a foreign institution (i.e., an ACH debit transaction from a foreign gateway operator, foreign bank, or a foreign third-party processor or a check for collection directly from a foreign bank) to take reasonable steps to ensure that their cross-border relationship is not used to facilitate restricted transactions.[18] Participants in such arrangements should take steps to prevent their foreign counterparty from sending restricted transactions through the participant, such as including as a term of its contractual agreement with the foreign institution a requirement that the foreign institution have policies and procedures in place to avoid sending restricted transactions to the U.S. participant. In addition, the U.S. participant's policies and procedures would be deemed compliant with the regulation if they also include procedures to be followed with respect to a foreign bank or foreign third-party processor that is found to have transmitted restricted transactions to, or received restricted transactions through, the participant. These policies and procedures might address (i) when access through the cross-border relationship should be denied and (ii) the circumstances under which the cross-border relationship should be terminated.

In the case of outgoing wire transfers and ACH credit transactions, a transfer by a U.S. gambler to a foreign Internet gambling business would be initiated in the United States and be sent or credited to an account at the gambling business's foreign bank. In this case, the originator's bank or the intermediary bank in the U.S. that sends the wire transfer transaction, or the gateway operator that sends the ACH credit entry, directly to a foreign bank should have policies and procedures in place to be followed if such transfers to a particular foreign bank are subsequently determined to be restricted transactions.[19]

---

[18] In an incoming cross-border ACH debit transaction, if the first participant in the United States is an ACH operator (not an ODFI), the proposed rule makes clear that, while serving in the capacity of a receiving gateway operator, the ACH operator is not exempt from the general requirement to have policies and procedures reasonably designed to identify and block, or otherwise prevent or prohibit, restricted transactions.

[19] The proposed rule makes clear that the originator's bank or the intermediary bank in the United States that directly sends a cross-border wire transfer to a foreign bank, while acting in that capacity, is not exempt from the general requirement to have policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions. Similarly, in an outgoing cross-border ACH credit transaction, the ACH operator in the United States, acting as the originating gateway operator, that directly sends the transaction to a foreign gateway operator is not exempt from the general policies and procedures requirement while acting in that capacity.

23

**EXHIBIT "E"**    0023

For example, some Internet gambling businesses indicate on their websites the U.S. correspondent bank through which wire transfers to them must be made. In such cases, the U.S. participant should consider whether wire transfer services or the correspondent arrangement should continue.

The Agencies recognize that the issue of the extent of a bank's responsibility to have knowledge of its respondent banks' customers is a difficult one, which also arises in the context of managing money laundering and other risks that may be associated with correspondent banking operations. The Agencies specifically request comment on the likely effectiveness and burden of the proposed rule's due diligence and remedial action provisions for cross-border arrangements, and whether alternative approaches would increase effectiveness with the same or less burden.

6. List of unlawful Internet gambling businesses

The Act does not mention the creation of a list of unlawful Internet gambling businesses. However, the Agencies are aware that there is some interest in exploring this idea. The Agencies considered including in the proposed rule's examples of reasonably designed policies and procedures, examination of a list that would be established by the U.S. Government of businesses known to be engaged in the business of unlawful Internet gambling. Some have suggested that the obligation of financial institutions with respect to such a list might be similar in effect to their obligations under certain other U.S. laws, such as those administered by the Office of Foreign Assets Control (OFAC), albeit in a different context.[20] Some have also suggested that the list could be either available publicly in its entirety, so that financial transaction providers could check transactions against the list themselves, or maintained confidentially at a central location, so that financial transaction providers could submit transactions to the entity operating the central database, which would inform the financial transaction providers whether the transaction involved an unlawful Internet gambling business on its list. Proponents of the list suggest that under either of these approaches, certain restricted transactions directed to unlawful Internet gambling accounts could be blocked.

Any government agency compiling and providing public access to such a list would need to ensure that the particular business was, in fact, engaged in activities deemed to be unlawful Internet gambling under the Act. This would require significant investigation and legal analysis. Such analysis could be complicated by the fact that the legality of a particular Internet gambling transaction might change depending on the location of the gambler at the time the transaction was initiated, and the location where the bet or wager was received. In addition, a business that engages in unlawful Internet gambling might also engage in lawful activities that are not prohibited by the Act. The government would need to provide an appropriate and reasonable process to avoid inflicting unjustified harm to lawful businesses by incorrectly including them on the list without adequate review. The high standards needed to establish and maintain such a list likely would make compiling such a list time-consuming and perhaps under-inclusive.

---

[20] H. Rep. No. 109-412, Part 1, p.11.

**EXHIBIT "E"**    0024

To the extent that Internet gambling businesses can change the names they use to receive payments with relative ease and speed, such a list may be outdated quickly.

The Agencies do not enforce the gambling laws, and interpretations by the Agencies in these areas may not be determinative in defining the Act's legal coverage. As noted above, the Act does not comprehensively or clearly define which activities are lawful and which are unlawful, but rather relies on underlying substantive law.[21]  In order to compile a list of businesses engaged in unlawful Internet gambling under the Act, the Agencies would have to formally interpret the various Federal and State gambling laws in order to determine whether the activities of each business that appears to conduct some type of gambling-related function are unlawful under those statutes.

The Agencies request comment on whether establishment and maintenance of such a prohibited list by the Agencies is appropriate, and whether examining or accessing such a list should be included in the regulation's examples of policies and procedures reasonably designed to identify and block or otherwise prevent or restricted transactions.  The Agencies also request comment on whether, if it were practical to establish a fairly comprehensive list and a participant routinely checked the list to make sure the indicated payee of each transaction the participant processed on a particular designated payment system is not on the list, the participant should be deemed to have, without taking any other action, policies and procedures reasonably designed to prevent or prohibit restricted transactions with respect to that designated payment system. Similarly, the Agencies also request comment on whether, if such a list were established and a participant routinely checked the list to make sure a prospective commercial customer was not included on the list (as well as perhaps periodically screening existing commercial customers), the participant should be deemed to have, without taking any other action, policies and procedures reasonably designed to prevent or prohibit restricted transactions.  Finally, assuming such a list were established and became available to all participants in the designated payment systems, the Agencies request comment on the extent to which the exemptions provided in section 4 of the proposed rule should be narrowed.

Any commenter that believes that such a list should be included in the regulation's examples of policies and procedures is requested to address the issues discussed above regarding establishing, maintaining, updating, and using such a list.  The Agencies also request comment on any other practical or operational aspects of establishing, maintaining, updating, or using such a list.  Finally, the Agencies request comment on whether relying on such a list would be an effective means of carrying out the purposes of the Act, if unlawful Internet gambling businesses can change their corporate names with relative ease.

---

[21] See H.R. Rep. No. 109-412, at 10 (2006).

