D. GILBERT ATHAY (0143)
Attorney for Defendant Baron Lombardo
43 East 400 South
Salt Lake City, Utah 84111
Telephone:(801) 364-1333

MICHAEL PANCER
Attorney for Defendant Richard Carson
105 West "F" Street, 4thFloor
San Diego, California 92101-6087
Telephone: (619) 236-1826

LONI F. DeLAND (0862)
Local Counsel for Defendant Richard Carson
43 East 400 South
Salt Lake City, Utah 84111
Telephone: (801) 364-1333

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | REPLY TO GOV'T OPPOSITION TO MOTION TO DISMISS INDICTMENT BASED ON UNANTICIPATED EXPANSION OF CRIMINAL LIABILITY TO CREDIT CARD PROCESSORS |
| Plaintiff, | : | |
| | : | |
| vs. | : | Case No. 2:07CR0286 |
| BARON LOMBARDO, RICHARD CARSON-SELMAN, et al, | : | Judge Clark Waddoups |
| Defendants. | : | |

Defendants Richard Carson-Selman and Baron Lombardo, by and through their respective counsel, hereby reply in the attached Memorandum of Law to the government's opposition to their motion to dismiss the indictment on the grounds that its application to their alleged conduct in the Indictment is an unanticipated expansion of criminal activity in violation of the due process clause of the Fifth Amendment to the Constitution of the United States.

## MEMORANDUM OF LAW IN SUPPORT OF REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT

As duly noted in defendants' motion to dismiss, it is well settled that criminal prosecutions for the violation of an unclear law violates the constitutional duty of the government under the due process clause of the Fifth Amendment to warn its citizens whether and what particular conduct is legal or illegal. *James v. United States*, 366 U.S. 213, 221 (1961). Despite the government's indictment of the defendants in the instant case, there was and continues to be an ongoing legal controversy over whether the Wire Act even applies to Internet gambling,[1] a statute written, as the government openly admits, well before there was such a thing as an Internet. Defendants assert that the criminal prosecution of the defendants, who purportedly acted as credit card processors for Internet gambling web sites created and maintained by computers located in sovereign nations where Internet gambling is legal, is an unanticipated expansion of criminal liability.

Under the Fifth Amendment, due process bars U.S. courts from applying "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Marks v. United States*, 430 U.S. 188, 191-192, 97 S.Ct. 990, 992-993 (1977); *Rabe v. Washington*, 405 U.S. 313, 92 S.Ct. 993 (1972) (per curiam). See also *Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697 (1964).[2]

---

[1] See, e.g., Exhibit A, pp. 2, 4, 6, 8-9;.Exhibit B, pp.1-3, 5-6, 9-21; Exhibit C, pp. 4-5; Exhibit D, pp.1-6, 9-11, 13-15, 16-17 attached to defendant's motion to dismiss.

[2] As the Court recognized in *Pierce v. United States*, 314 U.S. 306, 311, 62 S.Ct. 237, 239, 'judicial enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness.' Even where vague statutes are concerned, it has been pointed out that the vice in such an enactment cannot 'be cured in a given case by a construction in that very case placing valid limits on the statute,' for the objection of vagueness is two-fold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. The former objection could not be cured retrospectively by

(continued...)

The government has not directly challenged the defendants' flat assertion that **there have been no other Internet gambling cases where the credit card processors have been prosecuted** as opposed to "bookies" or the actual operators of the website where the bets and wagers were placed. The government attempts to dodge this factual and legal trueism directly applicable to this case and defendants' Fifth Amendment argument by first claiming that it is "bootstraping" and secondly that it is legally incorrect and irrelevant. Since it is nearly impossible to prove a negative, evidence that a specific law has **never** been applied in a certain manner after being on the books for over 40 years would be logically relevant to a defendant's assertion that to this new application is novel.[3] Nor do the defendants understand the bootstrapping metaphor by the government since the

---

[2](...continued)
a ruling either of the trial court or the appellate court, though it might be cured for the future by an authoritative judicial gloss." Freund, The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 541 (1951).

[3] "Novel" is defined, for example, in the Cambridge Advanced Learner's dictionary as: "1. the quality of being new and unusual; 2. something which has not been experienced before and so is interesting..." Merriam-Webster's Online Dictionary, 11th Edition, defines novel as "1 : new and not resembling something formerly known or used 2 : original or striking especially in conception or style <a novel scheme to collect money>. The American Heritage Dictionary of the English Language (4th Ed. 2000), similarly defines novel as "strikingly new, unusual, or different." Lest the government question the recent definitions of novel, Webster's Revised Unabridged, 1913 Edition defines novel as: "Of recent origin or introduction; not ancient; new; hence, out of the ordinary course; unusual; strange; surprising. &hand; In civil law, the novel or new constitutions are those which are supplemental to the code, and posterior in time to the other books. These contained new decrees of successive emperors. Novel assignment (Law), a new assignment or specification of a suit. Syn. -- New; recent; modern; fresh; strange; uncommon; rare; unusual. -- Novel, New . Everything at its first occurrence is new; that is novel which is so much out of the ordinary course as to strike us with surprise. That is a new sight which is beheld for the first time; that is a novel sight which either was never seen before or is seen but seldom. We have daily new inventions, but a novel one supposes some very peculiar means of attaining its end. Novel theories are regarded with distrust, as likely to prove more ingenious than sound."