**EXHIBIT "E"**    0025

F. Regulatory Enforcement

As provided in the Act, section 7 of the proposed rule indicates that the requirements of the Agencies' rule would be subject to the exclusive regulatory enforcement of (1) the Federal functional regulators, with respect to the designated payment systems and participants therein that are subject to the respective jurisdiction of such regulators under section 505(a) of the Gramm-Leach-Bliley Act and section 5g of the Commodity Exchange Act; and (2) the Federal Trade Commission, with respect to designated payment systems and financial transaction providers not otherwise subject to the jurisdiction of any Federal functional regulators.

## III.    Administrative Law Matters

A. Executive Order 12866

It has been determined that this regulation is a significant regulatory action as defined in E.O. 12866. Accordingly, this proposed regulation has been reviewed by the Office of Management and Budget. The Regulatory Assessment prepared by the Treasury for this regulation is provided below.

1. Description of Need for the Regulatory Action

The rulemaking is required by the Act, the applicable provisions of which are designed to interdict the flow of funds between gamblers and unlawful Internet gambling businesses. To accomplish this, the Act requires the Agencies, in consultation with the Attorney General, to jointly prescribe regulations requiring designated payment systems (and their participants) to establish policies and procedures that are reasonably designed to prevent or prohibit such funding flows (hereafter "unlawful Internet gambling transactions").[22]

In accordance with the Act, section 3 of the proposed rule designates five payment systems that could be used in connection with unlawful Internet gambling transactions. Sections 5 and 6 of the proposed rule require designated payment systems and participants in those payment systems to establish reasonably designed policies and procedures to identify and block or otherwise prevent or prohibit unlawful Internet gambling transactions. As required by the Act, section 4 of the proposed rule exempts certain participants in designated payment systems from the requirement to establish policies and procedures because the Agencies believe that it is not reasonably practical for those participants to prevent or prohibit unlawful Internet gambling transactions. As required by the Act, section 6 of the proposed rule also contains a "safe harbor" provision by including non-exclusive examples of policies and procedures which would be deemed to be reasonably designed to prevent or prohibit unlawful Internet gambling transactions within the meaning of the Act.

---

[22] 31 U.S.C. 5364.

**EXHIBIT "E"**    0026

2.  Assessment of Potential Benefits and Costs

a.  Potential Benefits

Congress determined that Internet gambling is a growing cause of debt collection problems for insured depository institutions and the consumer credit industry.[23]  Further, Congress determined that there is a need for new mechanisms for enforcing Internet gambling laws because traditional law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet, especially where such gambling crosses State or national borders.[24]  Sections 5 and 6 of the proposed rule address this by requiring participants in designated payment systems, which include insured depository institutions and other participants in the consumer credit industry, to establish reasonably designed policies and procedures to identify and block or otherwise prevent or prohibit unlawful Internet gambling transactions in order to stop the flow of funds to unlawful Internet gambling businesses.  This funds flow interdiction is designed to inhibit the accumulation of consumer debt and to reduce debt collection problems for insured depository institutions and the consumer credit industry.  Moreover, the proposed rule carries out the Act's goal of implementing new mechanisms for enforcing Internet gambling laws.  The proposed rule will likely provide other benefits.  Specifically, the proposed rule could restrict excesses related to unlawful Internet gambling by under-age, addicted or compulsive gamblers.

The Treasury also examined the potential benefits of the establishment by the U.S. Government of a list of entities that it determines are engaged in the business of "unlawful Internet gambling."  While the Treasury understands that interest exists in such a list, we have tentatively concluded that the benefits of the list as an effective tool for use by regulated entities to identify and block or otherwise prevent or prohibit unlawful Internet gambling transactions is uncertain relative to the likely costs involved in creating such a list.

Establishing a list of unlawful Internet gambling businesses would be a time consuming process given the fact-finding and legal analysis that would be required.  For example, the names of the businesses directly receiving unlawful Internet gambling payments are often not readily identifiable from their gambling websites.  As a result, the Government would need to engage in fact-finding to identify the name of each unlawful Internet gambling business and its associated bank account numbers and bank.  In addition, to avoid inflicting unjustified harm on lawful businesses by erroneously including them on the list, the Government would likely need to provide businesses with advance notice and a reasonable opportunity to contest their potential inclusion on the list.  This process could result in a considerable lag time between the U.S. Government first identifying a gambling website and ultimately adding the name of an unlawful Internet gambling business to the list.  Because it is possible for unlawful Internet

---

[23] 31 U.S.C. 5361(a)(3).

[24] 31 U.S.C. 5361(a)(4).

**EXHIBIT "E"**    0027

gambling businesses, particularly those located in foreign countries with foreign bank accounts, to change with relative ease the business names and bank accounts of entities directly receiving restricted transactions, the list of unlawful Internet gambling businesses could be quickly outdated and thus have limited practical utility as an effective tool for regulated entities to prevent unlawful Internet gambling transactions.

b.  Potential Costs

Treasury believes that the costs of implementing the Act and the proposed rule are lower than they would be if the Act and the proposed rule were to require a prescriptive, one-size-fits-all approach with regard to regulated entities.  First, both the Act and section 5 of the proposed rule provide that a financial transaction provider shall be considered to be in compliance with the regulations if it relies on and complies with the policies and procedures of the designated payment system of which it is a participant.  This means that regulated entities will not be required to establish their own policies and procedures but can instead follow the policies and procedures of the designated payment system, thereby resulting in lower costs.

Second, with regard to regulated entities that establish their own policies and procedures, both the Act and sections 5 and 6 of the proposed rule provide maximum flexibility.  Specifically, neither the Act nor the proposed rule contain specific performance standards but instead require that such policies and procedures be "reasonably designed" to identify and block or otherwise prevent or prohibit unlawful internet gambling.  In addition, the proposed rule expressly authorizes each regulated entity to use policies and procedures that are "specific to its business" which will enable it to efficiently tailor its policies and procedures to its needs.  Because the Act and the proposed rule provide flexibility for regulated entities in crafting their policies and procedures, allowing them to tailor their policies and procedures to their individual circumstances, the costs imposed by the Act on regulated entities should be lower than if the Act and the proposed rule were to take a prescriptive one-size-fits-all approach.

Third, the "safe harbor" provision, with its nonexclusive examples of policies and procedures deemed to be "reasonably designed," provides regulated entities with specific guidance on how to structure the policies and procedures required by the Act.  As a result, costs associated with formulating policies and procedures should be lower because the safe harbor provision provides guidance on how to so structure the policies and procedures.