See http://www.onelook.com/?loc=pub&w=novel for these and other Dictionary definitions.

lack of any prior prosecutions has a tendency in reason to support the defendants' assertion that the application of criminal liability under the Wire Act to mere credit card processors under any theory of liability is a new and <u>unanticipated</u> expansion of criminal liability.  Finally and logically defendants assertion that there has never been a prosecution of mere credit card processors under the Wire Act, necessarily includes prosecutions under an aiding and abetting, conspiracy and *Pinkerton* theories of liability.  Prosecutions under derivative and alternative theories of criminal liability is a subset of all prosecutions under the Wire Act**.**

**In any case, the government has not referenced a single case <u>under any theory of liability</u>, i.e., directly or indirectly under agency, conspiracy or derivative liability, where a credit card processor has been prosecuted with respect to the Wire Act!**  Therefore, the instant prosecution of the defendants as credit card processors is certainly new, does not resemble any former case in the last 40 years, and is clearly unusual.  Moreover, with respect to the government's alternative argument that *sui generis* cases are not unconstitutional (Resp. p. 3.), their own memorandum cites several cases that have applied the Wire Act to owners of web sites and bookies using the Internet in criminal prosecutions.  In *United States v. Cohen*, 260 F.3d 68 (2nd Cir. 2001), for example, the <u>owner</u> of the accounting-wagering service and a book maker in Antigua was also charged with "aiding and abetting" the gambling website also hosted in Antigua.[4]  What is unusual,

---

[4] "Cohen decided to pursue the dream of owning his own e-business. By year's end he had left his job at Group One, moved to the Caribbean island of Antigua, and had become a bookmaker. [¶] Cohen, as President, and his partners, all American citizens, dubbed their new venture the World Sports Exchange ("WSE"). WSE's sole business involved bookmaking on American sports events.... WSE operated an "account-wagering" system. It required that its new customers first open an account with WSE and wire at least $300 into that account in Antigua. A customer seeking to bet would then contact WSE either by telephone or internet to request a particular bet. WSE would issue an immediate, automatic acceptance and confirmation of that bet, and would maintain the bet from that customer's account." *Id*.

different and startingly new in defendants' case is the government's application of the Wire Act to mere credit card processors, where it has never been applied before, and highly unusual in light of the patent **failure** of numerous congressional bills to criminalize credit card processors' working relationship with international gambling web sites, which is the precise issue presented in the instant Indictment.

As noted in defendants' earlier motion to dismiss, until the passage of the UEGIA in October 2006, the primary federal law enforcement tool employed against domestic and international gambling was 18 U.S.C. §1084(a) known as the "Wire Wager Act" ("Wire Act") enacted in 1961.[5] The Wire Act statute typically has been enforced against bookmakers in connection with taking bets or wagers on sporting events or contests.[6] For example, proprietors of service which gave horse race results over telephone by means of recording which played when advertised telephone number was dialed were not "engaged in the business of betting or wagering" within subsection (a) of this section

---

[5] "Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers, or information assisting in the placement of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years or both." 18 U.S.C. § 1084.

"The purpose of the bill is to assist the various States and the District of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information in interstate and foreign commerce." H.R.Rep. No. 967, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Adm.News 2631.

[6] In *United States. v. Baborian*, 528 F.Supp. 324, 327-328 (D.C.R.I.1981, the court held that an individual who placed bets was not engaged in business of betting or wagering and could not be convicted of knowingly using wire communication facilities for transmission in interstate commerce of bets, even though individual wagered 3 or 4 times a week an average of $800 to $1,000 per day.

5

forbidding the use of wire communications facilities for the transmission of bets or wagers or information assisting in the placing of bets or wagers on sporting events or contests. *Telephone News System, Inc. v. Illinois Bell Tel. Co.*, 210 F.Supp. 471 (N.D.Ill.1962), *affirmed* 376 U.S. 782.

- Given the fact that the Wire Act was passed at a time when the Internet did not exist, the application of the Act to international Internet web sites hosted from computers located in countries where such gambling is legal, is problematical at best.

- A reasonable person could honestly believe that the Wire Wager Act did not apply to a rapidly developing technology that was significantly different from prior transmissions over wire based telephone systems, particularly when Congress was in the process of enacting a new law that specifically targeted Internet transactions and the financial support network necessary to its operation.[7]

- Why pass a law when there was already one in effect that covers the conduct at issue over the Internet unless the old law arguably does not apply?