Because the Treasury does not have sufficient information to quantify reliably the costs of developing specific policies and procedures, the Treasury seeks information and comment on any costs, compliance requirements, or changes in operating procedures arising from the application of the proposed rule.  Moreover, the Treasury anticipates that the Agencies will contact trade groups representing participants, particularly those that qualify as small entities, and encourage them to provide comments during the comment period to ascertain, among other things, the costs imposed by this rulemaking.

**EXHIBIT "E"**    0028

Once the policies and procedures have been developed, however, the Treasury believes the burden of this rulemaking will be relatively low.  It is estimated that the recordkeeping requirement required by the Act and the proposed rule will take approximately one hour per recordkeeper per year to maintain the policies and procedures required by this rulemaking.  It is estimated that the total annual cost to regulated entities to maintain the policies and procedures will be approximately $4 million.[25]

The Treasury also considered the potential costs to the U.S. Government of establishing a list of unlawful Internet gambling businesses, and has initially determined that such costs would likely be significant.  This is because establishing a list would require considerable fact-finding and legal analysis once the U.S. Government identifies a gambling website.  The Government must engage in an extensive legal analysis to determine whether the gambling website is used, at least in part, to place, receive or otherwise knowingly transmit unlawful bets or wagers.  This legal analysis would entail interpreting the various Federal and State gambling laws, which could be complicated by the fact that the legality of a particular Internet gambling transaction might change depending on the location of the gambler at the time the transaction was initiated and the location where the bet or wager was received.  The U.S. Government would at the same time also need to identify the business name and the bank account number and bank of the entity directly receiving payments on behalf of the Internet gambling business, which is often not readily ascertainable from the website.  Identifying the business name and bank account number of the entity directly receiving unlawful Internet gambling payments might be challenging, especially where the Internet gambling business is located in and maintains its bank accounts in a foreign country.  Once the fact-finding and legal analysis are concluded successfully, the U.S. Government might then need to afford the business advance notice and an opportunity to object to its potential inclusion on the list in order to ensure that lawful businesses are not harmed by being erroneously included on the list.  These due process safeguards would result in considerable added costs to the U.S. Government.

2.    Interference with State, Local, and Tribal Governments

The Act does not alter State, local or tribal gaming law.[26]  In addition, the Act exempts from the definition of the term "unlawful Internet gambling," intrastate, intratribal, and intertribal gambling transactions.[27]  Because the proposed rule does not

---

[25] This estimate is based on an estimate of 270,721 recordkeepers.  The hourly cost of the person who would be responsible for maintaining the policies and procedures is estimated to be $14.60 per hour (based on the U.S. Department of Labor, Bureau of Labor Statistics' occupational employment statistics for office and administrative support occupations, dated May 2006).

[26] Specifically, the Act defines the term "unlawful Internet gambling" as a bet or wager, which involves at least in part the use of the Internet, where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made. 31 U.S.C. 5362(10)(A).

[27] 31 U.S.C. 5362(10)(B) and (C).

**EXHIBIT "E"**    0029

alter these defined terms, it avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions.

B.  Regulatory Flexibility Act Analysis

Congress enacted the Regulatory Flexibility Act (RFA) (5 U.S.C. 601 et seq.) to address concerns related to the effects of agency rules on small entities and the Agencies are sensitive to the impact their rules may impose on small entities.  In this case, the Agencies believe that the proposed rule likely would not have a "significant economic impact on a substantial number of small entities."  5 U.S.C. 605(b).  The Act mandates that the Agencies jointly prescribe regulations requiring designated payment systems, and all participants therein, to identify and block or otherwise prevent or prohibit restricted transactions through the establishment of reasonably designed policies and procedures. Comments are requested on whether the proposed rule would have a significant economic impact on a substantial number of small entities and whether the costs are imposed by the Act itself, and not the proposed rule.

The RFA requires agencies either to provide an initial regulatory flexibility analysis with a proposed rule or to certify that the proposed rule will not have a significant economic impact on a substantial number of small entities.  In accordance with section 3(a) of the RFA, the Agencies have reviewed the proposed regulation. While the Agencies believe that the proposed rule likely would not have a significant economic impact on a substantial number of small entities (5 U.S.C. 605(b)), the Agencies do not have complete data at this time to make this determination.  Therefore, an Initial Regulatory Flexibility Analysis has been prepared in accordance with 5 U.S.C. 603.  The Agencies will, if necessary, conduct a final regulatory flexibility analysis after consideration of comments received during the public comment period.

1.  Statement of the need for, objectives of, and legal basis for, the proposed rule.

The Agencies are proposing a regulation to implement the Act, as required by the Act.  The Act prohibits any person in the business of betting or wagering (as defined in the Act) from knowingly accepting payments in connection with the participation of another person in unlawful Internet gambling.  Section 802 of the Act (codified at 31 U.S.C. 5361 et seq.) requires the Agencies jointly (in consultation with the Attorney General) to designate payment systems that could be used in connection with, or to facilitate, restricted transactions and to prescribe regulations requiring designated payment systems, and financial transaction providers participating in each designated payment system, to establish policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions.  The proposed regulation sets out necessary definitions, designates payment systems that could be used in connection with restricted transactions, exempts participants providing certain functions in designated payment systems from certain requirements imposed by the regulation, provides nonexclusive examples of policies and procedures reasonably designed to identify and block, or otherwise prevent and prohibit, restricted transactions, and reiterates the enforcement regime set out in the Act for designated payment systems and

EXHIBIT "E"    0030

non-exempt participants therein.   The Agencies believe that the proposed regulation implements Congress's requirement that the Agencies prescribe regulations that carry out the purposes of the Act.

2.   Small entities affected by the proposed rule

The proposed rule would affect non-exempt financial transaction providers participating in the designated payment systems, regardless of size.   The Agencies estimate that 4,792 small banks (out of a total of 8,192 banks), 420 small savings associations (out of a total of 838), 7,609 small credit unions (out of a total of 8,477), and 240,547 small money transmitting businesses (out of a total of 253,208) would be affected by this proposed rule.   Pursuant to regulations issued by the Small Business Administration (13 CFR 121-201), a "small entity" includes a commercial bank, savings association or credit union with assets of $165 million or less.   For money transmitting businesses, a "small entity" would include those with assets of $6.5 million or less. The Agencies propose that the requirements in this rule be applicable to all entities subject to the Act, as implemented, regardless of their size because an exemption for small entities would significantly diminish the usefulness of the policies and procedures required by the Act by permitting unlawful Internet gambling operations to evade the requirements by using small financial transaction providers.   The Agencies anticipate, however, that, as provided in the Act and the proposed regulations, small non-exempt participants in some designated payment systems, to a large extent, should be able to rely on policies and procedures established and implemented by the designated payment systems of which they are participants or other existing systems.   The Agencies seek information and comment on the number of small entities to which the proposed rule would apply.