In recent congressional action, even the UIGEA has been targeted as being too vague to be enforced and needs to clarified.[8] *See also* testimony before the House committee on the

---

[7]   The legislative history of UIGEA and its predecessor bills suggests that the Wire Act does not cover the conduct at issue– the Wire Act violations alleged in Counts 16 to 19 of the Indictment. The direct predecessor to UIGEA, the Internet Gambling Prohibition and Enforcement Act, H.R. 4411, 109th Cong. (as passed by House, July 11, 2006), contained several provisions that would have amended the Wire Act to cover the transmissions alleged in Counts 16 to 19. One such provision would have amended the definition of "bet or wager" to extend the Wire Act's coverage to non-sports gambling, *see* H.R. 4411, § 101, while another provision would have amended the Wire Act to prohibit electronic fund transfers associated with Internet gambling. *See id.* § 102.

Although the language from H.R. 4411 prohibiting non-sports gambling and electronic fund transfers was incorporated directly into UIGEA, Congress *omitted* all references to the provisions amending the Wire Act and *that statute was left unaltered. See* 31 U.S.C. §§ 5362-5363. That Congress chose to incorporate into UIGEA language from H.R. 4411 without amending the Wire Act indicates its intention that UIGEA, rather than the Wire Act, govern transmissions of the kind alleged in Counts 16 to 19.

[8]   See attached on line AP News article from on or about November 11, 2008 that states:

> WASHINGTON (AP) - The Bush administration is moving in its last weeks to finalize regulations to enforce a controversial law that seeks to block Internet

(continued...)

Judiciary, November 15, 2007; April 2, 2008 hearing: "Proposed UIGEA Regulations: Burden Without Benefit?" Chm. Barney Frank. *See also* H.R. 5767 and 6663. The congressional response

---

[8](...continued)
    gambling. The move is drawing hot protests from Democratic lawmakers and supporters of online betting.

    "This midnight rule making will tie the hands of the new administration, burden the financial services industry at a time of economic crisis and contradict the stated intent of the Financial Services Committee," the committee's chairman, Rep. Barney Frank, D-Mass., wrote this week to Treasury Secretary Henry Paulson. [¶] Frank asked Paulson to postpone the regulation, which was reviewed by the White House budget office last week, usually a final step before publication in the Federal Register.

    White House spokeswoman Dana Perino said in response Tuesday that "no regulations are being rushed. They are all going through the process and getting the full due diligence required." She said she couldn't comment specifically on the Internet gambling rule because it was not yet final.

    At issue is a law Congress passed hastily in 2006 when Senate Republicans, pushed by then-Majority Leader Bill Frist, attached it to an unrelated port security bill in a rush of year-end legislation. [¶] The law sought to curb online gambling by prohibiting financial institutions from accepting payments from credit cards, checks or electronic fund transfers to settle online wagers.

    The result has been a cascade of disputes because the law didn't offer a clear definition of Internet gambling, instead referring to existing federal and state laws which themselves provoke differing interpretations. [¶] Banks, credit unions and others have protested about being put in the position of enforcing an unclear law complicated by the difficulty of determining where payments are going and the fact that online betting businesses can disguise themselves with relative ease. Officials with the Treasury and Federal Reserve testified before Frank's committee earlier this year that they struggled to write the implementing regulation because of the law's vagueness. The regulation they proposed would require designated payment systems to establish procedures to identify and prohibit Internet gambling transactions. The regulation doesn't attempt a definition of illegal online gambling.

    ..."It is irresponsible for the Bush administration to rush through a fundamentally flawed regulation that even representatives of the Treasury Department and Federal Reserve have stated on record is unworkable," said Jeffrey Sandman, spokesman for the Safe and Secure Internet Gambling Initiative, which represents online gambling groups.

is attached as Exhibit A, pp. 1-2, 4, 8-9, 20 and Exhibit B, pp.1-3,  5-6, 9-21 to defendants' motion to dismiss.  The patent ambiguity inherent in applying the Wire Act to businesses associated with Internet gambling web sites was noted in <u>Gambling Law an Overview</u>, Cornell Univ. Law School:

> Since current gambling law (18 U.S.C. 1084) focuses on wire transmissions, its application to the Internet is far from explicit.  Legislation has been proposed to address the problem, but it hasn't yet passed.  **Until it does, an uncertain mix of Federal and state law must cope with the issues complexities**.

www.law.cornell.edu/wex/index.php/Gambling (last modified June 28, 2007)