3.   Projected reporting, recordkeeping, and other compliance requirements

Section 802 of the Act requires the Agencies to prescribe regulations requiring each designated payment system, and all financial transaction providers participating in the designated payment system, to identify and block or otherwise prevent or prohibit restricted transactions through the establishment of policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit the acceptance of restricted transactions.   The proposed rule implements this requirement by requiring all non-exempt participants in designated payment systems to establish and implement policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions.   Because the Agencies do not have sufficient information to quantify reliably the effects the Act and the proposed rule would have on small entities, the Agencies seek information and comment on any costs, compliance requirements, or changes in operating procedures arising from the application of the proposed rule and the extent to which those costs, requirements, or changes are in addition to or different from those arising from the application of the Act generally. Moreover, the Agencies anticipate contacting trade groups representing participants that qualify as small entities and encouraging them to provide comments during the comment period to ascertain, among other things, the costs imposed on regulated small entities.

**EXHIBIT "E"**   0031

4.   Identification of duplicative, overlapping, or conflicting Federal rules

The Agencies have not identified any Federal rules that duplicate, overlap, or conflict with the proposed rule. The Agencies seek comment regarding any statutes or regulations that would duplicate, overlap, or conflict with the proposed rule.

5.   Significant alternatives to the proposed rule

Other than as noted above, the Agencies are unaware of any significant alternatives to the proposed rule that accomplish the stated objectives of the Act and that minimize any significant economic impact of the proposed rule on small entities. The Agencies request comment on additional ways to reduce regulatory burden associated with this proposed rule.

C.      Paperwork Reduction Act Analysis

The collection of information requirement contained in this notice of joint proposed rulemaking has been submitted by the Agencies to the Office of Management and Budget (OMB) for review in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)). Comments on the collection of information should be sent to the Office of Management and Budget, Attention: Desk Officer for the Department of the Treasury and the Board of Governors of the Federal Reserve System, Office of Information and Regulatory Affairs, Washington, D.C., 20503, with copies to Treasury's Office of Critical Infrastructure Protection and Compliance Policy and the Board's Secretary at the addresses previously specified. Because OMB must complete its review of the collection of information between 30 and 60 days after publication, comments on the information collection should be submitted not later than [insert 30 days from date of publication]. Comments are specifically requested concerning:

(1) Whether the proposed information collection is necessary for the proper performance of Agency functions, including whether the information will have practical utility;

(2) The accuracy of the estimated burden associated with the proposed collection of information (see below);

(3) How to enhance the quality, utility, and clarity of the information required to be maintained;

(4) How to minimize the burden of complying with the proposed information collection, including the application of automated collection techniques or other forms of information technology; and

(5) Estimates of capital or start-up costs and costs of operation, maintenance, and purchase of services to maintain the information.

**EXHIBIT "E"**   0032

The collection of information in the proposed rule is in sections 5 and 6. This information is required by section 802 of the Act, which requires the Agencies to prescribe joint regulations requiring each designated payment system, and all participants in such systems, to identify and block or otherwise prevent or prohibit restricted transactions through the establishment of policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit the acceptance of restricted transactions. The proposed rule implements this requirement by requiring all non-exempt participants in designated payment systems to establish and implement written policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions. The proposed rule does not include a specific time period for record retention, however, non-exempt participants would be required to maintain the policies and procedures for a particular designated payment system as long as they participate in that system.

The Agencies anticipate that, as provided in the Act and the proposed regulations, small non-exempt participants in designated payment systems, for the most part, should be able to rely on policies and procedures established and implemented by the designated payment systems of which they are participants. For example, certain money transmitting business operators may have their own centralized procedures to prevent unlawful gambling transactions. Small money transmitters, acting as agents in these large systems, may be able to rely on the system's policies, and therefore would not have to create their own.

Many of the payment systems used by depository institutions, such as check clearing, do not have centralized system operators. Therefore, depository institutions would likely have to create their own policies for check clearing.

The likely recordkeepers are businesses or other for-profits and not-for-profit institutions and include commercial banks, savings associations, credit unions, card servicers, and money transmitting businesses. The Agencies have agreed to split equally for burden calculations the total number of recordkeepers not subject to examination and supervision by either the Board or the Treasury's Office of the Comptroller of the Currency and Office of Thrift Supervision.

Board:
Estimated number of recordkeepers: 134,451.
Estimated average annual burden hours per recordkeeper: 25 hours for depository institutions and card servicers, 1 hour for money transmitting businesses.
Estimated frequency: annually.
Estimated total annual recordkeeping burden: 322,779 hours.

Treasury:
Estimated number of recordkeepers: 136,270.
Estimated average annual burden hours per recordkeeper: 25 hours for depository institutions and card servicers, 1 hour for money transmitting businesses.
Estimated frequency: annually.

**EXHIBIT "E"**    0033

Estimated total annual recordkeeping burden: 368,254 hours.

The initial burden is imposed by the Act which requires non-exempt participants to establish policies and procedures. The Agencies estimate that this initial burden will average 24 hours per recordkeeper for depository institutions and card servicers. The Agencies also estimate that the annual burden of maintaining the policies and procedures once they are established will be 1 hour per recordkeeper. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by OMB.

### D.  Plain Language

Each Federal banking agency, such as the Board, is required to use plain language in all proposed and final rulemakings published after January 1, 2000. 12 U.S.C. 4809. In addition, in 1998, the President issued a memorandum directing each agency in the Executive branch, such as Treasury, to use plain language for all new proposed and final rulemaking documents issued on or after January 1, 1999. The Agencies have sought to present the proposed rule, to the extent possible, in a simple and straightforward manner. The Agencies invite comment on whether there are additional steps that could be taken to make the proposed rule easier to understand, such as with respect to the organization of the materials or the clarity of the presentation.

### IV.  Statutory Authority

Pursuant to the authority set out in the Act and particularly section 802 (codified at 31 U.S.C. 5361 et seq.), the Board and the Treasury jointly propose the common rules set out below.