Obviously, despite the enactment of the UIEGA in October of 2006 and the lengthy proposed regulations (12 CFR Part 233; 31 CFR Part 132, "Prohibition on Funding of Unlawful Internet Gambling," attached as Exhibit E to motion to dismiss and referred to in attached AP article [*see* footnote 6 *supra*) – there is still no body of law that is clear and definite even at this juncture, let alone clear as to the culpability of the defendants' actions under the earlier and more vague and ambiguous application of the Wire Wager Act to the defendants allegedly acting as credit card processors for Internet gambling web sites.[9]

---

[9]  As stated in Gov't Exhibit C-1 , p.2, filed with their Response:

> From 1996 through 2002, Senator Kyl made several attempts to pass the Internet Gambling Prohibition Act, which would have criminalized the operation of a betting business and the placing of bets online.  However, Kyl's law was ultimately defeated.  In 2001, Representatives James Leach (R-IA) and John LaFalce (D-NY) introduced the Unlawful Internet Gambling Funding Prohibition, which would have criminalized credit card, check, and electronic funds transfers to online casinos**. This legislation did not pass Congress in 2001 or 2002.**  The UIGEA was initially introduced by Representative Leach on November 18, 2005.The Act was passed by Congress on September 29, 2006, and enacted by President Bush on October 13, 2006.  The Act is Title VIII of the Safe Port Act, a completely unrelated bill that deals with port security**.  In fact, <u>the UIGEA was pushed through Congress so quickly that no one on the Senate-House Conference Committee ever saw the final language of the bill,</u> according to Senator Frank R. Lautenberg (D-NJ)**. [Emphasis added; footnotes omitted.]

Prior to and after the passage of the UIEGA, it is well acknowledged the laws pertaining to Internet gambling were a complex, patchwork of state and federal statutes that contained ambiguities limiting its applicability that were still unresolved at the time of the enactment of the UIEGA. **Here, the actions alleged in the Indictment of defendants Carson-Selman and Baron Lombardo long <u>predated</u> the adoption of the UIEGA** and the application of the Wire Act to defendants' activities as credit card processors was unforeseeable in light of the plain meaning and history of the statute and its interpretation at the time by the courts and knowledgeable governmental bodies.

In addition, officers of the Korean bank used by the defendants consulted prominent and world renown internet gambling attorneys on this subject. The Korean bank officials thereafter advised the defendants that their activities as credit card processors for internet gambling web sites was lawful and did not violate the Wire Act or any another federal criminal statute. LG Bank agreed to operate as credit card processors for the internet gambling web sites only after their officials, in conducting their due diligence, sought advice that it was not criminal in the United States.

LG bank was a part of the LG Corporation that makes washing machines, cell phones and television monitors on a global scale.[10] After LG bank was spun off, it kept the name, prestige and high standards of the LG holding company. Officers from the bank flew to and stayed in Las Vegas to independently confirm that the defendants representations that actions with respect to gambling web sites were lawful. While in Las Vegas they sought and obtained legal advice regarding their participation in the internet gambling web sites with the defendants. After the bankers' meeting with Las Vegas law firms the LG Bank officers informed the defendants that their proposed activities with

---

[10] LG Exports, $47 billion USD; Employees, approximately 160,000; Overseas Subsidiaries, approximately 130; Number of Companies: 39. See http://www.lg.net/index.jsp "The Official Site of LG Group." LG acquired American television manufacturing company Zenith in 1999. See http://en.wikipedia.org/wiki/LG.

the defendants was not prohibited or curtailed by any federal or state law and they could start to setting up LG Bank to process the credit card transactions referred to them by the defendants.

LG Bank proceeded to process credit card transactions after its bank officials returned from Las Vegas, thereby corroborating the defendants honest and subjective good faith belief that what they would be doing was entirely lawful and not subject to any criminal penalties -- a belief that any reasonable person would have under the circumstances.  Obviously, if the bankers had been advised by the attorneys they consulted in Las Vegas that what they proposed doing with the defendants could be construed as illegal, the bank would not have processed the credit card transactions from the defendants. In the view of the foregoing, the defendants acted with due diligence that their activities was not in violation of any federal law, state law or case law with respect to Internet gambling.

## CONCLUSION

Insofar as reasonable minds can differ and respected legal scholars continue to debate the applicability of the Wire Act to Internet gambling transactions given the statute's plain meaning and legislative history, to criminalize the defendants' alleged acts in processing credit card transactions over the Internet violates the due process clause of the Fifth amendment. Consequently, the Wire Act counts alleged in the Indictment must be dismissed and stricken from the Indictment.

                Respectfully submitted,

DATED:  December 30, 2008   /s/ D. Gilbert Athay
                D. Gilbert Athay Lawyer for Defendant

## CERTIFICATE OF SERVICE

      I hereby certify that on December 30, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Loren Washburn
Assistant United States Attorney 185 South State Street, Suite 400 Salt Lake City, Utah 84111


                /s/ Heather M. Stokes