### V.  Text of Proposed Rules

**List of Subjects**

**12 CFR Part 233**
> [Banks, Banking, Electronic Funds Transfers, Incorporation by Reference, Internet Gambling, Payments, Recordkeeping]

**31 CFR Part 132**
> [Banks, Banking, Electronic Funds Transfers, Incorporation by Reference, Internet Gambling, Payments, Recordkeeping]

**Federal Reserve System**
**Authority and Issuance**

For the reasons set forth in the preamble, the Board proposes to amend Title 12, Chapter II of the Code of Federal Regulations by adding a new part 233 as set forth under Common Rules at the end of this document:

**EXHIBIT "E"**    0034

## PART 233 - PROHIBITION ON FUNDING OF UNLAWFUL INTERNET GAMBLING (REGULATION GG)

**Sec.**

233.1   Authority, Purpose, and Incorporation by Reference.

233.2   Definitions.

233.3   Designated Payment Systems.

233.4   Exemptions.

233.5   Processing of Restricted Transactions Prohibited.

233.6   Policies and Procedures.

233.7   Regulatory Enforcement.

**Authority:** 31 U.S.C. 5364.

**Department of the Treasury**
**Authority and Issuance**

For the reasons set forth in the preamble, Treasury proposes to amend Title 31, Chapter I of the Code of Federal Regulations by adding a new part 132 as set forth under Common Rules at the end of this document:

## PART 132 - PROHIBITION ON FUNDING OF UNLAWFUL INTERNET GAMBLING

**Sec.**

132.1   Authority, Purpose, and Incorporation by Reference.

132.2   Definitions.

132.3   Designated Payment Systems.

132.4   Exemptions.

132.5   Processing of Restricted Transactions Prohibited.

132.6   Policies and Procedures.

**EXHIBIT "E"**   0035

132.7  Regulatory Enforcement.

**Authority:**  31 U.S.C. 321 and 5364.

**Common Rules**

The common rules that are proposed to be adopted by the Board as part 233 of Title 12, Chapter II of the Code of Federal Regulations and by Treasury as part 132 of Title 31, Chapter I of the Code of Federal Regulations follow:

**§__.1  Authority, Purpose, and Incorporation by Reference.**

(a) <u>Authority</u>.  This part is issued jointly by the Board of Governors of the Federal Reserve System (Board) and the Secretary of the Department of the Treasury (Treasury) under section 802 of the Unlawful Internet Gambling Enforcement Act of 2006 (Act) (enacted as Title VIII of the Security and Accountability For Every Port Act of 2006, Pub. L. No. 109-347, 120 Stat. 1884, and codified at 31 U.S.C. 5361 - 5367).

(b) <u>Purpose</u>.  The purpose of this part is to issue implementing regulations as required by the Act.  The part sets out necessary definitions, designates payment systems subject to the requirements of this part, exempts certain participants in designated payment systems from certain requirements of this part, provides nonexclusive examples of policies and procedures reasonably designed to identify and block, or otherwise prevent and prohibit, restricted transactions, and sets out the Federal entities that have exclusive regulatory enforcement authority with respect to the designated payments systems and non-exempt participants therein.

(c) <u>Incorporation by reference—relevant definitions from ACH rules</u>.

(1) This part incorporates by reference the relevant definitions of ACH terms as published in the "2007 ACH Rules:  A Complete Guide to Rules & Regulations Governing the ACH Network" (the "ACH Rules").  The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  Copies of the "2007 ACH Rules" are available from the National Automated Clearing House Association, Suite 100, 13450 Sunrise Valley Drive, Herndon, Virginia  20171 (703/561-1100).  Copies also are available for public inspection at the Department of Treasury Library, Room 1428, Main Treasury Building, 1500 Pennsylvania Avenue, N.W., Washington, D.C.  20220, and the National Archives and Records Administration (NARA).  Before visiting the Treasury library, you must call (202) 622-0990 for an appointment.  For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_loc ations.html 20002.

**EXHIBIT "E"**    0036

(2) Any amendment to definitions of the relevant ACH terms in the ACH Rules shall not apply to this part unless the Treasury and the Board jointly accept such amendment by publishing notice of acceptance of the amendment to this part in the Federal Register. An amendment to the definition of a relevant ACH term in the ACH Rules that is accepted by the Treasury and the Board shall apply to this part on the effective date of the rulemaking specified by the Treasury and the Board in the joint Federal Register notice expressly accepting such amendment.

§__.2  **Definitions.**

(a) Automated clearing house system or ACH system means a funds transfer system, primarily governed by the ACH Rules, which provides for the clearing and settlement of batched electronic entries for participating financial institutions. When referring to ACH systems, the terms in this regulation (such as "originating depository financial institution," "operator," "originating gateway operator," "receiving depository financial institution," "receiving gateway operator," and "third-party sender") are defined as those terms are defined in the ACH Rules.

(b) Bet or wager

(1) Means the staking or risking by any person of something of value upon the outcome or a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome;

(2) Includes the purchase of a chance or opportunity to win a lottery or other prize (which opportunity to win is predominantly subject to chance);

(3) Includes any scheme of a type described in 28 U.S.C. 3702;

(4) Includes any instructions or information pertaining to the establishment or movement of funds by the bettor or customer in, to, or from an account with the business of betting or wagering (which does not include the activities of a financial transaction provider, or any interactive computer service or telecommunications service); and

(5) Does not include –

(i) Any activity governed by the securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)) for the purchase or sale of securities (as that term is defined in section 3(a)(10) of that act (15 U.S.C. 78c(a)(10));

**EXHIBIT "E"**    0037

(ii)   Any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act (7 U.S.C. 1 et seq.);

(iii)  Any over-the-counter derivative instrument;

(iv)  Any other transaction that—

    (A) Is excluded or exempt from regulation under the Commodity Exchange Act (7 U.S.C. 1 et seq.); or

    (B) Is exempt from State gaming or bucket shop laws under section 12(e) of the Commodity Exchange Act (7 U.S.C. 16(e)) or section 28(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(a));

(v)   Any contract of indemnity or guarantee;

(vi)  Any contract for insurance;

(vii) Any deposit or other transaction with an insured depository institution;

(viii) Participation in any game or contest in which participants do not stake or risk anything of value other than—

    (A) Personal efforts of the participants in playing the game or contest or obtaining access to the Internet; or

    (B) Points or credits that the sponsor of the game or contest provides to participants free of charge and that can be used or redeemed only for participation in games or contests offered by the sponsor; or

(ix)  Participation in any fantasy or simulation sports game or educational game or contest in which (if the game or contest involves a team or teams) no fantasy or simulation sports team is based on the current membership or an actual team that is a member of an amateur or professional sports organization (as those terms are defined in 28 U.S.C. 3701) and that meets the following conditions:

    (A) All prizes and awards offered to winning participants are established and made known to the participants in advance of the game or contest and their value is not determined by the number of participants or the amount of any fees paid by those participants.

    (B) All winning outcomes reflect the relative knowledge and skill of the participants and are determined predominantly by accumulated statistical results of the performance of individuals (athletes in the case

**EXHIBIT "E"**    0038

of sports events) in multiple real-world sporting or other events.

    (C) No winning outcome is based—

        <u>(1 )</u>On the score, point-spread, or any performance or performances of any single real-world team or any combination of such teams, or

        <u>(2 )</u>Solely on any single performance of an individual athlete in any single real-world sporting or other event.

(c) <u>Card issuer</u> means any person who issues a credit card, debit card, pre-paid card, or stored value product, or the agent of such person with respect to such card or product.

(d) <u>Card system</u> means a system for clearing and settling transactions in which credit cards, debit cards, pre-paid cards, or stored value products, issued or authorized by the operator of the system, are used to purchase goods or services or to obtain a cash advance.

(e) <u>Check clearing house</u> means an association of banks or other payors that regularly exchange checks for collection or return.

(f) <u>Check collection system</u> means an interbank system for collecting, presenting, returning, and settling checks or intrabank system for settling checks deposited in and drawn on the same bank. When referring to check collection systems, the terms in this regulation (such as "paying bank," "collecting bank," "depositary bank," "returning bank," and "check") are defined as those terms are defined in 12 CFR 229.2. For purposes of this part, "check" also includes an electronic representation of a check that a bank agrees to handle as a check.

(g) <u>Consumer</u> means a natural person.

(h) <u>Designated payment system</u> means a system listed in §__.3.

(i) <u>Electronic fund transfer</u> has the same meaning given the term in section 903 of the Electronic Fund Transfer Act (15 U.S.C. 1693a), except that such term includes transfers that would otherwise be excluded under section 903(6)(E) of that act (15 U.S.C. 1693a(6)(E)), and includes any funds transfer covered by Article 4A of the Uniform Commercial Code, as in effect in any State.

(j) <u>Financial institution</u> means a State or national bank, a State or Federal savings and loan association, a mutual savings bank, a State or Federal credit union, or any other person that, directly or indirectly, holds an account belonging to a consumer. The term does not include a casino, sports book, or other business at or through which bets or wagers may be placed or received.

(k) <u>Financial transaction provider</u> means a creditor, credit card issuer, financial

**EXHIBIT "E"**    0039

institution, operator of a terminal at which an electronic fund transfer may be initiated, money transmitting business, or international, national, regional, or local payment network utilized to effect a credit transaction, electronic fund transfer, stored value product transaction, or money transmitting service, or a participant in such network, or other participant in a designated payment system.

(l) <u>Interactive computer service</u> means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(m) <u>Internet</u> means the international computer network of interoperable packet switched data networks.

(n) <u>Intrastate transaction</u> means placing, receiving, or otherwise transmitting a bet or wager where -

    (1) The bet or wager is initiated and received or otherwise made exclusively within a single State;

    (2) The bet or wager and the method by which the bet or wager is initiated and received or otherwise made is expressly authorized by and placed in accordance with the laws of such State, and the State law or regulations include –

        (i) Age and location verification requirements reasonably designed to block access to minors and person located out of such State; and

        (ii) Appropriate data security standards to prevent unauthorized access by any person whose age and current location has not been verified in accordance with such State's law or regulations; and

    (3) The bet or wager does not violate any provision of –

        (i) The Interstate Horseracing Act of 1978 (15 U.S.C. 3001 et seq.);

        (ii) 28 U.S.C. chapter 178 (professional and amateur sports protection);

        (iii) The Gambling Devices Transportation Act (15 U.S.C. 1171 et seq.); or

        (iv) The Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.).

(o) <u>Intratribal transaction</u> means placing, receiving or otherwise transmitting a bet or wager where –

**EXHIBIT "E"** 0040

(1) The bet or wager is initiated and received or otherwise made exclusively –

    (i)   Within the Indian lands of a single Indian tribe (as such terms are defined under the Indian Gaming Regulatory Act (25 U.S.C. 2703)); or

    (ii)   Between the Indian lands of two or more Indian tribes to the extent that intertribal gaming is authorized by the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.);

(2) The bet or wager and the method by which the bet or wager is initiated and received or otherwise made is expressly authorized by and complies with the requirements of –

    (i)   The applicable tribal ordinance or resolution approved by the Chairman of the National Indian Gaming Commission; and

    (ii)   With respect to class III gaming, the applicable Tribal-State compact;

(3) The applicable tribal ordinance or resolution or Tribal-State compact includes –

    (i)   Age and location verification requirements reasonably designed to block access to minors and person located out of the applicable Tribal lands; and

    (ii)   Appropriate data security standards to prevent unauthorized access by any person whose age and current location has not been verified in accordance with the applicable tribal ordinance or resolution or Tribal-State Compact; and

(4) The bet or wager does not violate any provision of –

    (i)   The Interstate Horseracing Act of 1978 (15 U.S.C. 3001 et seq.);

    (ii)   28 U.S.C. chapter 178 (professional and amateur sports protection);

    (iii)   The Gambling Devices Transportation Act (15 U.S.C. 1171 et seq.); or

    (iv)   The Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.).

(p) Money transmitting business and money transmitting service have the meanings given the terms in 31 U.S.C. 5330(d) (determined without regard to any regulations prescribed by the Secretary of the Treasury thereunder).

(q) Participant in a designated payment system means an operator of a designated payment system, or a financial transaction provider that is a member of or, has contracted for financial transaction services with, or is otherwise participating in, a designated payment system. This term does not include a customer of the financial transaction provider if the customer is not a financial transaction

**EXHIBIT "E"**    0041

provider otherwise participating in the designated payment system on its own behalf.

(r) Restricted transaction means any of the following transactions or transmittals involving any credit, funds, instrument, or proceeds that the Act prohibits any person engaged in the business of betting or wagering (which does not include the activities of a financial transaction provider, or any interactive computer service or telecommunications service) from knowingly accepting, in connection with the participation of another person in unlawful Internet gambling –

(1) Credit, or the proceeds of credit, extended to or on behalf of such other person (including credit extended through the use of a credit card);

(2) An electronic fund transfer, or funds transmitted by or through a money transmitting business, or the proceeds of an electronic fund transfer or money transmitting service, from or on behalf of such other person; or

(3) Any check, draft, or similar instrument that is drawn by or on behalf of such other person and is drawn on or payable at or through any financial institution.

(s) State means any State of the United States, the District of Columbia, or any commonwealth, territory, or other possession of the United States, including the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, and the Virgin Islands.

(t) Unlawful Internet gambling means to place, receive, or otherwise knowingly transmit a bet or wager by any means that involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made. The term does not include placing, receiving, or otherwise transmitting a bet or wager that is excluded from the definition of this term by the Act as an intrastate transaction or an intra-tribal transaction, and does not include any activity that is allowed under the Interstate Horseracing Act of 1978 (15 U.S.C. 3001 et seq.). The intermediate routing of electronic data shall not determine the location or locations in which a bet or wager is initiated, received, or otherwise made.

(u) Wire transfer system means a system through which an unconditional order to a bank to pay a fixed or determinable amount of money to a beneficiary upon receipt, or on a day stated in the order, is transmitted by electronic or other means through the network, between banks, or on the books of a bank. When referring to wire transfer systems, the terms in this regulation (such as "bank," "originator's bank," "beneficiary's bank," and "intermediary bank") are defined as those terms are defined in 12 CFR part 210, appendix B.

§__.3   **Designated Payment Systems.** The following payment systems could be used

**EXHIBIT "E"**   0042

by participants in connection with, or to facilitate, a restricted transaction:

(a) Automated clearing house systems;

(b) Card systems;

(c) Check collection systems;

(d) Money transmitting businesses; and

(e) Wire transfer systems.

§__.4  **Exemptions**.

(a) <u>Automated clearing house systems</u>.  The participants providing the following functions of an automated clearing house system with respect to a particular ACH transaction are exempt from this regulation's requirements for establishing written policies and procedures reasonably designed to prevent or prohibit restricted transactions –

   (1) The ACH system operator, except as provided in §___.6(b)(2) and §___.6(b)(3);

   (2) The originating depository financial institution in an ACH credit transaction; and

   (3) The receiving depository financial institution in an ACH debit transaction.

(b) <u>Check collection systems</u>.  The participants providing the following functions of a check collection system with respect to a particular check transaction are exempt from this regulation's requirements for establishing written policies and procedures reasonably designed to prevent or prohibit restricted transactions —

   (1) A check clearing house; and

   (2) The paying bank (unless it is also the depositary bank), any collecting bank (other than the depositary bank), and any returning bank.

(c) <u>Wire transfer systems</u>.  The participants providing the following functions of a wire transfer system with respect to a particular wire transfer are exempt from this regulation's requirements for establishing written policies and procedures reasonably designed to prevent or prohibit restricted transactions—

   (1) The operator of a wire transfer network; and

   (2) The originator's bank and any intermediary bank, except as provided in §___.6(f)(2).

§__.5  **Processing of Restricted Transactions Prohibited**.

(a) All non-exempt participants in designated payment systems shall establish and

**EXHIBIT "E"**  0043

implement written policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions.

(b) A non-exempt financial transaction provider participant in a designated payment system shall be considered to be in compliance with the requirements of paragraph (a) of this section if it –

    (1) Relies on and complies with the written policies and procedures of the designated payment system that are reasonably designed to –

        (i) Identify and block restricted transactions; or

        (ii) Otherwise prevent or prohibit the acceptance of the products or services of the designated payment system or participant in connection with restricted transactions; and

    (2) Such policies and procedures of the designated payment system comply with the requirements of this part.

(c) As provided in the Act, a person that identifies and blocks a transaction, prevents or prohibits the acceptance of its products or services in connection with a transaction, or otherwise refuses to honor a transaction, shall not be liable to any party for such action if –

    (1) The transaction is a restricted transaction;

    (2) Such person reasonably believes the transaction to be a restricted transaction; or

    (3) The person is a participant in a designated payment system and blocks or otherwise prevents the transaction in reliance on the policies and procedures of the designated payment system in an effort to comply with this regulation.

(d) Nothing in this regulation requires or is intended to suggest that designated payment systems or participants therein must or should block or otherwise prevent or prohibit any transaction in connection with any activity that is excluded from the definition of "unlawful Internet gambling" in the Act as an intrastate transaction, an intratribal transaction, or a transaction in connection with any activity that is allowed under the Interstate Horseracing Act of 1978 (15 U.S.C. 3001 et seq.).

(e) Nothing in this regulation modifies any requirement imposed on a participant by other applicable law or regulation to file a suspicious activity report to the appropriate authorities.

## §__.6  Policies and Procedures.

**EXHIBIT "E"**  0044

(a) The examples of policies and procedures to identify and block or otherwise prevent or prohibit restricted transactions set out in this section are non-exclusive. In establishing and implementing written policies and procedures to identify and block or otherwise prevent or prohibit restricted transactions, a non-exempt participant in a designated payment system may design and use other policies and procedures that are specific to its business and may use different policies and procedures with respect to different types of restricted transactions.

(b) Automated clearing house system examples.

(1) Except as provided in paragraphs (b)(2) and (b)(3) of this section, the policies and procedures of the originating depository financial institution and any third-party sender in an ACH debit transaction, and the receiving depository financial institution in an ACH credit transaction, are deemed to be reasonably designed to prevent or prohibit restricted transactions if they —

(i) Address methods for conducting due diligence in establishing or maintaining a customer relationship designed to ensure that the customer will not originate restricted transactions as ACH debit transactions or receive restricted transactions as ACH credit transactions through the customer relationship, such as –

(A) Screening potential commercial customers to ascertain the nature of their business; and

(B) Including as a term of the commercial customer agreement that the customer may not engage in restricted transactions; and

(ii) Include procedures to be followed with respect to a customer if the originating depository financial institution or third-party sender becomes aware that the customer has originated restricted transactions as ACH debit transactions or if the receiving depository financial institution becomes aware that the customer has received restricted transactions as ACH credit transactions, such as procedures that address –

(A) When fines should be imposed;

(B) When the customer should not be allowed to originate ACH debit transactions; and

(C) The circumstances under which the account should be closed.

(2) The policies and procedures of a receiving gateway operator and third-party sender that receives instructions to originate an ACH debit transaction directly from a foreign sender (which could include a foreign bank, a foreign third-

EXHIBIT "E"    0045

party processor, or a foreign originating gateway operator) are deemed to be reasonably designed to prevent or prohibit restricted transactions if they –

(i)    Address methods for conducting due diligence in establishing or maintaining the relationship with the foreign sender designed to ensure that the foreign sender will not send instructions to originate ACH debit transactions representing restricted transactions to the receiving gateway operator or third-party sender, such as including as a term in its agreement with the foreign sender requiring the foreign sender to have reasonably designed policies and procedures in place to ensure that the relationship will not be used to process restricted transactions; and

(ii)    Include procedures to be followed with respect to a foreign sender that is found to have sent instructions to originate ACH debit transactions to the receiving gateway operator or third-party sender that are restricted transactions, which may address –

(A) When ACH services to the foreign sender should be denied; and

(B) The circumstances under which the cross-border arrangements with the foreign sender should be terminated.

(3) The policies and procedures of an originating gateway operator that receives an ACH credit transaction containing instructions to send or credit a transaction to a foreign bank directly or through a foreign receiving gateway operator are deemed to be reasonably designed to prevent or prohibit restricted transactions, if they include procedures to be followed with respect to a foreign bank that is found to have received from the originating gateway operator either directly or indirectly transactions that are restricted transactions, which may address –

(i)    When ACH credit transactions for the foreign bank or through the foreign gateway operator should be denied; and

(ii)    The circumstances under which the cross-border arrangements with the foreign bank should be terminated.

(c) Card system examples. The policies and procedures of a card system operator, a merchant acquirer, and a card issuer, are deemed to be reasonably designed to prevent or prohibit restricted transactions, if they –

(1) Address methods for conducting due diligence in establishing or maintaining a merchant relationship designed to ensure that the merchant will not receive restricted transactions through the card system, such as --

(i)    Screening potential merchant customers to ascertain the nature of their

**EXHIBIT "E"**    0046

business; and

    (ii)   Including as a term of the merchant customer agreement that the merchant may not receive restricted transactions through the card system;

(2) Include procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions, such as –

    (i)   Establishing transaction codes and merchant/business category codes that are required to accompany the authorization request for a transaction and creating the operational functionality to enable the card system or the card issuer to identify and deny authorization for a restricted transaction;

    (ii)   Ongoing monitoring or testing to detect potential restricted transactions, including –

        (A) Conducting testing to ascertain whether transaction authorization requests are coded correctly;

        (B) Monitoring of web sites to detect unauthorized use of the relevant card system, including its trademark; or

        (C) Monitoring and analyzing payment patterns to detect suspicious payment volumes from a merchant customer; and

(3) Include procedures to be followed with respect to a merchant customer if the card system, card issuer, or merchant acquirer becomes aware that a merchant has received restricted transactions through the card system, such as --

    (i)   When fines should be imposed; and

    (ii)   When access to the card system should be denied.

(d) <u>Check collection system examples</u>.

(1) Except as provided in paragraph (d)(2) of this section, the policies and procedures of a depository bank are deemed to be reasonably designed to prevent or prohibit restricted transactions if they —

    (i)   Address methods for conducting due diligence in establishing or maintaining a customer relationship designed to ensure that the customer will not receive restricted transactions through the customer relationship, such as –

**EXHIBIT "E"**    0047

    (A) Screening potential commercial customers to ascertain the nature of their business; and

    (B) Including as a term of the commercial customer agreement that the customer may not deposit checks that constitute restricted transactions; and

  (ii)   Include procedures to be followed with respect to a customer if the depositary bank becomes aware that the customer has deposited checks that are restricted transactions, such as procedures that address –

    (A) When checks for deposit should be refused; and

    (B) The circumstances under which the account should be closed.

(2)  The policies and procedures of a depositary bank that receives a check for collection directly from a foreign bank are deemed to be reasonably designed to prevent or prohibit restricted transactions if they –

  (i)   Address methods for conducting due diligence in establishing or maintaining the correspondent relationship with the foreign bank designed to ensure that the foreign bank will not send checks representing restricted transactions to the depositary bank for collection, such as including as a term in its agreement with the foreign bank requiring the foreign bank to have reasonably designed policies and procedures in place to ensure that the correspondent relationship will not be used to process restricted transactions; and

  (ii)   Include procedures to be followed with respect to a foreign bank that is found to have sent checks to the depositary bank that are restricted transactions, which may address –

    (A) When check collection services for the foreign bank should be denied; and

    (B) The circumstances under which the correspondent account should be closed.

(e)  <u>Money transmitting business examples</u>.  The policies and procedures of a money transmitting business are deemed to be reasonably designed to prevent or prohibit restricted transactions if they –

  (1) Address methods for conducting due diligence in establishing or maintaining commercial subscriber relationships designed to ensure that the commercial subscriber will not receive restricted transactions through the money transmitting business, such as -

**EXHIBIT "E"**  0048

    (i)   Screening potential commercial subscribers to ascertain the nature of their business; and

    (ii)   Including as a term of the commercial subscriber agreement that the subscriber may not receive restricted transactions; and

(2) Include procedures regarding ongoing monitoring or testing to detect potential restricted transactions, such as –

    (i)   Monitoring and analyzing payment patterns to detect suspicious payment volumes to any recipient; or

    (ii) Monitoring web sites to detect unauthorized use of the relevant money transmitting business, including their trademarks; and

(3) Include procedures to be followed with respect to recipients that are found to have engaged in restricted transactions, that address –

    (i)   When fines should be imposed;

    (ii)   When access should be denied; and

    (iii)  The circumstances under which an account should be closed.

(f) <u>Wire transfer system examples.</u>

(1) The policies and procedures of the beneficiary's bank in a wire transfer are deemed to be reasonably designed to prevent or prohibit restricted transactions if they –

    (i)   Address methods for conducting due diligence in establishing or maintaining a commercial customer relationship designed to ensure that the commercial customer will not receive restricted transactions through the customer relationship, such as -

       (A) Screening potential commercial customers to ascertain the nature of their business; and

       (B) Including as a term of the commercial customer agreement that the customer may not receive restricted transactions.

    (ii)   Include procedures to be followed with respect to a commercial customer if the beneficiary's bank becomes aware that the commercial customer has received restricted transactions, such as procedures that address –

**EXHIBIT "E"**    0049

(A) When access to the wire transfer system should be denied; and

(B) The circumstances under which an account should be closed.

(2) An originator's bank or intermediary bank that sends or credits a wire transfer transaction directly to a foreign bank is deemed to have policies and procedures reasonably designed to identify and block, or otherwise prevent or prohibit restricted transactions, if the policies and procedures include procedures to be followed with respect to a foreign bank that is found to have received from the originator's bank or intermediary bank wire transfers that are restricted transactions, which may address –

    (i)    When wire transfer services for the foreign bank should be denied; and

    (ii)   The circumstances under which the correspondent account should be closed.

**§__.7    Regulatory Enforcement**. The requirements under this regulation are subject to the exclusive regulatory enforcement of –

(a) The Federal functional regulators, with respect to the designated payment systems and participants therein that are subject to the respective jurisdiction of such regulators under section 505(a) of the Gramm-Leach-Bliley Act (15 U.S.C. 6805(a)) and section 5g of the Commodity Exchange Act (7 U.S.C. 7b-2) ; and

(b) The Federal Trade Commission, with respect to designated payment systems and financial transaction providers not otherwise subject to the jurisdiction of any Federal functional regulators (including the Commission) as described in paragraph (a) of this section.

**EXHIBIT "E"**    0050

[THIS SIGNATURE PAGE PERTAINS TO THE NOTICE TITLED, "PROHIBITION ON FUNDING OF UNLAWFUL INTERNET GAMBLING"]

By order of the Board of Governors of the Federal Reserve System, October 1, 2007.


Jennifer J. Johnson (signed)
Jennifer J. Johnson,
Secretary of the Board.

**EXHIBIT "E"**   0051

[THIS SIGNATURE PAGE PERTAINS TO THE NOTICE TITLED, "PROHIBITION
ON FUNDING OF UNLAWFUL INTERNET GAMBLING"]


Dated:  October 1, 2007


By the Department of the Treasury.


Valerie A. Abend (signed)
Valerie A. Abend
Deputy Assistant Secretary for Critical Infrastructure Protection and Compliance Policy.

**EXHIBIT "E"**    0052